



RECEIVED PJJ
5/20/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

FILED
6/4/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| Kimberly Jean Brown, individually,<br>    Plaintiff, and, | Honorable<br><br>_____,<br><br>presiding |
| Brown-Washington Trust,<br>    Derivative Plaintiff on behalf<br>    of Legacy Complete | Case: |
| vs. | *DEMAND FOR*<br>*JURY TRIAL* |
| ServiceNow, Inc.; | 3‹47/ex/2784;<br>Lʌf i g'Hɪ cpmkp'WOXcɪf gt t co c<br>O ci kʌt cvg'Lʌf i g'MgɪkN0J qmgd'J qvcɪkpi<br>TCPFQO 'TEcv04 |
| Cody Barbo; Gorman E. Brown;<br>Scott Gartner; Daniel Goldstein;<br>Lila Goldston; Michael Greeby;<br>Adam Kingsley; John Koht;<br>Brian Lamb; Michelle Montgomery;<br>W. Kelly Shannon;<br>Dorothy Tucker; Storm Vaske;<br>Tony Wilkins; Erika Williams;<br>    ("Individual Defendants"); and, | **Jurisdiction by**<br>**Federal Question**<br>**18 U.S.C.§1964**<br>Violations of Racketeer<br>Influenced and<br>Corrupt Organizations |
| CBS News and Stations;<br>Grand Prix Printing, LLC; | ***COMPLAINT*** |

Huge Legal Technology Company Inc;

James D. Montgomery & Associates, Ltd;

JP Morgan Chase Co;

Kingsley Law Group, PC;

Kohmedia LLC;

Law Bulletin Media, Inc;

Lila E. Goldston Consulting LLC;

Omega Psi Phi Fraternity, Inc.

Merit Law Group, Inc;

ServiceNow, Inc.

Standing Oaks Venture Partners; and,

TechStars Chicago LLC

    ("Corporate Defendants")

Legacy Complete

    ("Derivative Defendant")

## COMPLAINT

Plaintiff Kimberly Jean Brown, acting individually, and, Derivative Plaintiff, Brown Washington Trust[1] ("BW Trust") acting on behalf of Legacy Complete ("Legacy"), and demand a trial by jury on all issues so triable and, for their complaint against Individual Defendants; Cody Barbo, Gorman Edward Brown, Scott Gartner, Daniel Goldstein, Lila Goldston, Michael Greeby, Brian Lamb, Adam

_____

[1] Through its assignee, Kimberly Jean Brown,

Kingsley, John Koht, Brian Lamb, Michelle Montgomery, W. Kelly Shannon, Dorothy Tucker, Storm Vaske, Tony Wilkins, Erika Williams, and Corporate Defendants; CBS News and Stations; Grand Prix Printing, LLC; Huge Legal Technology Company Inc; James D. Montgomery & Associates, LTD; JP Morgan Chase Co; Kingsley Law Group PC,; Kohmedia LLC; Law Bulletin Media, Inc; Lila E. Goldston Consulting LLC; Omega Psi Phi Fraternity Inc; Merit Law Group, Inc; ServiceNow, Inc.; Standing Oak Ventures Partners; and TechStars Chicago LLC, allege the following:

# Table of Contents

**BASIS FOR JURISDICTION AND VENUE**......................................................**11**

**BACKGROUND**.........................................................................................**24**

Overview.................................................................................................. 24

Ms. Brown's background in estate planning...................................................25

*Exhibit Group 1*

Ms. Brown was referred to Dr. Hamilton.......................................................28

*Exhibit Group 2*

The Birth of Legacy...................................................................................32

*Exhibit Group 3*

Investing in Legacy....................................................................................34

*Exhibit Group 4*

Legacy's Formation....................................................................................37

*Exhibit Group 5*

Hiring Kohmedia........................................................................................41

*Exhibit Group 6*

Elder Care Concern....................................................................................46

*Exhibit Group 7*

Equity-to-Debt Conversion..........................................................................51

*Exhibit Group 8*...........................................................................................*51*

Hiring Bellwether to Complete Software.......................................................54

*Exhibit Group 9*

Redesigned App and Joint Venture................................................................57

*Exhibit Group 10*

Joint Venture default..................................................................................64

*Exhibit Group 11*

Bellwether Judgment / Merit Contracts.........................................................66

*Exhibit Group 12*

Contractor Case / Merit Contracts................................................................69

*Exhibit Group 13*

Business Development for Legacy..................................................................74

*Exhibit Group 14*

Recommendations for Legacy.......................................................................79

*Exhibit Group 15*

DISCOVERING TRUSTANDWILL.COM...........................................................................81

*Exhibit Group 16*

THE FOUNDING OF DEFENDANT HUGE LEGAL.............................................................82

*Exhibit Group 17*

TRUSTANDWILL.COM IS OPERATING LEGACY'S SOFTWARE............................................87

*Exhibit Group 18*

FRAUDULENT ACQUISITION OF LEGACY'S SOFTWARE....................................................94

*Exhibit Group 19*

FALSE INFORMATION BEING CIRCULATED....................................................................99

*Exhibit Group 20*

A TARGET OF VIOLENCE.........................................................................................108

*Exhibit Group 21*

HOLIDAY INN INCIDENT.........................................................................................113

*Exhibit Group 22*

LAW BULLETIN'S HEADLINE ADVERTISEMENT...........................................................120

*Exhibit Group 23*

SERVICENOW EMPLOYMENT...................................................................................124

*Exhibit Group 24*


**COUNTS............................................................................................................129**

**KOHMEDIA CONTRACTS........................................................................................**129

COUNT 1: BW TRUST CLAIMS DEFENDANT KOHMEDIA BREACHED THE KOHMEDIA CONTRACTS.........................................................................................................129

COUNT 2: PLAINTIFFS CLAIM DEFENDANTS BROWN, GOLDSTON, KOHMEDIA, KOHT, MONTGOMERY, SHANNON, TUCKER-WILKINS, WILKINS AND WILLIAMS VIOLATED THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/1-7) AND/OR THE ILLINOIS CONSUMER FRAUD ACT (815 ILCS 505/1-12) AND FRAUDULENTLY CONCEALED THEIR ACTIONS WITH RESPECT TO THE APP........................................................................133

COUNT 3: PLAINTIFFS CLAIM THAT DEFENDANTS BROWN, GOLDSTON, KOHT, MONTGOMERY, SHANNON, TUCKER-WILKINS, WILKINS AND WILLIAMS TORTUOUSLY INTERFERED WITH THE KOHMEDIA CONTRACTS........................................................137

COUNT 4: BW TRUST CLAIMS DEFENDANTS BROWN, GOLDSTON, KOHMEDIA, KOHT, MONTGOMERY, SHANNON, TUCKER-WILKINS, WILKINS AND WILLIAMS MISAPPROPRIATED, AND/OR CONSPIRED TO MISAPPROPRIATE LEGACY'S TRADE SECRETS VIOLATING 18 U.S.C. §1836 AND/OR THE ILLINOIS TRADE SECRETS ACT 765 ILCS 1065/1 ET SEQ WITH RESPECT TO THE APP.............................................................................................139

COUNTS 5 AND 6: PLAINTIFFS CLAIM THAT DEFENDANTS BROWN, GOLDSTON, KOHMEDIA, KOHT, MONTGOMERY, SHANNON, TUCKER-WILKINS, WILKINS AND WILLIAMS COMMITTED, OR CONSPIRED TO COMMIT, MAIL FRAUD 18 U.S.C. §1341 (COUNT 5) AND/OR WIRE FRAUD 18 U.S.C. §1343 (COUNT 6) WITH RESPECT TO THE KOHMEDIA CONTRACTS...........................................................................................................141

**LEGACY OPERATIONS**........................................................................................144

COUNT 7: PLAINTIFFS CLAIM DEFENDANTS GOLDSTON AND MONTGOMERY BREACHED THEIR FIDUCIARY DUTY TO LEGACY..........................................................................144

COUNT 8: PLAINTIFFS CLAIM THAT DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, AND KOHMEDIA FRAUDULENTLY CONCEALED, AND/OR CONSPIRED TO FRAUDULENTLY CONCEAL, MATERIAL FACTS RELATED TO LEGACY'S OPERATIONS......................................................................................148

COUNT 9: PLAINTIFFS CLAIM THAT DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, AND KOHMEDIA TORTUOUSLY INTERFERED, AND/OR CONSPIRED TO TORTUOUSLY INTERFERE WITH LEGACY'S OPERATING AGREEMENT.....................................................................................................152

COUNTS 10, 11 AND 12: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, AND KOHMEDIA VIOLATED, OR CONSPIRED TO VIOLATE, THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/2) AND/OR THE ILLINOIS CONSUMER FRAUD ACT (815 ILCS 505/1-12) (COUNT 10), AND/OR COMMITTED, OR CONSPIRED TO COMMIT, MAIL FRAUD 18 U.S.C. §1341 (COUNT 11), AND/OR WIRE FRAUD 18 U.S.C. §1343 (COUNT 12), WITH RESPECT TO LEGACY'S OPERATIONS.....................................................................................................155

**BELLWETHER & JOINT VENTURE CONTRACTS**......................................................158

COUNT 13: BW TRUST CLAIMS DEFENDANT BELLWETHER BREACHED THE BELLWETHER CONTRACTS..............................................................................................................158

COUNT 14: BW TRUST CLAIMS DEFENDANTS BELLWETHER, VASKE AND GREEBY BREACHED THE JOINT VENTURE AGREEMENT............................................................161

COUNT 15: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, AND HUGE LEGAL FRAUDULENTLY CONCEALED, OR CONSPIRED TO FRAUDULENTLY CONCEAL, MATERIAL FACTS RELATED TO THE BELLWETHER CONTRACTS, THE JOINT VENTURE AGREEMENT, THE PATCHED APP AND/OR THE REDESIGNED APP.....................................................................................................165

COUNT 16: PLAINTIFFS CLAIM THAT DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS AND HUGE LEGAL TORTUOUSLY INTERFERED, AND/OR CONSPIRED TO TORTUOUSLY INTERFERE, WITH THE BELLWETHER CONTRACTS AND/OR THE JOINT VENTURE AGREEMENT...........................................................................................168

COUNT 17: PLAINTIFFS CLAIM DEFENDANTS BELLWETHER, VASKE AND GREEBY BREACHED THEIR FIDUCIARY DUTY TO LEGACY AND THE JOINT VENTURE.....................171

COUNT 18: BW TRUST CLAIMS DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, AND HUGE LEGAL MISAPPROPRIATED, AND/OR CONSPIRED TO MISAPPROPRIATE, LEGACY'S AND/OR THE JOINT VENTURE'S TRADE SECRETS VIOLATING DEFEND TRADE SECRETS ACT, 18 U.S.C. §1836 AND/OR THE ILLINOIS TRADE SECRETS ACT 765 ILCS 1065/1 ET SEQ. WITH RESPECT TO THE REDESIGNED APP AND THE PATCHED APP............................................................................................................174

COUNT 19: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, AND HUGE LEGAL VIOLATED THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/1-7) AND/OR THE ILLINOIS CONSUMER FRAUD ACT (815 ILCS 505/1-12) WITH RESPECT TO THE PATCHED APP AND/OR THE REDESIGNED APP..176

COUNTS 20 AND 21: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, AND HUGE LEGAL COMMITTED, OR CONSPIRED TO COMMIT, FRAUD AND MAIL FRAUD 18 U.S.C. §1341 (COUNT 20), AND WIRE FRAUD 18 U.S.C. §1343 (COUNT 21) WITH RESPECT TO THE BELLWETHER CONTRACTS, THE JOINT VENTURE AGREEMENT, LEGACY'S SOFTWARE AND/OR ITS TRADE SECRETS.................179

COUNT 22: PLAINTIFFS CLAIM GRAND PRIX IS RESPONSIBLE FOR DEFENDANT BELLWETHER'S DEBTS AND OBLIGATIONS.................................................................183

MERIT CONTRACTS................................................................................................186

COUNT 23: MS. BROWN CLAIMS DEFENDANT MERIT LAW BREACHED THE MERIT CONTRACTS.........................................................................................................186

COUNT 24: MS. BROWN CLAIMS DEFENDANTS KINGSLEY, GARTNER, MERIT LAW AND KINGSLEY LAW BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED LEGAL MALPRACTICE WITH RESPECT TO THE CONTRACTOR CASE AND/OR THE BELLWETHER JUDGMENT COLLECTION.........................................................................................................189

COUNT 25: MS. BROWN CLAIMS THAT DEFENDANTS BARBO, BROWN, GARTNER, GOLDSTEIN, GOLDSTON, GREEBY, KINGSLEY, KINGSLEY LAW, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS AND WILLIAMS TORTUOUSLY INTERFERED, OR CONSPIRED TO INTERFERE, WITH THE MERIT CONTRACTS.....................................196

COUNTS 26 AND 27: Ms. BROWN CLAIMS DEFENDANTS BARBO, BROWN, GARTNER, GOLDSTEIN, GOLDSTON, GREEBY, KINGSLEY, KINGSLEY LAW, LAMB, MERIT LAW, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, AND HUGE LEGAL VIOLATED, AND/OR CONSPIRED TO VIOLATE, THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/1-7) AND/OR THE ILLINOIS CONSUMER FRAUD ACT (815 ILCS 505/1-12) (COUNT 26) AND FRAUDULENTLY CONCEALED MATERIAL FACTS (COUNT 27) WITH RESPECT TO THE MERIT CONTRACTS...................................199

COUNTS 28 AND 29: Ms. BROWN CLAIMS DEFENDANTS BARBO, BROWN, GARTNER, GOLDSTEIN, GOLDSTON, GREEBY, KINGSLEY, KINGSLEY LAW, LAMB, MERIT LAW, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, AND WILLIAMS COMMITTED, AND/OR CONSPIRED TO COMMIT, FRAUD AND MAIL FRAUD (COUNT 28) AND WIRE FRAUD 18 U.S.C. §1343 (COUNT 29) WITH RESPECT TO THE MERIT CONTRACTS 202

**SHANNON CONTRACT**............................................................................................206

COUNT 30: PLAINTIFFS CLAIMS DEFENDANT SHANNON BREACHED HIS DUTY TO LEGACY AND BREACHED HIS INDEPENDENT CONTRACTOR AGREEMENT WITH BW TRUST...........206

COUNTS 31 AND 32: PLAINTIFFS CLAIM DEFENDANT OMEGA IS NEGLIGENT FOR NOT MAINTAINING PROPER CONTROLS (COUNT 31) AND DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, KOHMEDIA, AND OMEGA INVADED, OR CONSPIRED TO INVADE, PLAINTIFFS' PRIVACY (COUNT 32)..........208

COUNTS 33 AND 34: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, KOHMEDIA, AND OMEGA VIOLATED OR CONSPIRED TO VIOLATE THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510/1-7) AND/OR THE ILLINOIS CONSUMER FRAUD ACT (815 ILCS 505/1-12) (COUNT 33), COMMITTED WIRE FRAUD (18 U.S.C. §1343) AND FRAUDULENTLY CONCEALED MATERIAL FACTS (COUNT 34) WITH RESPECT TO THE SHANNON CONTRACTOR AGREEMENT WITH LEGACY.......................................................................................214

**THEFT OF LEGACY'S SOFTWARE**........................................................................219

COUNT 35: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL AND KOHMEDIA, COMMITTED, OR CONSPIRED TO COMMIT, THE THEFT AND UNLAWFUL TRANSPORT OF THE REDESIGNED APP, AND/OR THE APP, VIOLATING18 U.S.C. §2314.........................................................................219

COUNT 36: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL AND KOHMEDIA RECEIVED, OR CONSPIRED TO RECEIVE, LEGACY'S SOFTWARE WHICH IS STOLEN PROPERTY (18 U.S.C. §2315).........222

COUNT 37: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL AND KOHMEDIA ENGAGED IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM UNLAWFUL ACTIVITY (18 U.S.C. §1957) AND/OR LAUNDERED MONETARY INSTRUMENTS (18 U.S.C. §1956)............................224

COUNT 38: PLAINTIFFS CLAIM THAT DEFENDANTS BARBO, BELLWETHER, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHMEDIA, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, AND KOHMEDIA TORTUOUSLY INTERFERED, AND/OR CONSPIRED TO TORTUOUSLY INTERFERE, WITH THE BUSINESS EXPECTANCY OF LEGACY'S SOFTWARE.........................................226

COUNT 39: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, KOHT, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, HUGE LEGAL, KOHMEDIA AND OMEGA VIOLATED, AND/OR CONSPIRED TO VIOLATE, THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. §1030) WITH RESPECT TO ONE OR BOTH VERSIONS OF LEGACY'S SOFTWARE...........................230

**DISINFORMATION CLAIMS**.....................................................................233

COUNTS 40 AND 41: PLAINTIFFS CLAIM DEFENDANTS GOLDSTON, MONTGOMERY, SHANNON, TUCKER-WILKINS, WILKINS AND WILLIAMS, CBS, CHASE, GOLDSTON FIRM, MONTGOMERY FIRM, OMEGA, TECHSTARS AND STANDING OAKS ARE NEGLIGENT FOR NOT MAINTAINING PROPER CONTROLS, INVADING MS. BROWN'S PRIVACY, AND/OR AND FRAUDULENTLY CONCEALING MATERIAL FACTS (COUNT 40) AND/OR MISAPPROPRIATING MS. BROWN'S TRADE SECRETS (18 U.S.C. §1836 AND/OR 765 ILCS §1065/1 ET SEQ.) (COUNT 41).................................................................................233

COUNT 42: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, CBS, CHASE, HUGE LEGAL, STANDING OAKS AND TECHSTARS COMMITTED, OR CONSPIRED TO COMMIT, FRAUD AND WIRE FRAUD (18 U.S.C. §1343), WITH RESPECT TO THE DALEY CENTER, AND THE CHASE MEETING.............................241

**VIOLENCE TOWARDS MS. BROWN**.........................................................244

COUNTS 43 AND 44: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS AND WILLIAMS TRAVELED, OR CONSPIRED TO TRAVEL, IN AID OF RACKETEERING ENTERPRISES (18 U.S.C. §1952) (COUNT 43), AND/OR TAMPERED WITH, OR CONSPIRED TO TAMPER WITH, A WITNESS OR VICTIM (18 U.S.C. §1512) (COUNT 44)..................244

**HOLIDAY INN INCIDENT CLAIMS**..........................................................................246

COUNTS 45 AND 46: MS. BROWN CLAIMS DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS AND HUGE LEGAL COMMITTED, OR CONSPIRED TO COMMIT, TRESPASS, FALSE IMPRISONMENT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INVASION OF PRIVACY, THEFT AND/OR FRAUDULENT CONCEALMENT (COUNT 45), AND/OR INTERFERED WITH COMMERCE BY THREATS OR VIOLENCE, 18 U.S.C. §1951 (COUNT 46), WITH RESPECT TO THE HOLIDAY INN INCIDENT..........................................................246

COUNTS 47 AND 48: MS. BROWN CLAIMS THAT DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS AND HUGE LEGAL COMMITTED, OR CONSPIRED TO COMMIT, FRAUD AND MAIL FRAUD 18 U.S.C. §1341 (COUNT 47) AND/OR WIRE FRAUD 18 U.S.C. §1343 (COUNT 48) WITH RESPECT TO THE HOLIDAY INN INCIDENT...........................253

**HEADLINE AD CLAIMS**.............................................................................................258

COUNTS 49 AND 50: MS. BROWN CLAIMS THAT DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, HUGE LEGAL, AND LAW BULLETIN TORTUOUSLY INTERFERED, OR CONSPIRED TO TORTUOUSLY INTERFERE, WITH MS. BROWN'S BUSINESS EXPECTANCY (COUNT 49) AND/OR COMMITTED, OR CONSPIRED TO COMMIT WIRE FRAUD 18 U.S.C. §1343 (COUNT 50) WITH RESPECT TO LAW BULLETIN'S HEADLINE AD.......258

**SERVICENOW CLAIMS**.............................................................................................262

COUNTS 51, 52 AND 53: MS. BROWN CLAIMS THAT SERVICENOW COMMITTED FRAUD AND MAIL FRAUD, 18 U.S.C. §1341 (COUNT 51) AND WIRE FRAUD, 18 U.S.C. §1343 (COUNT 52) AND OBSTRUCTION OF JUSTICE, 18 U.S.C. §1513(E) (COUNT 53) RELATED TO MS. BROWN'S EEOC CHARGES AGAINST SERVICENOW........................................262

COUNT 54: MS. BROWN CLAIMS SERVICENOW VIOLATED THE R.I.C.O ACT 18 U.S.C. §1964 BY VIOLATING 18 U.S.C. §1962(C)...............................................................264

**ONGOING MAIL FRAUD**..........................................................................................267

COUNTS 55 AND 56: MS. BROWN CLAIMS THAT DEFENDANTS BARBO, BROWN, GOLDSTEIN, GOLDSTON, GREEBY, LAMB, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, AND HUGE LEGAL COMMITTED FRAUD AND MAIL FRAUD, 18 U.S.C. §1341 (COUNT 55) AND WIRE FRAUD, 18 U.S.C. §1343 (COUNT 56) WITH RESPECT TO MS. BROWN'S RECEIPT OF US MAIL.......................................................267

**ENTERPRISE 1 R.I.C.O. CLAIMS**..........................................................................270

COUNT 57: PLAINTIFFS CLAIM DEFENDANTS BARBO, BROWN, GARTNER, GOLDSTEIN, GOLDSTON, GREEBY, KINGSLEY, KINGSLEY LAW, KOHMEDIA, KOHT, LAMB, MERIT LAW, MONTGOMERY, SHANNON, TUCKER-WILKINS, VASKE, WILKINS, WILLIAMS, BELLWETHER, CBS, CHASE, HUGE LEGAL, KOHMEDIA, LAW BULLETIN, OMEGA, TECHSTARS, AND STANDING OAKS VIOLATED THE R.I.C.O ACT 18 U.S.C. §1964, BY VIOLATING 18 U.S.C. §1962(A-D)..........................................................................................................270

**OTHER CLAIMS**....................................................................................................277

COUNT 58: PLAINTIFFS CLAIMS DEFENDANTS INTENTIONALLY INFLICTED EMOTIONAL DISTRESS.............................................................................................................277

COUNT 59: PLAINTIFFS CLAIM CORPORATE DEFENDANTS ARE VICARIOUSLY LIABLE FOR THE ACTS OF THEIR AGENTS AND EMPLOYEES..........................................................278

**DAMAGES**...........................................................................................................**279**

**BASIS FOR JURISDICTION AND VENUE**

1)  This matter includes allegations of violations of the Racketeer Influenced and Corrupt Organizations Act and the Court has jurisdiction of this matter under 18 U.S.C. §1964.  As set forth herein, Plaintiffs claim that through a series of racketeering activities spanning nearly 10 years, certain Defendants violated 18 U.S.C. §1962(a-d), including but not limited to:

   A. Fraudulently acquiring, and operating as their own, estate planning software that Legacy developed and owned. 18 U.S.C. §1962(b);

   B. Fraudulently deriving income from the theft of Legacy's Software, then reinvesting the income into a business that was established to operate Legacy's Software. 18 U.S.C. §1962(a);

   C. Engaging in racketeering activities (18 U.S.C. §1962(c)) to:

      i.  Conceal material facts from Plaintiffs;

      ii. Prevent Plaintiffs from becoming aware of the fraudulent conveyance of Legacy's Software;

      iii. Damage Ms. Brown's reputation;

iv. Deprive Ms. Brown of her ability to earn a living to minimize the likelihood that she could prosecute the fraudulent conveyance of Legacy's Software, if she discovered it; and,

v. Harm Ms. Brown.

D. Conspiring with other entities to commit racketeering activities against Plaintiffs to achieve the goals set forth herein. 18 U.S.C. §1962(d)

2) Venue in this judicial district is proper under 28 U.S.C. §1391 as a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

3) On information and belief, each Individual Defendant is subject to this Court's general and specific personal jurisdiction. Each Individual Defendant, except Cody Barbo, Gorman Edward Brown, Daniel Goldstein, Lila Goldston, Brian Lamb, Storm Vaske and Erika Williams, are citizens of the State of Illinois. Each Individual Defendant and Corporate Defendant (collectively, "Defendants") has sufficient minimum contacts within the State of Illinois, and this District, pursuant to due process and/or the Illinois Long Arm Statute:

    A. Because each Defendant purposefully availed itself of the privileges of conducting business in the State of Illinois and in this District;

    B. Because each Defendant conducts and/or solicits business within the State of Illinois and within this District; and/or,

    C. Because the Plaintiffs' causes of action initially arose from Defendants' activities in the State of Illinois and this District.

4) Derivative Defendant, Legacy Complete ("Legacy"), was originally a limited liability company established under Nevada law. However, the limited liability company designation was administratively dissolved in 2017 for failure to pay the annual fee to the Nevada Department of Business Services. Legacy has not conducted business since 2017. Legacy's mailing address is 1026 E. 46th St, 2E, Chicago, IL. 60653. This suit is brought on behalf of the owners of Legacy. Legacy is owned by:

    A. 75% by BW Trust; and,

    B. 25% by the Charles V. Hamilton Living Trust (together, Dr. Charles V. Hamilton and his Living Trust are referred to as "Dr. Hamilton").

5) Derivative Plaintiff Brown Washington Trust ("BW Trust") has filed suit on behalf of the owners of Legacy. BW Trust is organized

under Illinois law and Ms. Brown is the trustee of BW Trust. BW Trust has assigned the right to pursue this suit on behalf of BW Trust to Ms. Brown acting in her individual capacity. Legacy is financially unable to participate in this lawsuit. Since Ms. Brown is the trustee of the BW Trust which owns 75% of Legacy, a demand on Legacy to file this lawsuit is unnecessary. BW Trust's mailing address is 1026 E 46th St, Unit 2E, Chicago, IL 60653.

6)  Plaintiff Kimberly Jean Brown ("Ms. Brown") is currently a citizen of Illinois. Ms. Brown resides at 1026 E 46th St, Unit 2E, Chicago, IL 60653. Ms. Brown, BW Trust and Legacy are together referred to as "Plaintiffs".

7)  Defendant Cody Barbo ("Defendant Barbo") is an individual and is believed to be a citizen of Texas. Plaintiffs believe Defendant Barbo conducts business in Illinois.   Plaintiffs believe Defendant Barbo's work address is either 8605 Santa Monica Blvd, #40156, West Hollywood, CA 90069-1094 or 961 West Laurel Street, San Diego, CA 92101. Plaintiffs believe Defendant Barbo's home address recently became 6534 Oriole Dr., Dallas, TX 75209-5307.

8)  Defendant Gorman Edward Brown ("Defendant Brown") is an individual and a citizen of Maryland. Defendant Brown grew up in

Chicago and returns to Chicago often. Defendant Brown resides at 9407 Kynaston Ct, Bowie, Maryland 20721.

9) Defendant Scott Gartner ("Defendant Gartner") is an individual and a citizen of Illinois. Defendant Gartner is the CEO of Merit Law Group, Inc and the mayor of the village of Antioch, Illinois. Antioch's Village Hall is located at 874 Main St, Antioch, IL 60002. Merit Law Group, Inc is located at 345 Park Ave, Suite 7, Antioch, IL 60002.

10) Defendant Daniel Goldstein ("Defendant Goldstein") is an individual and is believed to be a citizen of California or Texas. Plaintiffs believe Defendant Goldstein attended graduate school in Illinois, worked in Illinois and conducts business in Illinois. Plaintiffs believe Defendant Goldstein's work address is either 8605 Santa Monica Blvd, #40156, West Hollywood, CA 90069-1094 or 961 West Laurel Street, San Diego, CA 92101. Plaintiffs believe Defendant Goldstein's home address is 3321 Stanford Ave, Dallas, TX 73225.

11) Defendant Lila Goldston ("Defendant Goldston") is an individual and a citizen of the State of Illinois or New York. Defendant Goldston owns and operates Defendant Goldston Firm which is registered with the Illinois Secretary of State at 5201 S. Cornell, Unit 25D, Chicago, IL, 60615. Plaintiffs believe that Defendant Goldston's home address is 88 E. Roosevelt Ave, Roosevelt, NY 11575.

12) Defendant Michael Greeby ("Defendant Greeby") is an individual and a citizen of Illinois. Defendant Greeby's work address is c/o Wilson Sporting Goods, 1 Prudential Plaza, 130 E. Randolph St., Chicago, IL 60601.  Plaintiffs believe that Defendant Greeby's home address is either 1643 N. Humboldt Blvd , Apt 1, Chicago, IL 60647; 111 W. Polk St, Apt 813, Chicago, IL 60605; or 200 N. Dearborn, Unit 1505, Chicago, IL 60601.

13) Defendant Adam Kingsley ("Defendant Kingsley") is an individual and a citizen of Illinois.  Defendant Kingsley owns and operates Defendant Kingsley Law which is registered at 2227 W. Leland Ave, Chicago, IL. 60625. Plaintiffs believe Defendant Kingsley's home address is 2212 W. Eastwood Ave, Chicago, IL 60625.

14) Defendant John Koht ("Defendant Koht") is an individual and a citizen of Illinois.  Defendant Koht owns and operates Kohmedia LLC which is registered at 520 Rio Vista Rd, Glenview, IL 60025. Plaintiffs believe that that is Defendant Koht's home address as well.

15) Defendant Brian Lamb ("Defendant Lamb") is an individual and is believed to be a citizen of California.  Plaintiffs believe Defendant Lamb conducts business in Illinois.  Defendant Lamb's work address is 8605 Santa Monica Blvd, #40156, West Hollywood, CA 90069-1094

or 961 West Laurel Street, San Diego, CA 92101. Plaintiffs believe Defendant Lamb's home address is either 1029 S. Cloverdale Ave, Los Angeles, CA 90019; 2814 Florentine Ct, Thousand Oaks, CA 91362; or 7316 Woodhome Dr, Dallas, TX 75249.

16) Defendant Michelle Montgomery ("Defendant Montgomery") is an individual and a citizen of Illinois. Defendant Montgomery is a partner at Defendant Montgomery Firm which is registered at 33 W. Monroe, Suite 1375, Chicago, IL 60603. Plaintiffs believe Defendant Montgomery's home address is either 6901 S. Oglesby Ave, #3B, Chicago, IL 60649; or, 2315 S. Kolin Ave, Chicago, IL 60623.

17) Defendant William Kelly Shannon ("Defendant Shannon") is an individual and is believed to be a citizen of Illinois. Defendant Shannon is believed to reside at 2817 S. Michigan Ave, Chicago, IL 60616.

18) Defendant Dorothy Tucker ("Defendant Tucker-Wilkins") is an individual and a citizen of Illinois. Defendant Tucker-Wilkins works for Defendant CBS which has an address of 22 West Washington St, Chicago, IL 60602. Plaintiffs believe Defendant Tucker-Wilkins' home address is 5008 S. Blackstone, Chicago, IL 60615.

19) Defendant Storm Vaske ("Defendant Vaske") is an individual and a citizen of Iowa. Defendant Vaske was formerly a citizen of Illinois

and continues to have business dealings in Illinois. Defendant Vaske works for an alias of Grand Prix Printing, LLC which has a registered address of 4111 NE Bellagio Cir, Ankeny, IA 50021. Plaintiffs believe Defendant Vaske' home address is 2823 NW 34th Ln, Ankeny, IA 50023.

20) Defendant Tony Wilkins, also known as Anthony Wilkins ("Defendant Wilkins"), is an individual and a citizen of Illinois. Defendant Wilkins is a partner at Standing Oaks Venture Partners and a co-founder of TechStars Chicago. The address for both entities is 222 Merchandise Mart Plaza, Suite 1212, Chicago, IL 60654. Plaintiffs believe Defendant Wilkins' home address is 5008 S. Blackstone, Chicago, IL 60615.

21) Defendant Erika Williams ("Defendant Williams") is an individual and a citizen of the state of California. Defendant Williams was formerly a citizen of Illinois, worked in Illinois, and continues to conduct business in Illinois. Plaintiffs believe that Defendant Williams resides at 704 Pier View Way, Oceanside, CA 92054.

22) Defendant CBS News and Stations ("Defendant CBS") is a division of CBS Entertainment Group unit of Paramount Global, a Delaware corporation with its principal place of business at 1515 Broadway, New York, NY 10036 and 22 West Washington St, Chicago,

IL 60602. Plaintiffs believe that the CEO of Defendant CBS is Wendy McMahon.

23) Defendant Grand Prix Printing, LLC, along with its aliases, is an Iowa limited liability company that merged with, and is the successor in interest to, Bellwether Creation Company LLC, an Illinois limited liability company which was voluntarily dissolved on or about June 30, 2017. Collectively, Bellwether Creation Company LLC, Grand Prix Printing LLC, and its aliases, are referred to as "Defendant Bellwether". Defendant Bellwether provides service to customers in Illinois. Defendant Bellwether's registered officer and office is Kent Vaske, 4111 NE Bellagio Circle, Ankeny, Iowa 50021 and its principal place of business is listed as 1785 Guthrie Ave, Des Monies, Iowa 50316.

24) Defendant Huge Legal Technology Company, Inc. ("Defendant Huge Legal") is a Delaware corporation. Defendant Huge Legal's CEO is Cody Barbo, and its principal place of business is 8605 Santa Monica Blvd, #40156, West Hollywood, CA 90069-1094. Plaintiffs believe Defendant Huge Legal is headquartered at 961 West Laurel, San Diego, CA 92101. Defendant Huge Legal operates TrustAndWill.com which serves customers in Illinois.

25) Defendant James D. Montgomery & Associates, Ltd. ("Defendant Montgomery Firm") is a law firm incorporated under the laws of the State of Illinois and has its principal place of business at 33 W. Monroe, Suite 1375, Chicago, IL 60603. Plaintiffs believe Defendants Montgomery and Montgomery Firm are represented by Chris S. Wunder and Eric D. Kaplan, Kaplan, Papadakis & Gournis, P.C. 180 N. LaSalle Street, Suite 2108, Chicago, Illinois 60601.

26) Defendant J.P. Morgan Chase & Co ("Defendant Chase") is a financial institution incorporated under the laws of the State of New York. Its principal place of business is 270 Park Avenue, New York, NY 10017-2070.  Defendant Chase has hundreds of locations of its financial institutions in Illinois. Plaintiffs believe Defendant Chase is represented by Patricia Brown Holmes and Lucas Rael of Riley, Safer, Holmes & Cancila, LLP, 70 W. Madison Street, Suite 2900, Chicago, Illinois 60602.

27) Defendant Kingsley Law Group, PC ("Defendant Kingsley Law") is incorporated under the laws of Illinois. Defendant Kingsley is the CEO of Defendant Kingsley Law which has its principal place of business at 2227 W. Leland Ave, Chicago, IL. 60625.  Plaintiffs believe Defendants Kingsley and Kingsley Law are represented by Joseph R.

Marconi and Samuel D. Branum, Johnson & Bell, Ltd., 33 W. Monroe St, Suite 2700, Chicago, IL 60603.

28) Defendant Kohmedia LLC ("Defendant Kohmedia") is a limited liability company organized under the laws of the State of Illinois. Defendant Kohmedia LLC is managed by Defendant Koht and has its principal place of business as 520 Rio Vista Rd, Glenview, IL 60025.

29) Defendant Law Bulletin Media, Inc ("Defendant Law Bulletin") is incorporated under the laws of Illinois. Plaintiffs believe the CEO of Defendant Law Bulletin is Sandy Macfarland. Defendant Law Bulletin's address is 415 N. State Street, Chicago, IL 60654. Plaintiffs believe Defendant Law Bulletin is represented by Daniel S. Rubin, 200 S. Michigan Ave, Suite 1100, Chicago, IL 60604.

30) Defendant Lila E. Goldston Consulting ("Defendant Goldston Firm") is an Illinois limited liability company. Defendant Goldston Firm is managed by Defendant Goldston and has its principal place of business at 5201 S. Cornell, Unit 25D, Chicago, IL 60615. Plaintiffs believe Defendants Goldston and Goldston Firm are represented by Lee Pulliam, Lee Pulliam and Associates, P.O. Box 166, Oak Park, Il. 60303.

31) Defendant Merit Law Group, Inc. ("Defendant Merit Law") is incorporated under the laws of Illinois. Defendant Scott Gartner is the

CEO of Defendant Merit Law which has its principal place of business at 345 Park, Suite 7, Antioch, IL 60002-1567.  Plaintiffs believe Defendants Scott Gartner and Merit Law are represented by Joseph R. Marconi and Samuel D. Branum, Johnson & Bell, Ltd., 33 W. Monroe St, Suite 2700, Chicago, IL  60603.

32) Defendant Omega Psi Phi Fraternity, Inc, ("Defendant Omega") is incorporated under the laws of the District of Columbia.  Defendant Omega has its principal place of business at 3951 Snapfinger Pkwy, Decatur, GA 30035. Defendant Omega's executive director is John Howard and its Grand Basileus is Ricky L. Lewis. Defendant Omega has chapters of its fraternity in Illinois.

33) Defendant ServiceNow, Inc ("Defendant ServiceNow") is incorporated under the laws of Delaware and has its principal place of business at 2225 Lawson Lane, Santa Clara, CA 95054.  ServiceNow has an office in Chicago, Illinois.  ServiceNow is represented by Ashley L. Orler,  Constangy, Brooks, Smith and Prophete LLP, 20 N. Wacker Dr, Suite 4120, Chicago, IL 60606.

34) Defendant Standing Oaks Venture Partners ("Defendant Standing Oaks") is a partnership organized under the laws of Illinois and has its principal place of business at 222 Merchandise Mart

Plaza, Suite 1212, Chicago, IL 60654. Plaintiffs believe Defendant Standing Oak's managing partner is Defendant Wilkins.

35) Defendant TechStars Chicago LLC ("Defendant TechStars") is a limited liability company organized under the laws of Illinois and has its principal place of business at 222 Merchandise Mart Plaza, Suite 1212, Chicago, IL 60654. Plaintiffs believe that Defendant TechStar's managing member is Tricia Martinez. Defendant Wilkins co-founded, and is currently a mentor for and advisor to, Defendant TechStars.

## BACKGROUND

### Overview

36)   Legacy is a company that was formed in 2015 to develop and operate an estate planning software-as-a-service application ("Legacy's Software").  Legacy's former manager, and BW Trust's trustee, Ms. Brown, designed the software and managed the software development teams.

37) Legacy completed the development of two versions of Legacy's Software.  However, at the end of both software development processes, the software developers refused to allow Legacy to release the completed software.[2]

38)  Plaintiffs believe that certain Defendants utilized racketeering activities and a disinformation campaign, to fraudulently-acquire Legacy's Software, re-brand it, and are currently operating Legacy's Software as their own under the brand TrustandWill.com.

39) Defendant Huge Legal, the owner of TrustAndWill.com, was founded less than a year after Legacy's software developer refused to release Legacy's Software.

---

[2]  Legacy's Software was complete, tested and ready to launch.

Brown et al v. ServiceNow et al  -  p25

40) Since its founding in October 2017, Defendant Huge Legal has utilized Legacy's Software to raise more than forty-eight million dollars in funding and has attracted nearly 500,000 members.

41) As a result of Legacy's Software being fraudulently-conveyed from Legacy, Legacy's owners lost their entire investments. Moreover, Ms. Brown, who invested four years developing Legacy's Software was left destitute and her reputation destroyed.

## Ms. Brown's background in estate planning[3]

42) Plaintiff Kimberly Jean Brown ("Ms. Brown") has been a Illinois transactional attorney for more than twenty years. However, due to the events described in this complaint, Ms. Brown remains licensed to practice law in Illinois, but no longer practices.

43) Prior to embarking on an estate planning practice, Ms. Brown witnessed the devastation a family can experience without an effective estate plan.  One of her real estate clients passed away suddenly without an estate plan. After his death, his family was engulfed in years of chaos.

44) In or about 2008, Ms. Brown made the decision to devote her practice to proactive estate planning. In or about 2009, Ms. Brown

---

[3] Exhibit Group 1

committed to offering living trust based estate plans exclusively. In addition, she decided to focus on serving the community most in need of proactive estate planning: middle-income and lower-income individuals.

45) Living trust based estate planning was a novel concept for her targeted clientele as trusts were regarded as tools used exclusively by the wealthy. At the time, will-based estate planning was the norm.

46) Ms. Brown was committed to changing the paradigm to favor living trust-based estate planning for three primary reasons:

    A. living trust-based estate planning eliminates one of the primary reasons many individuals avoid proactive estate planning: hesitancy to discuss assets[4], or lack thereof;

    B. assets properly aligned with an individual's living trust avoid the expensive, time-consuming and public probate process; and

    C. the overall cost for effective living trust-based planning is less than the overall cost for will-based planning.

---

[4]Often, clients are concerned that their loved ones will behave inappropriately if their loved ones know what assets they will receive after the client's death.

Brown et al v. ServiceNow et al - p27

47) Ms. Brown created a living trust design process that minimized
the need for discussing client's specific assets.[5] Ms. Brown would
help her clients:

    A. Assign appropriate healthcare and financial helpers;

    B. Create living trust "buckets";

    C. Determine what percentage of the bucket to give to each of
       the client's loved ones along with instructions governing the
       disbursement; then,

    D. Understand how to put their assets into, and remove their
       assets out of, their living trust bucket on their own.

48) By teaching clients how to manage the assets in their living
trust on their own, clients were able to keep their assets private while
ensuring their living trust governed their assets.

49) Early on, Ms. Brown had few clients due to the living trust
knowledge gap and the front-end price differential[6]. Ms. Brown
remained undeterred. Ms. Brown and her two children lived off Ms.

_____

[5]Ms. Brown provided potential clients with a worksheet to complete on their
own to determine whether they had a taxable estate. Ms. Brown employed a
separate planning process for individuals with taxable estates and those
without. Over the years, less than five of her clients had taxable estates.

[6] The initial price of living trust planning is higher than the initial price for
wills.

Brown's savings while Ms. Brown focused on bringing her vision to fruition.

50) Ms. Brown spent her initial estate planning years educating the community on the benefits of living trust planning.  Ms. Brown also created a not-for-profit association of professionals (Legacy Revolution) to deliver complimentary presentations on topics related to creating generational wealth while on a budget.

51) Ms. Brown conducted approximately 50 complimentary educational presentations each year for the initial years of her estate planning practice.  Ms. Brown's practice grew based primarily on referrals from past clients, financial advisors and attendees of her presentations.

**Ms. Brown was referred to Dr. Hamilton[7]**

52) Ms. Brown estimates that she was retained by about a dozen clients from Defendant Chase employees' referrals.  To Ms. Brown's knowledge, the clients who were referred to her from Chase employees had only positive feedback about their experience with Ms. Brown. In fact, Chase employees often complimented Ms. Brown on

─────────────────

[7]Exhibit Group 2

the quality of her work and her strong commitment to customer service.

53) A former Defendant Chase employee referred Ms. Brown to Defendant Williams, a financial advisor at Defendant Chase. Defendant Williams introduced Ms. Brown to her client Dr. Charles Hamilton, a prominent author, political scientist, and civil rights leader. Dr. Hamilton was in his eighties when the events described in this complaint took place.

54) In 2014, Ms. Brown created a living trust estate plan for Dr. Hamilton[8] and Dr. Hamilton paid Ms. Brown her normal rate for the estate plan.

55) In her first estate planning meeting with Dr. Hamilton, Ms. Brown explained the mechanics of living trust planning and they discussed Ms. Brown's planning process. Dr. Hamilton was unfamiliar with the concept of living trust planning but immediately became an advocate. Dr. Hamilton, who has both a Phd. and J.D., requested that Ms. Brown provide additional reading materials on living trust planning.

56) Several weeks after Ms. Brown provided the requested information to Dr. Hamilton, Dr. Hamilton contacted Ms. Brown to

_____

[8] Ms. Brown was not retained to create an estate plan for Mrs. Hamilton who was residing in a nursing home at the time.

schedule his living trust planning session. By Ms. Brown and Dr. Hamilton's next meeting, Dr. Hamilton was well-versed on living trust planning and had diagrammed his desired outcome. Ms. Brown and Dr. Hamilton discussed his diagram and confirmed Dr. Hamilton understood the consequences of each decision.

57) Following the meeting, Dr. Hamilton and Ms. Brown discussed ways to educate Dr. Hamilton's friends about living trust planning. Dr. Hamilton thought, as does Ms. Brown, that living trusts are the missing piece to families creating generational wealth.

58) Dr. Hamilton and Ms. Brown became friends. At the time, Ms. Brown worked approximately two blocks from Dr. Hamilton's condo. Dr. Hamilton would often stop by Ms. Brown's office when he was taking a walk or Dr. Hamilton would invite Ms. Brown for a meal. Dr. Hamilton would often have a friend or neighbor join them and Dr. Hamilton would ask Ms. Brown to give an overview of how living trust planning operates. Dr. Hamilton became such an advocate of living trust planning that it was common for him to give his estate planning binder, which contained his living trust, to his friends or neighbors to take home and review.

59) During one lunch in or about the fourth quarter of 2014, Dr. Hamilton stated that something was weighing heavy on him. He

shared that a few days earlier, he met with a group of people Dr.

Hamilton referred to as the think tank ("Think Tank"). Dr. Hamilton

shared that the Think Tank boasted that their members have top

leadership roles at virtually every African-American civil rights

organization, local and national politics, the judiciary, law

enforcement and enterprise businesses. Dr. Hamilton further shared

that the Think Tank members boasted that they have successfully

harnessed Black power and have significant control over the "voice of

Black America" and they wield that power as they see fit.[9]

60) At that time, Dr. Hamilton was actively writing a book on South

African democracy. However, following his meeting with the Think

Tank, Dr. Hamilton started outlining a book to critique the civil rights

movement which he tentatively titled Lessons Learned from the Civil

Rights Movement. Dr. Hamilton planned to include his critique of the

---

[9] Dr. Hamilton, who wrote the book *Black Power*, shared with Ms. Brown that his meeting with the Think Tank reminded him of his biggest regret during the civil rights era. Dr. Hamilton shared that, although there were significant civil rights victories, he did not feel that the entire Black community had been empowered. Instead power was concentrated in a chosen few, and more often than not, those who amassed power, passed that power down to their children rather than disseminating the power to the masses.

Dr. Hamilton shared that he was concerned that the division between powerful and powerless Black folks was growing exponentially. Dr. Hamilton shared that having a group of powerful Black people, such as what the Think Tank claimed itself to be, is not Black power as he envisioned it. Dr. Hamilton shared that having one powerful group of Black folks deciding what's right or wrong merely changes who the oppressor is. Absolute power corrupts absolutely regardless of the oppressor's skin color.

post civil rights era along with essays from other individuals from their vantage points. Dr. Hamilton asked Ms. Brown to write a chapter of the book.  Ms. Brown declined but offered to introduce Dr. Hamilton to a few people she thought would be excited to write a chapter.

61) In 2014 and 2015, Dr. Hamilton hosted several meals at his home to discuss his proposed book and request essay submissions. Ms. Brown invited several people, and several expressed interest in writing an essay for the book.

**The Birth of Legacy[10]**

62) Prior to meeting Dr. Hamilton, Ms. Brown participated in the Goldman Sachs 10,000 Small Businesses program.  Ms. Brown's goal in the program was to design a process to scale the creation of effective living trust plans.[11]

---

[10] Exhibit Group 3

[11] Although the concept of living trusts was catching on with her target clientele, Ms. Brown noticed that some attorneys who were unfamiliar with living trust planning were drafting living trusts in a manner which would force their clients into probate. However, avoiding probate is one of the primary benefits of effective living trust planning. There was a significant need for properly-drafted, affordable living trust planning.

63) Ms. Brown drafted a detailed business plan to develop a software program that would make effective, high-quality living trust resources more accessible for a low one-time payment or affordable monthly subscription.

64) Using her own resources and loans from friends and family, Ms. Brown embarked on building a minimum viable product of the predecessor to Legacy's software ("mvp software") using an overseas software development company.

65) In or about December 2014, the overseas software company sought additional funds to complete the project. Ms. Brown consulted with another company within the University of Chicago's entrepreneurship incubator[12] to assess the quality of the overseas company's work and determine a path to complete the mvp software. Ms Brown determined that she needed to raise an additional $25,000 in capital to finish the mvp software.

66) Ms. Brown attempted to raise the capital through crowdfunding. Ms. Brown created a crowdfunding site then emailed a fundraising request to her email distribution list of more than 5,000 individuals.

---

[12]Ms. Brown was a member of the incubator.

Brown et al v. ServiceNow et al  -  p34

**Investing in Legacy[13]**

67) Dr. Hamilton, who was on Ms. Brown's email distribution list, learned of Ms. Brown's fundraising efforts through the crowdfunding email. In or about March 2015, Dr. Hamilton repeatedly offered to donate the entire $25,000 to Ms. Brown as a gift. However, Ms. Brown refused to accept the large gift because Dr. Hamilton was a former client and because of his age.

68) Following Ms. Brown's repeated refusals, Dr. Hamilton asked Ms. Brown to discuss the mvp software's financial needs with his business manager.  Ms. Brown remained apprehensive but agreed to make a formal presentation regarding the mvp software to Dr. Hamilton's business manager, Defendant Goldston.

69) Following Ms. Brown's presentation to Defendant Goldston, Defendant Goldston made several recommendations regarding the mvp software.  Each recommendation was based on starting the development process anew with a software developer in the United States. At the conclusion of the presentation, Defendant Goldston requested that Ms. Brown calculate the capital needed to implement Defendant Goldston's recommendations.

---

[13]Exhibit Group 4

70) Factoring in Defendant Goldston's recommendations, Ms. Brown determined that $125,000 in capital was required to start the development process again from the beginning. As requested, Ms. Brown made a second formal presentation to Defendant Goldston, which Dr. Hamilton attended. To Ms. Brown's surprise, following the presentation, Defendant Goldston stated:

    A. Dr. Hamilton wanted to invest the entire $125,000 in capital in exchange for equity in the business (25%);

    B. that a new business entity would need to be formed for the venture;

    C. that the operating agreement would need to include a provision stating that:

        i.   Ms. Brown could not sell additional capital without Dr. Hamilton's approval; and,

        ii.   Dr. Hamilton would have the right of first refusal to provide debt financing and purchase additional equity.

71) Ms. Brown remained hesitant about allowing Dr. Hamilton to invest. It is important to Ms. Brown to ensure that there is no impropriety or an appearance of impropriety. In addition, although Dr. Hamilton was in good cognitive health at the time, Ms. Brown was concerned that his cognitive health might deteriorate.

72) Ms. Brown discussed these issues, along with her conflicts of interest, with Defendant Goldston.  Ms. Brown's conflicts included:

    A. Ms. Brown was Dr. Hamilton's former attorney;

    B. Ms. Brown's family trust (BW Trust) was the current owner of the business; and,

    C. Ms. Brown was the trustee of the BW Trust as well as the manager of Legacy.

73) Ms. Brown provided Defendant Goldston with a memorandum of understanding outlining Ms. Brown's concerns and conflicts.  Ms. Brown asked Defendant Goldston to discuss the conflicts with Dr. Hamilton and his advisors.

74) Defendant Goldston attempted to alleviate Ms. Brown's concerns about Dr. Hamilton investing in Legacy by sharing with Ms. Brown that:

    A. Dr. Hamilton's desire to invest in Legacy was part of his larger campaign to invest in women-owned businesses to honor his late daughter, who was an entrepreneur;

    B. Dr. Hamilton had already funded two women-owned businesses, one being Defendant Goldston's business. Legacy would be the third woman-owned business Dr. Hamilton funded; and,

C. Dr. Hamilton intended to invest up to $500,000 in women-owned businesses. He also intended to amend his estate planning to create and fund a foundation to support women-owned businesses.

**Legacy's Formation[14]**

75) A few days after the meeting, Defendant Goldston contacted Ms. Brown and confirmed that Defendant Goldston and Dr. Hamilton discussed the various points in the memorandum of understanding and consulted with Dr. Hamilton's other advisors. Defendant Goldston confirmed that Dr. Hamilton would be signing the memorandum and wanted to move forward with an investment in Legacy.

76) Ms. Brown responded that she was willing to accept Dr. Hamilton's offer to partner only if Dr. Hamilton agreed to several conditions. Ms. Brown's conditions included:

A. Dr. Hamilton would be prohibited from hiring Ms. Brown as his attorney in the future;

---

[14]Exhibit Group 5

B. Ms. Brown would work directly with Dr. Hamilton's business manager (Defendant Goldston) regarding business matters, rather than working with Dr. Hamilton;

C. Ms. Brown would not accept the $125,000 in capital as a lump sum, which is how Dr. Hamilton wanted to contribute funds. Instead, Dr. Hamilton would invest the capital as needed and only after Defendant Goldston reviewed and approved the Legacy's previous expenditures; and,

D. Both Defendant Goldston and Dr. Hamilton would attend monthly progress meetings with Ms. Brown until the software launched so that Ms. Brown could provide them with an update on the company's progress.

77) Dr. Hamilton and Defendant Goldston agreed to Ms. Brown's conditions. Ms. Brown began the process of creating a new company for the venture.

78) Shortly after Ms. Brown agreed to partner with Dr. Hamilton, Dr. Hamilton's wife passed away. Ms. Brown contacted Defendant Goldston and offered to void the deal with Dr. Hamilton if Dr. Hamilton wished to cancel it because of his wife's death. Defendant Goldston responded that Dr. Hamilton remained just as interested in pursuing the business venture as he was before.

79) The paperwork creating Legacy Complete LLC ("Legacy") was filed on or about May 14, 2015. Ms. Brown organized Legacy as a Nevada limited liability company because of Nevada's favorable LLC laws. Dr. Hamilton's trust received a 25% ownership interest in Legacy, with the remaining 75% held by BW Trust. This 75%-25% ownership structure remains unchanged.[15]

80) Prior to the formation of Legacy, Defendant Goldston and Ms. Brown approved the operating budget, which provided that Ms. Brown, who was not an owner of Legacy, would initially receive a $100,000 annual salary, plus bonuses, in return for her work as manager of Legacy.

81) Shortly after forming Legacy, Ms. Brown realized that she failed to account for the repayment of loans made to Legacy's predecessor company in her capital calculation for Legacy.[16] Ms. Brown pointed this error out to Defendant Goldston.

82) Defendant Goldston and Ms. Brown agreed that Ms. Brown's compensation would be deferred so that those funds could be used to

---

[15] Legacy lost its limited liability company status for failing to pay its annual fee to the Nevada Department of Business Services in 2017 and has not conducted business since then.

[16] Ms. Brown's calculations were based on utilizing the existing entity to rebuild the software rather than launching a new entity and retiring the predecessor company's debt.

repay the $35,000 in loans on the predecessor company.[17] They also agreed that Ms. Brown's deferred compensation would be paid to Ms. Brown once an accountant was retained and Legacy's software launched.

83) However, since Legacy's software never launched and an accountant was not retained, Ms. Brown was never paid her deferred compensation.[18]

84) Ms. Brown was committed to providing full financial transparency for Defendant Goldston and Dr. Hamilton. On a monthly basis, Ms. Brown diligently prepared fully reconciled financial account statements for each of Legacy's bank accounts using QuickBooks. Ms. Brown delivered the reconciled statements, along with a copy of the month's disbursements, to Defendant Goldston during their monthly meetings.

85) In addition, Ms. Brown insisted that Dr. Hamilton be added as a signatory on Legacy's bank accounts so that Dr. Hamilton and

---

[17] Legacy repaid the loans to the predecessor company. Ms. Brown included each loan repayment in Legacy's QuickBooks monthly statements and included copies of the loan repayment checks in the monthly disbursements provided to Defendant Goldston.

[18] Ms. Brown worked full-time for Legacy/Joint Venture for more than a year, typically working 60-80 hours per week. However, Ms. Brown received approximately 10% of the salary she was due. Moreover, Ms. Brown maintained a ledger of expenses Ms. Brown paid from her personal accounts, on Legacy's behalf, for which Ms. Brown was not reimbursed.

Defendant Goldston could independently audit the bank accounts if they desired.

86) As previously agreed, prior to delivering Dr. Hamilton's partial capital contribution checks to Ms. Brown, Defendant Goldston reviewed and verbally approved each of the previous month's expenditures and reconciled financial accounts.

## Hiring Kohmedia[19]

87) One of the first actions Ms. Brown took after Legacy was formed was to hire a local software developer to build Legacy's software.

88) On or about June 19, 2015, Ms. Brown executed a written contract with Defendant Kohmedia, a Chicago-based software development firm, to build and service the first full version of Legacy's Software (the "App").[20]

89) Defendant Kohmedia is owned and operated by John Koht ("Defendant Koht"). Legacy and Defendant Kohmedia executed the

---

[19] Exhibit Group 6

[20] The version of Legacy's Software that Defendant Kohmedia built is referred to as the "App". The version of Legacy's Software that Defendant Bellwether built is referred to as the "Redesigned App". Together, the versions are referred to as "Legacy's Software."

Kohmedia Contract and the Kohmedia Reciprocal Confidentiality and
Nondisclosure Agreement (together, the "Kohmedia Contracts").

90)     The Kohmedia Contracts include provisions that required
Defendant Kohmedia and its agents to protect Legacy's trade secrets
and other intellectual property.

91)     The total amount of the Kohmedia Contracts was $40,000.
The Kohmedia Contracts set forth milestones upon which payments
were due to Defendant Kohmedia.  Legacy made all payments to
Defendant Kohmedia by or before the milestone dates.  In total,
Legacy paid Defendant Kohmedia approximately $30,000.

92)     Defendant Kohmedia delivered on time and as promised
from June 2015 until late October 2015. However, beginning
approximately the last week of October 2015, Ms. Brown experienced
several items of concern.

93)      On or about October 26, 2015, Defendant Kohmedia
notified Legacy that Defendant Kohmedia was ready to begin final
testing of the App.  Defendant Kohmedia gave Ms. Brown a series of
tasks to complete so that Defendant Kohmedia could move the App's
software code to Defendant Kohmedia's testing domain. Ms. Brown
completed the steps and Defendant Kohmedia transferred the App's
software code to Defendant Kohmedia's testing domain.

94)     On or about November 7, 2015, while testing the App, Ms. Brown received an App-generated notification which directed Ms. Brown to a second domain, BuildDeployDestroy.com.  Ms. Brown clicked the link and found that a clone of the App was running on that domain. Ms. Brown attempted to log into the cloned App, but she was unable to do so.

95) Ms. Brown contacted Defendant Kohmedia who assured Ms. Brown that Defendant Kohmedia installed the App on a second domain which it typically does during testing. Defendant Kohmedia represented to Ms. Brown that the BuildDeployDestroy.com domain was just one of the domains it owned and used for internal testing only.

96) Ms. Brown believed Defendant Kohmedia's representations. The clone of the App remained active on the second domain until at least November 23, 2015.

97) On or about November 16, 2015, Defendant Kohmedia requested an extension to resolve some of the App's glitches found during testing. Ms. Brown granted Defendant Kohmedia's extension request.

98) On or about December 1, 2015, Defendant Kohmedia installed the App on Legacy's domain, LegacyComplete.com, and Ms. Brown began final user acceptance testing for the App.

99) However, after Defendant Kohmedia installed the App on LegacyComplete.com, Ms. Brown encountered technical issues with the App immediately. In fact, there were more glitches than there were in previous versions. In addition, Defendant Kohmedia, once quick to repair technical issues, became unresponsive.

100) On or about December 10, 2015, without forewarning or provocation, Defendant Kohmedia informed Ms. Brown that Defendant Kohmedia was not going to fix the software issues. Instead, Defendant Kohmedia was going to default on the Kohmedia Contracts. In addition, Defendant Kohmedia stated that it would not return the $30,000 Legacy had already paid to Defendant Kohmedia.

101) Defendant Kohmedia represented to Ms. Brown that Defendant Kohmedia was abandoning the project due to staffing challenges. Ms. Brown had no reason to doubt Kohmedia's representation and there was no way to verify it.

102) Ms. Brown immediately notified Defendant Kohmedia that Defendant Kohmedia was in default of the Kohmedia Contracts and

demanded Defendant Kohmedia cure the default or refund Legacy's funds. Defendant Kohmedia refused.

103)     Defendant Kohmedia assured Legacy that another developer would be able to easily repair the remaining issues in the App's software code.

104)      Due to financial constraints, Legacy could not both sue Defendant Kohmedia and hire another developer to complete the App. Since Defendant Kohmedia maintained that the glitches in the App's software could easily be corrected by another software developer, Ms. Brown chose to utilize the remaining capital to hire a new developer to fix the App's software issues.

105)     Defendant Kohmedia agreed to release the App's software to a developer that Legacy selected so that Legacy could attempt to mitigate its damages.  The new developer that Legacy selected was Defendant Bellwether.

**Elder Care Concern[21]**

106)     Shortly after Legacy contracted with Defendant Kohmedia, and just a few weeks after Dr. Hamilton's wife passed

---

[21] Exhibit Group 7

away, Ms. Brown noticed that the relationship between Defendant

Goldston and Dr. Hamilton changed in several ways that concerned

Ms. Brown including, but not limited, to the following:

    A. It appeared as if Defendant Goldston began to ignore Dr.

       Hamilton's wishes in favor of her own;[22]

    B. It appeared as if Defendant Goldston was increasingly

       making Dr. Hamilton physically dependent on her;[23]

---

[22] Four examples:

a) Dr. Hamilton adamantly maintained that he did not want to sign a contract with his book publisher until after he completed the books he was writing. He did not want to be pressured to complete the books and wanted to work at a leisurely pace. However, Defendant Goldston insisted that Dr. Hamilton sign a contract with his publisher immediately. Defendant Goldston scheduled a trip for her and Dr. Hamilton to fly to New York to meet with the publisher. On his return, Dr. Hamilton stated he changed his mind and decided to sign with his publisher and receive the advance.

b) Dr. Hamilton was adamant that he did not want to write a follow-up to his bestselling book, *Black Power*. However, Defendant Goldston selected a co-author to co-write the follow-up book and convinced Dr. Hamilton to co-author it.

c) Defendant Goldston did not want Dr. Hamilton to write his proposed book, Lessons Learned, and took steps to prevent him from writing it. In addition, Defendant Goldston told Dr. Hamilton that the Lessons Learned book would damage his legacy.

d) Following Mrs. Hamilton's death, Defendant Goldston was in charge of planning a memorial service for Mrs. Hamilton. Ms. Brown volunteered to help. However, Defendant Goldston did not seem to want Mrs. Hamilton to have a memorial service. Ms. Brown is not aware of a memorial service held for Mrs. Hamilton other than a small memorial held by the Hamilton's condo association.

[23] For example, Dr. Hamilton had been prescribed physical therapy for his leg and he asked Defendant Goldston to schedule his therapy appointments. However, Ms. Goldston kept delaying the scheduling of his physical therapy.

    C.  It appeared as if Defendant Goldston was gas-lighting Dr. Hamilton and causing him to question the accuracy of his memory; [24]

    D.  It appeared as if Defendant Goldston was increasingly asserting more control over Dr. Hamilton's finances and civil rights artifacts;[25]

    E.  It appeared as if Defendant Goldston was increasingly dictating with whom Dr. Hamilton interacted, including dissuading Dr. Hamilton from seeing some of his family members and friends.[26]  In addition, Defendant Goldston

---

Without therapy, Dr. Hamilton began to have difficulty walking the neighborhood to handle his errands, which he enjoyed doing.  Instead, Defendant Goldston chauffeured him.

[24] For example, when both Ms. Brown and Defendant Goldston were with Dr. Hamilton at his condo, Dr. Hamilton stepped away to take care of something and Ms. Brown went to the bathroom.  While Ms. Brown was in the bathroom, Dr. Hamilton returned to his living room and asked Defendant Goldston: *where's Kimberly [Ms. Brown]*. Defendant Goldston responded to Dr. Hamilton: *you mean where's Beverly* [a friend of Defendant Goldston]. Dr. Hamilton responded: *no, Kimberly*.  Again, Defendant Goldston corrected him and referenced her friend.  Dr. Hamilton stated that he was asking about Ms. Brown who just there, or he thought she was just there.  Hearing the conversation, Ms. Brown exited the bathroom and interjected that Dr. Hamilton was asking about her, not Beverly.

[25] For example, Dr. Hamilton wanted all of his civil rights artifacts to be placed in the John Hope Franklin Center and he did not want any placed in DuSable Museum.  However, Defendant Goldston wanted to place his artifacts in DuSable.  Ms. Brown believes Defendant Goldston transferred several of Dr. Hamilton's artifacts to DuSable Museum.

[26] For example, when Dr. Hamilton's niece visited Dr. Hamilton, Defendant Goldston commented that Dr. Hamilton's niece's motives were not altruistic

began surrounding Dr, Hamilton with individuals she

selected;[27]

    F.   Ms. Brown grew even more concerned when Dr. Hamilton

amended his living trust to add Defendant Goldston as his

disability trustee and beneficiary;[28] [29]

107)     Ms. Brown briefly mentioned her concerns to Dr.

Hamilton.  Dr. Hamilton responded that he had everything under

control.

108)     In or about August 2015, Ms. Brown prepared financial

projections to present at the upcoming owner's meeting.  Her

projections suggested that Legacy's reserves should be increased in

preparation of November's launch of the App.  Ms. Brown discussed

---

and discouraged Dr. Hamilton from allowing his niece to visit again.

[27] For example, during the period that Dr. Hamilton was writing a book on democracy in South Africa, Defendant Goldston asked Dr. Hamilton to pay for a group of people, whom Defendant Goldston would select, to travel with Dr. Hamilton to South Africa with first-class travel and accommodations paid for by Dr. Hamilton.

[28] Pursuant to their agreement, Ms. Brown was not Dr. Hamilton's attorney when he amended his living trust to add Defendant Goldston as a trustee and beneficiary.  In addition, Ms. Brown did not receive a referral fee from the attorney who amended Dr. Hamilton's living trust and she did not receive a fee for notarizing the documents.

[29] After Mrs. Hamilton died, Ms. Goldston repeatedly asked Dr. Hamilton to leave everything to her.  Ms. Goldston promised she would distribute everything according to Dr. Hamilton's wishes. Initially, Ms. Brown thought Defendant Goldston was joking, but later realized she was serious.

with Defendant Goldston Ms. Brown's desire to sell additional equity or to seek debt financing to increase Legacy's capital reserves.[30]  The discussion was preemptive, Legacy's capital had not been exhausted and was sufficient to cover expenses until 2016.

109)     Without offering any explanation, Defendant Goldston asserted that she was willing to allow Legacy to fail rather than to allow additional equity to be sold or to permit debt financing.  In addition, Defendant Goldston requested that Ms. Brown cease formal monthly meetings because she wanted Dr. Hamilton to focus on writing his books.

110)     Pursuant to Ms. Goldston's request, on or about August 26, 2015, Ms. Brown hosted her last formal meeting with Defendant Goldston and Dr. Hamilton.  During that meeting, Ms. Brown discussed her concerns that Defendant Goldston's actions might not be aligned with Dr. Hamilton's, or Legacy's, best interests.

111)     Ms. Brown insisted that Dr. Hamilton have his attorney work alongside Defendant Goldston to protect his interests.   Ms.

---

[30] Legacy's operating agreement provided that Dr. Hamilton had to approve the sale of additional equity and he had the right of first refusal to purchase additional equity or provide debt-financing.  Thus, Ms. Brown was required to present, and did present, the opportunity to buy additional equity, or provide financing, to Dr. Hamilton. However, Defendants Goldston and Montgomery refused to provide or allow Legacy to seek debt financing or sell additional capital.

Brown also discussed that Defendant Goldston's flat refusal to discuss selling additional equity or securing a loan from a financial institution might eventually endanger the viability of Legacy.

112) Defendant Goldston was furious with Ms. Brown for discussing these matters with her and Dr. Hamilton. Defendant Goldston threatened Ms. Brown and stated Ms. Brown would regret having the discussion.

113) Following the meeting, Ms. Brown remained concerned about Defendant Goldston's threat. Ms. Brown contacted Dr. Hamilton and Defendant Goldston and asked if Dr. Hamilton would be willing to convert his equity interest into debt or sell his interest, if Ms. Brown could find a buyer.

114) In response to Ms. Brown's request, Dr. Hamilton offered to convert his ownership share into a gift for Ms. Brown, which Ms. Brown could pay forward once Legacy was successful. Ms. Brown responded that she refused to accept a large monetary gift from Dr. Hamilton before the company was founded and she would not accept Dr. Hamilton's equity as a gift either.

115) Dr. Hamilton agreed to allow Ms. Brown to either convert his equity into debt or find a buyer to purchase his interest, whichever Ms. Brown preferred. Dr. Hamilton also agreed to hire an attorney to

assess Defendant Goldston's actions, review his estate plan and handle the equity-to-debt conversion.

## Equity-to-Debt Conversion [31]

116)     Heeding Ms. Brown's recommendation, in or about September 2015, Dr. Hamilton (or Defendant Goldston on Dr. Hamilton's behalf) hired Attorney Michelle Montgomery ("Defendant Montgomery"), a partner at James D. Montgomery & Associates, Ltd. ("Defendant Montgomery Firm").

117)     According to Defendant Montgomery's retainer letter with Dr. Hamilton, Defendant Montgomery was retained to take actions including, but not limited to:

    A.  Assessing Defendant Goldston's actions,

    B.  Reviewing Dr. Hamilton's estate planning, and

    C.  Converting Dr. Hamilton's equity in Legacy to debt.

118)     From the beginning of her representation of Dr. Hamilton, Defendant Montgomery was antagonistic and accusatory towards Ms. Brown. Shortly after being hired, Defendant Montgomery said that her job, according to Defendant Goldston, was to "clean up Ms. Brown's mess."

---

[31] Exhibit Group 8

119)     Ms. Brown provided a first draft of proposed equity-to-debt conversion documents to Defendant Montgomery in October 2015. Defendant Montgomery asked Ms. Brown to be a guarantor on the proposed note. Ms. Brown agreed.

120)     During the first few weeks of October 2015, it appeared that the equity-to-debt conversion process would be completed by November 2015 which was when Defendant Kohmedia was scheduled to release the App. However, by the end of the month, the equity-to-debt conversion process reached an impasse.

121)     Defendant Montgomery insisted that Ms. Brown agree to onerous terms in the conversion documents.  Ms. Brown suggested revisions and emailed the amended proposed equity-to-debt conversion documents to Defendant Montgomery on or about November 13, 2015.  In addition, eager to complete the equity-to-debt conversion as soon as possible, Ms. Brown mailed signed originals of the proposed equity-to-debt conversion documents to Defendant Montgomery.

122)     Ms. Brown did not receive a response from Defendant Montgomery regarding the conversion documents until on or about December 9, 2015, at which point Defendant Montgomery simply rejected the documents.

123)    On or about December 10, 2015, Ms. Brown contacted Defendant Montgomery and requested that Defendant Montgomery specify her objections to the equity-to-debt conversion documents that Ms. Brown proposed and suggest revisions.

124)    On or about that same date or the next, Defendant Kohmedia notified Legacy that it would be defaulting on the Kohmedia Contract because of staffing issues.

125)    Defendant Kohmedia's default put Legacy into a difficult position. Without being able to raise additional capital to hire another developer, Legacy might not be able to complete the App.  Defendant Kohmedia's default made completing the equity-to-debt conversion critical.

126)    Ms. Brown informed Defendant Montgomery of Defendant Kohmedia's default and asked Defendant Montgomery to suggest modifications to the equity-to-debt conversion documents as soon as possible to conclude the conversion.  Ms. Brown informed Defendant Montgomery that Defendant Kohmedia's default made it imperative to raise capital to hire another developer. However, Defendant Montgomery did not provide a substantive response to Ms. Brown until on or about March 4, 2016, nearly four months later.

127)     Although Ms. Brown sent signed equity-to-loan conversion documents to Defendant Montgomery for Dr. Hamilton's signature on more than one occasion, the equity-to-debt conversion was never completed.  Moreover, Defendants Montgomery and Goldston continued to prohibit Legacy from approaching an institution for debt financing and prohibited Legacy from selling additional equity to raise capital.

128)     Defendants Montgomery's and Goldston's actions prevented Legacy from raising capital knowing that by doing so, Legacy would likely fail.

## Hiring Bellwether to Complete Software [32]

129)     Following Defendant Kohmedia's default in December 2015, Legacy's funds were nearly exhausted and Defendants Goldston and Montgomery were preventing Legacy to raise capital or take on debt.

130)     Ms. Brown made the decision to continue to defer her salary to make one final attempt to launch Legacy's Software.  Ms. Brown immediately began vetting software developers to patch the App's code so that the App could be released.

---

[32] Exhibit Group 9

131)     Ms. Brown was referred to software developer Defendant Bellwether.[33] On or about December 14, 2015, Legacy and Defendant Bellwether signed a confidentiality and non-disclosure agreement. Defendant Kohmedia then released the App's software code to Defendant Bellwether.

132)     On or about January 13, 2016, Legacy and Defendant Bellwether executed a written contract ("Bellwether Contract") for Bellwether to patch the App and provide post-launch support.  The Bellwether Contracts[34] required Defendant Bellwether, its owners and employees to protect Legacy's trade secrets and keep them confidential.

133)     Defendant Bellwether initially estimated that it could patch the App and have it ready to launch in late February or early March 2016.

134)     In January 2016, not having heard back from Defendant Montgomery, Ms. Brown emailed Dr. Hamilton and Defendant Montgomery to share that Legacy hired another developer.  Ms.

_____

[33] Bellwether Creation Company LLC ("Bellwether Creation") later merged with Grand Prix Printing ("Grand Prix") and are together referenced as "Defendant Bellwether".

[34] Together, the Bellwether Contract and the confidentiality and non-disclosure agreement are referenced as "Bellwether Contracts".

Brown provided updates to Defendant Montgomery on the progress of Defendant Bellwether's effort to patch the App.

135)     In February 2016, Defendant Bellwether notified Ms. Brown that the patched App was ready for testing. However, during testing, it was determined that the App still contained numerous bugs and produced inconsistent results.  Defendant Bellwether attributed the results to flaws in Defendant Kohmedia's code.

136)     Thus, Legacy's attempt to mitigate damages caused by Defendant Kohmedia's breach of the Kohmedia Contracts by patching the App was not successful.

137)     Defendants Vaske and Greeby, two of the owners of Defendant Bellwether, determined that the price tag to fix the bugs in the App would be enormous.  Defendants Vaske and Greeby asked Ms. Brown about the possibility of discarding the existing code base and performing a full rebuild of the App.

138)     Defendants Vaske and Greeby were aware of the internal conflict Legacy was experiencing related to raising capital.  They asked Ms. Brown if she was willing to pitch the App to their business partner (hereinafter "Investor") who they said had a history of funding innovative ideas.

139)     Ms. Brown pitched Defendants Vaske's and Greeby's Investor in March 2016. Defendants Vaske and Greeby were in attendance.  All agreed that the pitch went well.

140)     After the pitch, Defendants Vaske and Greeby requested that Ms. Brown not contact Investor directly. Instead, Defendants Vaske and Greeby requested that Ms. Brown allow Defendants Vaske and Greeby to use their existing relationship with Investor to negotiate the terms of a deal. Defendants Vaske and Greeby represented that they helped another client get funding from Investor in that manner.  Ms. Brown agreed to allow Defendants Vaske and Greeby to handle the negotiations with Investor.

## Redesigned App and Joint Venture [35]

141)     The following week, on or about March 21, 2016, Defendants Vaske and Greeby offered to start redesigning the App immediately to avoid losing time waiting on the Investor. Defendants Vaske and Greeby stated that, if Investor decided not to invest, Defendants Bellwether, Greeby and Vaske would enter a joint venture partnership with Legacy.[36]

---

[35] Exhibit Group 10

[36] Because Ms. Brown was barred by Defendant Montgomery from raising additional capital or securing debt financing for Legacy, a joint venture was the only viable option available to Legacy that was not prohibited under

142) Defendants Vaske and Greeby explained to Ms. Brown that the Redesigned App[37] would be a derivative of the existing App and incorporate Legacy's intellectual property and trade secrets from the existing App. In addition, new intellectual property would be developed for the Redesigned App as needed.

143) Ms. Brown requested that the patched App be kept active during the construction of the Redesigned App. The existing App had bugs but portions of it could be used for customer feedback and to demo the software for potential investors.

144) However, Defendants Greeby and Vaske were adamant that the time it would take to service the existing patched App while building the Redesigned App would push the completion of the Redesigned App back months. Defendants Greeby and Vaske gave Ms. Brown their word that completion of the Redesigned App would not take more than 4 weeks and would be ready at the end of April 2016.

145) Without Ms. Brown's approval, and over Ms. Brown's objections, Defendant Bellwether, Greeby and Vaske disabled the

_____

Legacy's operating agreement.

[37] The Redesigned App is the version of Legacy's Software created by Defendant Bellwether. The App is the version of Legacy's Software created by Defendant Kohmedia. Together, the App and the Redesigned App are referred to as Legacy's Software.

purchasing mechanism on the patched App which rendered the patched App unusable.

146) Shortly after development began on the Redesigned App, Defendants Vaske and Greeby stated that the Investor remained undecided but Defendants Vaske and Greeby were ready to enter into a joint venture with Legacy. Defendants Vaske and Greeby valued Legacy's Software at one million dollars.

147) Defendants Vaske and Greeby negotiated the joint venture terms with Legacy (hereinafter the "Joint Venture"). Although a formal contract was not signed, the terms of the joint venture agreement are set forth in writing ("Joint Venture Agreement"), and include but are not limited to:

    A. Erasing Legacy's anticipated indebtedness to Defendant Bellwether;

    B. Transferring Legacy's ownership of the App's trade secrets and intellectual property to the Joint Venture. In addition, new trade secrets established during the development of the Redesigned App would be owned by the Joint Venture; and,

    C. Requiring Defendants Bellwether, Vaske and Greeby to build the Redesigned App and provide post-launch tech support for the Redesigned App.

Brown et al v. ServiceNow et al - p60

148) Equity ownership of the Joint Venture was: Legacy (81%)[38] and Defendants Bellwether, Vaske and Greeby (19% total).

149) Defendants Vaske and Greeby asked Ms. Brown to continue deferring her compensation until the Redesigned App launched. Since the Redesigned App was targeted to be completed in four weeks, Ms. Brown agreed.

150) Ms. Brown devoted 60-80 hours each week to the Joint Venture performing tasks for the development of the Redesigned App including, but not limited to, copywriting, drafting and formatting document templates with conditional logic, researching legal issues, preparing training information for consumers and attorneys, preparing marketing material, teaching employees of Defendant Bellwether about related legal concepts and responding to testers' inquiries.

151) Approximately eight weeks after development of the Redesigned App began, the Redesigned App remained unfinished. Defendants Vaske and Greeby asked Ms. Brown what Ms. Brown would do if Defendants Vaske and Greeby were to offer to purchase Legacy's Software for $300,000.  Ms. Brown responded that she

_____
[38] Based on Defendants Vaske's and Greeby's $1 million valuation, Legacy was valued at $810,000, an approximate 62% increase from its initial value one year earlier.

would recommend that Legacy's owners refuse the offer because, notwithstanding her dire personal financial situation, the offer would not make Legacy's owners whole. Ms. Brown reminded Defendants Vaske and Greeby that they valued Legacy's Software at one million US dollars just two months earlier. That set the value of Legacy's interest at $810,000, not $300,000. Defendants Vaske and Greeby never presented a formal offer to buy Legacy's Software.

152)       In August 2016, nearly five (5) months after Defendants Vaske and Greeby started developing the Redesigned App, development and testing were complete and the Redesigned App was finally ready for launch.

153)       However, the week before the Redesigned App's first press release was set to be released, Defendants Vaske and Greeby announced that they would not provide technical support for the Redesigned App as required by the Joint Venture Agreement.

154)       Defendants Vaske and Greeby stated that they spent more on the Redesigned App than they anticipated, and they were no longer able to provide tech support for the Redesigned App. Defendants Vaske and Greeby also claimed that they were short-staffed and could not afford to hire another developer.

155)     Defendants Vaske and Greeby told Ms. Brown that if Ms. Brown wanted the Redesigned App to have tech support, Ms. Brown would need to raise the capital to hire a developer to provide tech support. However, weeks earlier, Defendants Vaske and Greeby expressed that an enterprise-level software application, such as the Redesigned App, was destined to fail without a strong tech support team. Thus, Defendants Vaske's and Greeby's refusal to provide tech support delayed the Redesigned App from launching.

156)     Following Defendants Vaske's and Greeby's announcement regarding tech support, Ms. Brown contacted the U of C's Incubator to determine whether there might be resources to provide tech support for the App.

157)     The U of C Incubator's staff connected Ms. Brown to a mentor who owned and managed a successful software development company, Mr. Desai[39] ("Mentor Desai"). During a phone call with Mentor Desai, Mentor Desai offered to provide tech support for the Redesigned App at no upfront cost.  Mentor Desai's offer solved the tech support issue and enabled the Redesigned App to launch.

158)     Mentor Desai instructed Ms. Brown to have Defendants Vaske and Greeby transfer the Redesigned App's code to Mentor

---

[39] Ms. Brown no longer has Mentor Desai's first name or the name of his company. However, she is confident she will acquire it through discovery.

Desai so that he could familiarize his tech support group with the code. Mentor Desai stated that his team would be ready to provide tech support shortly after receiving the code.

159)     Following Ms. Brown's call with Mentor Desai, Ms. Brown called and emailed Defendants Greeby and Vaske to share the good news. Ms. Brown emailed, and left voicemails for Defendants Vaske and Greeby that Ms. Brown was drafting an agreement for Mentor Desai's company to provide tech support.  Ms. Brown instructed Defendants Greeby and Vaske to prepare to transfer the Redesigned App's software code to Mentor Desai so that the Redesigned App could launch.

160)     Ms. Brown contacted Defendants Vaske and Greeby numerous times.  Receiving no response from Defendants Vaske or Greeby, Ms. Brown called Legacy's project manager at Defendant Bellwether who confirmed that Defendants Vaske and Greeby had received Ms. Brown's messages. However, neither Defendant Vaske nor Defendant Greeby ever responded to Ms. Brown. Ms. Brown never heard from Defendant Greeby or Vaske again.

**Joint Venture default[40]**

161)     In or about September 2016, Ms. Brown sent the first default notice to Defendants Bellwether, Vaske and Greeby notifying them that they were in default of the Joint Venture Agreement by refusing to allow the Redesigned App to launch, and they were in default of the Bellwether Contracts by deactivating the patched App without Legacy's approval in March 2016. Ms. Brown demanded they cure the defaults.  However, Defendants Vaske, Greeby or Bellwether never responded.

162)     Since the Redesigned App was 100% complete, tested and ready to launch, Ms. Brown began checking the Internet regularly to determine whether Defendants Vaske and Greeby had launched the Redesigned App on their own. However, Ms. Brown was unable to find anything resembling the Redesigned App.

163)     Prior to Defendants Vaske and Greeby defaulting on the Joint Venture, Defendants Vaske and Greeby asked Ms. Brown to update Legacy's business plan and to address how Legacy's Software could be modified for use in other industries.  In addition, they asked Ms. Brown to update the first year's marketing strategies.  Ms. Brown updated the business plan as requested.

---

[40] Exhibit Group 11

164)     When Defendants Vaske and Greeby's refused to launch Legacy's Software and Ms. Brown was unable to find software similar to Legacy's Software in the estate planning realm, Ms. Brown began searching for Legacy's Software modified for one of the alternate uses Ms. Brown outlined in Legacy's business plan. However, Ms. Brown could not find anything comparable.

165)     For the first year after Defendants Bellwether, Vaske's and Greeby's default (2017), Ms. Brown searched weekly for software comparable to Legacy's Software.  By 2018, Ms. Brown searched monthly for comparable software.[41]  By 2019, Ms. Brown searched quarterly.  Ms. Brown recognized that if software was created after 2018, it would be difficult to know definitively whether that the application was based on Legacy's Software.

166)     Immediately after Defendants Bellwether, Vaske and Greeby defaulted, Ms. Brown wanted to sue them on behalf of Legacy. However, Legacy had completely exhausted its capital.  Unable to afford to hire an attorney to represent Legacy in a suit against Defendants Bellwether, Greeby and Vaske, and not being a litigator

---

[41] A news article reported that TrustandWill.com was made available for purchase in or about April 2018.

herself, Ms. Brown could not initiate a litigation on behalf of Legacy. Ms. Brown needed to hire an attorney to represent Legacy.

167)     However, Ms. Brown could file suit against Defendant Bellwether, Greeby and Vaske as a pro se plaintiff for her personal claims against them.

## Bellwether Judgment / Merit Contracts[42]

168)     On or about January 6, 2017, Ms. Brown reported Defendants Vaske and Greeby's actions as theft to the Chicago Police Department.  Ms. Brown is not aware of whether a police investigation was initiated.

169)     On or about that same day, Ms. Brown filed a lawsuit, pro se, against Defendants Bellwether, Vaske and Greeby for unjust enrichment related to her deferred compensation ("Unjust Enrichment Lawsuit").[43]

170)     Ms. Brown was able to serve the Unjust Enrichment Lawsuit complaint on Defendant Bellwether at its registered agent's

---

[42] Exhibit Group 12
[43] Brown v Law Bulletin, Cook County Illinois, Law Division, 2017-L-000203.

office. However, the Cook County Sheriff's Department was unable to locate the building to serve Defendants Vaske and Greeby.[44]

171)     Ms. Brown also attempted to serve the complaint on Defendants Vaske and Greeby at home and work via U.S. Mail. However, the mailed items were returned to Ms. Brown as undeliverable or the delivery receipts were never returned.

172)     Since Defendant Bellwether was properly served and did not respond, Ms. Brown filed a motion for default judgment against Defendant Bellwether.

173)     On or about February 23, 2018, Ms. Brown was awarded default judgment against Defendant Bellwether for $436,000 ("Bellwether Judgment"). However, the judge required that Ms. Brown delete Defendants Vaske and Greeby from the Unjust Enrichment Lawsuit before the judge would award the judgment against Defendant Bellwether. Not being familiar with litigation, and representing herself pro se, Ms. Brown agreed. The court removed Defendants Vaske and Greeby from the Unjust Enrichment Lawsuit then awarded the judgment against Defendant Bellwether to Ms. Brown.

_____

[44] The building in which Defendant Bellwether had its office spanned nearly the entire block.

174)     Being unfamiliar with collecting judgments, in or about July 2018, Ms. Brown hired Defendant Merit Law to collect the Bellwether Judgment for her.  Defendant Adam Kingsley of Defendant Merit Law represented Ms. Brown.

175)     Ms. Brown stressed to Defendant Kingsley the importance of collecting the Bellwether Judgment as soon as possible so that Ms. Brown could use the proceeds to file suit against Defendant Bellwether on behalf of Legacy.[45]

176)     Defendant Kingsley filed an appearance in the Unjust Enrichment Lawsuit and was issued one or more citations to discover Defendant Bellwether's assets.

177)     However, in the seven years since Ms. Brown hired Defendant Merit Law/Kingsley to collect the Bellwether Judgment, none of the $436,000 Bellwether Judgment that was awarded to Ms. Brown has been collected.

178)     Defendant Kingsley at some point stopped pursuing the collection action but did not notify Ms. Brown. Defendant Kingsley and Defendant Merit Law remain the attorney and law firm of record for the Bellwether Judgment collection.

_____

[45]Ms. Brown had no obligation to use her resources to hire an attorney for Legacy.  However, Ms. Brown intended to do so.

179)    Since Defendant Kingsley remains the attorney of record, if any of Defendant Bellwether's account holders responded to the citation(s) to discover Bellwether's assets, responses to the citation would have been sent to the attorney of record, not Ms. Brown.

## Contractor Case / Merit Contracts [46]

180)    Prior to hiring Defendant Merit Law to collect the Bellwether Judgment, Ms. Brown retained Defendants Merit Law and Kingsley for another matter: to argue a summary judgment motion for Ms. Brown's lawsuit against a home contractor who failed to complete repairs in Ms. Brown's home ("Contractor Case").

181)    Ms. Brown prepared the summary judgment binders for the Contractor Case summary judgment motion and provided them to Defendant Kingsley.  Ms. Brown also gave Defendant Kingsley her original receipts and damage documentation.

182)    In or about May 2018, Defendant Kingsley successfully argued the summary judgment motion and the Contractor was found to be liable. However,  Ms. Brown had not included damage calculations in her summary judgment motion.  Therefore, a separate damage prove-up hearing was necessary.

---

[46] Exhibit Group 13

183)     Ms. Brown continued to retain Defendant Kingsley to represent her in the prove-up hearing for the Contractor Case. Defendant Kingsley represented that, the earliest date available for the damages prove-up hearing was October 2019 (approximately 16 months after Ms. Brown was awarded liability on summary judgment).

184)     However, approximately one year after winning liability on summary judgment on the Contractor Case, and four months before the scheduled prove-up hearing, Ms. Brown agreed to a settlement amount for the Contractor Case.

185)     By this point, Defendant Kingsley had resigned from Defendant Merit Law and Defendant Gartner of Defendant Merit Law had stepped in to represent Ms. Brown. Defendant Gartner stipulated that he was not willing to represent Ms. Brown in court and limited his representation of Ms. Brown to negotiating a settlement agreement for the Contractor Case.

186)     The settlement amount Ms. Brown agreed to was less than half of the amount of damages Ms. Brown could prove she incurred with her damages documentation.  Ms. Brown agreed to the settlement amount because a lump sum would be paid immediately and because Defendants Gartner and Merit Law could not locate Ms.

Brown's damages documentation binder.  Without the damages documentation, the extent of the damages cannot be proven.

187)     When Ms. Brown agreed to the settlement amount, the only agreed-upon settlement terms were the settlement amount and the two-year repayment period.

188)     Nevertheless, on or about June 25, 2019, without Ms. Brown's permission and before a draft settlement agreement was circulated, Defendant Gartner attended a court conference with the Contractor's attorney and represented to the court that a settlement agreement had been entered into.[47]  Defendant Gartner and the Contractor's attorney then entered into an agreed order to dismiss the Contractor Case, and the summary judgment award, with prejudice.  Defendant Gartner took these actions without Ms. Brown's consent or permission.

189)     Defendant Gartner had been adamant that he would not appear in court for the Contractor Case.[48] When Defendant Gartner appeared in court and dismissed the Contractor Case with prejudice,

---

[47] Ms. Brown had moved away from Illinois and did not attend the court conference.

[48] Ms. Brown was not opposed to Defendant Gartner appearing in court on her behalf.  Defendant Gartner asserted, as a condition of representing Ms. Brown, that his representation was limited to negotiating the settlement agreement. Ms. Brown agreed to the limited representation.

Defendant Gartner had not filed an appearance and was dismissing the case without Ms. Brown's permission.[49]

190)     When Defendant Gartner told Ms. Brown of his actions, Ms. Brown demanded Defendant Gartner immediately reverse the dismissal, insisting that the dismissal was premature. Ms. Brown told Defendant Gartner that there was no reason to dismiss the Contractor Case until after a written settlement agreement had been executed. However, Defendant Gartner refused to reinstate the Contractor Case.

191)     A few months after Defendant Gartner dismissed the Contractor Case without Ms. Brown's authorization, the parties did not reach an agreement on the remaining settlement terms. Defendant Gartner withdrew from representing Ms. Brown:

    A. without ensuring the verbally agreed upon settlement amount would be paid to Ms. Brown;

    B. without obtaining an executed written settlement agreement;

    C. without reinstating the summary judgment award in the Contractor Case; and,

---

[49] This is apparent in the fact that the docket entry incorrectly shows that Ms Brown acting pro se initiated the agreed order. However, Ms. Brown was in North Carolina at the time.  The court's clerk likely inserted Ms. Brown's name as originator because Defendant Gartner never filed an appearance.

D.  without returning the binder with Ms. Brown's receipts and damage documentation so that Ms. Brown could conduct a damages prove-up hearing.

192)    In 2020, Ms. Brown filed a malpractice suit against Defendants Gartner, Kingsley, Kingsley Law and Defendant Merit Law, in federal court.[50]  However, after pending for two and a half years, with 74 docket entries, the court dismissed the case for lack of subject matter jurisdiction.  The court held that Ms. Brown, who moved away from Illinois in 2018 and became a citizen of North Carolina in 2019, was again a citizen of Illinois when she filed the complaint for that lawsuit.  Finding that all parties are citizens of Illinois, complete diversity of citizenship did not exist so the case was dismissed.

193)    The court directed Ms. Brown to refile the complaint before December 21, 2024 in the proper venue.  Since the counts against Defendants Gartner, Kingsley, Defendant Merit Law and Kingsley Law are intertwined with the counts in this lawsuit, Ms. Brown reasserts them in this suit which is before the court based on federal question jurisdiction.

_____

[50] Illinois Northern District, Brown v Gartner, 1:20-cv-05195

**Business Development for Legacy** [51]

194)      From 2010-2016, Ms. Brown presented several complimentary living trust presentations for Omega Psi Phi fraternity Inc. ("Defendant Omega") during their district and national conventions.

195)      In or about 2013, Ms. Brown conducted a complimentary living trust presentation at an Omega convention in Illinois. Following the presentation, the person who arranged for Ms. Brown to present at the convention, Andre Garner, introduced Ms. Brown to Defendant Shannon.   At the time, Defendant Shannon was the Grand Keeper of Finance, the highest financial officer, for Defendant Omega.

196)      Ms. Brown shared with Defendant Shannon that Ms. Brown was embarking on the creation of estate planning software. Ms. Brown asked Defendant Shannon which individual at Defendant Omega Ms. Brown could discuss group sales of the software. Defendant Shannon stated that he was the right person.

197)      Ms. Brown and Defendant Shannon had several discussions following the convention.  Defendant Shannon and Ms. Brown discussed Defendant Omega's requirements and process for group sales.  Defendant Shannon also provided a draft of the group

─────────────────

[51] Exhibit Group 14

sales agreement from another business that was offering an online product to Defendant Omega.[52]

198)    In 2015, while the first version of Legacy's Software was in development, Ms. Brown submitted a proposed group sales agreement to Defendant Shannon for Defendant Omega.

199)    While the group sales agreement with Defendant Omega was awaiting signature, Defendant Shannon offered to represent Legacy's Software as an independent contractor for business development for all national Greek fraternities and sororities. Ms. Brown consented. Defendant Shannon signed an independent contractor and confidentiality agreement with Legacy ("Shannon Contractor Agreement").

200)    From 2015-2016, Defendant Shannon requested that Ms. Brown travel to demo Legacy's Software to individuals at several events including but not limited to events in Washington DC, Florida and Las Vegas. For at least two of the events, Defendant Shannon incurred the cost of a separate hotel room for Ms. Brown's stay.[53] For the remainder of the events, Ms. Brown purchased her own hotel room.

---

[52] Ms. Brown believes the product was a digital vault.

[53] Ms. Brown and Defendant Shannon's interactions were strictly professional and limited to Legacy's Software.

201)     During that time period, Defendant Shannon stated that he needed Ms. Brown to travel to Atlanta to finalize the group sales agreement of Legacy's Software to Defendant Omega.  He stated that the meeting was necessary and urgent, so much so that he arranged for Ms. Brown to stay in Defendant Omega's corporate house in Atlanta ("Omega Corporate House").

202)     While in transit to Atlanta, Defendant Shannon stated Defendant Omega's executive director signed off on Legacy's group sales agreement and there was no need for the meeting.  Defendant Shannon stated that he was waiting for the agreement to be released to him.  Defendant Shannon also stated he had another national organization ready to sign once Legacy's Software was released.[54]

203)     Since Ms. Brown was already in route to Atlanta, Ms. Brown and Defendant Shannon worked from the Omega Corporate House conducting user testing of Legacy's Software.

204)     During testing, Ms. Brown's laptop and phone crashed repeatedly while connected to the network in the Omega Corporate House ("Omega House Network").  However, none of Defendant Shannon's devices crashed.

_____

[54] At this point, Legacy's Software (the App) was on target to be released in November 2015.

205)     Not long after after Ms. Brown's stay at the Omega Corporate House, Defendant Kohmedia defaulted on the Kohmedia Contracts.  Ms. Brown notified Defendant Shannon that the App's release was delayed until 2016 because Legacy needed to secure another software developer.  Ms. Brown provided updates to Defendant Shannon regarding the development of Legacy's Software during the first half of 2016.

206)     In or about June 2016, Defendant Shannon gave Ms. Brown short notice for Ms. Brown to present at Omega's national convention in Las Vegas.  Defendant Shannon arranged for Ms. Brown to deliver her living trust presentation to convention attendees and he arranged for Ms. Brown to demonstrate Legacy's Software.

207)     At the conference, Defendant Shannon provided Ms. Brown with presenter Wi-Fi ("Omega Presenter Wi-Fi") connection information.  Ms. Brown's devices crashed more than once while connected to the Omega Presenter Wi-Fi.

208)     In or about September 2016, when Defendants Bellwether, Greeby and Vaske refused to release Legacy's Software, Ms. Brown notified Defendant Shannon that Legacy would not be launching Legacy's Software as scheduled.

209)     At the end of 2016, Ms. Brown followed up with Defendant Shannon and shared that Legacy's Software would not be launching at all.

210)     Even though Ms. Brown was clear that Legacy's Software would not be launching, Defendant Shannon contacted Ms. Brown more than once in 2017 and requested that Ms. Brown create California document templates for Legacy's Software.   Defendant Shannon also inquired about the possibility of adding a module for standalone wills and guardianship.  Ms. Brown responded to Defendant Shannon that nothing had changed, Legacy's Software would not be launching.  Thus, there was no need for Ms. Brown to create California document templates.[55]

211)     Defendant Shannon represented that he was being optimistic and thought that Defendant Bellwether, Greeby and Vaske would allow Legacy's Software to be released.  Defendant Shannon represented that he wanted Legacy to be ready when that happened. Ms. Brown disagreed and responded that she had lost hope.

212)     The last time Ms. Brown spoke with Defendant Shannon was in or about spring of 2017 when she told him for at least the

---

[55] Ms. Brown had only created document templates for separate property states but California is a community property state which required the creation of different document templates.

second time that she would not create California document templates for Legacy's Software.

213)     Ms. Brown thought little of Defendant Shannon's unusual, untimely and persistent requests for California templates until Ms. Brown became aware in 2023 that Legacy's Software is being operated as TrustandWill.com and it is headquartered in California.

## Recommendations for Legacy[56]

214)     Before embarking on the journey to build Legacy's Software, Ms. Brown entered and won University of Chicago's business pitch competition (October 2014), pitching the concept for Legacy's Software.

215)     Defendant Wilkins was one of the judges for the competition.  Defendant Wilkins is a prominent angel investor and operates a venture capital fund.  Defendant Wilkins is also a mentor for the University of Chicago's entrepreneurship incubator and he co-founded TechStars Chicago.

216)     Following the pitch competition, Ms. Brown and Defendant Wilkins met on approximately three occasions to discuss the software.  During her meetings with Defendant Wilkins, Ms.

_____

[56] Exhibit Group 15

Brown repeatedly described the software as representing "a huge shift in the legal community regarding how estate plans would be prepared." Ms. Brown repeated this so often, that Defendant Wilkins interrupted and joked that he was clear that the software was a "*huge legal shift*".

217) During the meetings, Defendant Wilkins recommended that:

    A. The software should offer will-based plans and guardianship, not just living trust-based plans;

    B. A catchier tagline should be used such as "TurboTax for trusts and wills";

    C. The domain name should be changed from LegacyComplete.com to a domain such as "TrustandWill.com" or "WillandTrust.com".

218) Ms. Brown agreed with Defendant Wilkins that the suggestions should be implemented, but Ms. Brown needed to overcome the issue of raising capital first. Defendant Wilkins did not offer assistance with raising capital.

### Discovering TrustandWill.com[57]

219)     In Q4 2016, following Defendants Vaske's and Greeby's refusal to release the Redesigned App, Ms. Brown began diligently and regularly searching the Internet for software similar to Legacy's Software.  However, Ms. Brown did not find anything that resembled Legacy's Software.

220)     Ms. Brown did not discover that TrustandWill.com is operating Legacy's Software from an Internet search.  Instead, Ms. Brown became aware of Legacy's Software being operated as TrustandWill.com in 2023 when Ms. Brown received an email advertisement from Defendant Merit Law which was sent to one of Ms. Brown's former email addresses[58] in or about May 2023.

221)     Ms. Brown did not recall Defendant Merit Law having an estate planning practice during the period in which Ms. Brown retained Defendant Merit Law, so the email caught her attention. In addition, Ms. Brown remembered that the domain name, TrustAndWill.com, was the domain name Defendant Wilkins suggested.

_____

[57] Exhibit Group 16

[58]Ms. Brown had stopped using the email account when she was locked out of it and efforts to reset the account password failed. However, emails sent to the locked out email account began to be forwarded to Ms. Brown's current email address.

222)     Ms. Brown attempted to access the link in the advertisement. However, the link directed her to an error page.  Ms. Brown spent a significant amount of time attempting to bypass the error page on TrustandWill.com.  Ms. Brown attempted to access the site from several devices, browsers, networks and VPNs, all to no avail.  Ms. Brown assumed the website was down.

223)     Ms. Brown received a second advertisement from Defendant Merit Law later in 2023, approximately October. Ms. Brown again received an error when attempting to access TrustandWill.com.  Again, Ms. Brown devoted a significant amount of time trying to access the site. Ultimately, Ms. Brown successfully accessed the site by utilizing several advanced techniques simultaneously.

## The founding of Defendant Huge Legal[59]

224)     Once Ms. Brown accessed and reviewed TrustandWill.com, it was immediately clear that TrustandWill.com is operating a later version of Legacy's Software. The features of TrustandWill.com were remarkably similar to Legacy's Software as can be seen in Tables 1-4 herein.

---

[59] Exhibit Group 17

225)     TrustandWill.com is owned by Huge Legal Technology
Company, Inc ("Defendant Huge Legal"), a Delaware corporation
established in October 2017 and is headquartered in California.
Legacy's Software, which is being operated by Defendant Huge Legal
as TrustandWill.com, was initially Defendant Huge Legal's sole
offering.

226)     Each of the suggestions Defendant Wilkins made to Ms.
Brown was incorporated into TrustandWill.com, including its domain
name, TrustAndWill.com. Even Defendant Huge Legal's name itself is
an homage to Ms. Brown's mantra that the software is "a huge legal
shift".

227)     Based on publicly-available information, in the summer of
2017, two of Defendant Huge Legal's co-founders, Defendants Barbo
and Goldstein wondered how digital assets are handled following a
person's death. One of them noted, "In the summer of 2017, during
the crypto-craze, I started asking the question of what would happen
to everybody's digital assets if they die."[60]

228)     Since planning for digital assets is a basic estate planning
task, pondering this question suggests that the co-founders did not

_____

[60] FreshBrewedTech.com/aztech-trust-will, *Aztech: Trust & Will*, by Neal
Bloom, January 18, 2019

have a background in estate planning in 2017. Publicly-available information supports that none of the three co-founders, Defendants Barbo, Goldstein or Lamb, had estate planning experience prior to forming Defendant Huge Legal in 2017.

229)      Nevertheless, in October 2017, without experience in estate planning, Defendants Barbo, Goldstein and Lamb joined forces to "create" estate planning software and launched Defendant Huge Legal.

230)      Publicly-available information reveals the following timeline:

    A. Shortly after completing a successful funding round for his previous startup, Industry, Defendant Barbo was terminated as CEO of Industry in or about June 2017 for an undisclosed reason;

    B. On or about August 6, 2017, Defendant Goldstein sent Defendant Barbo a text that he had a good idea...creating estate planning software;

    C. On or about August 25, 2017 (**less than three weeks later)**, Defendants Barbo and Goldstein made it to the second round of a prominent pitch competition, after pitching TrustandWill.com and submitting a business plan;

D. On or about August 27, 2017, a news article was published that Defendant Barbo is bouncing back a month after being terminated from Industry and is launching a new estate planning software company;

E. On or about October 8, 2017, Defendants Barbo and Goldstein placed third in the final round of the aforementioned prominent pitch competition. Proceeds had to be paid to them individually because they had not yet formed Defendant Huge Legal;

F. On or about October 11, 2017, Defendants Barbo, Goldstein and Lamb formed Defendant Huge Legal;

G. Also on or about October 11, 2017, Defendants Barbo, Goldstein and Lamb began granting people access to test the software. They announced the mvp of the software would launch by the end of 2017 (approximately 10 weeks later);

H. In Q4 2017, Defendant Huge Legal was accepted into the highly-coveted TechStars Accelerator;[61]

_____

[61]According to publicly-available information. Defendant Wilkins is a mentor for TechStars and co-founded the Chicago chapter of TechStars.

     I.   In or about April 2018, Defendant Huge Legal released fully-functional, enterprise-level, estate planning software as TrustandWill.com.

231)     To recap, **in less than three weeks,** Defendants Barbo and Goldstein, two individuals without experience in estate planning, went from having an idea about creating estate planning software on August 6, 2017 to clearly articulating the concept for TrustandWill.com and submitting a business plan to a prominent pitch competition on August 25, 2017 (they later placed third).

232)     Moreover, Defendant Huge Legal went from being in the "idea-phase" in October 2017[62] to granting people access to test the estate planning software by December 2017.

233)     Defendant Huge Legal's total time from "idea-phase" to public release of fully-functional, enterprise-level, estate planning software was less than six months (October 2017-April 2018).

234)     This lightening-fast timeline would be difficult to achieve for an expert software development team with an experienced, full-

---

[62] It is unclear how Defendants Barbo and Goldstein submitted a business plan in August 2017, yet consider themselves to still be in the "idea-phase" in October 2017.

time, estate planning attorney on staff.  It is highly unlikely that a team with no experience in estate planning could accomplish it.[63]

235)     Moreover, it is taboo in entrepreneurship to publicly reveal a new product without having the product substantially complete. A premature announcement could deprive the entrepreneur from being first to market with the product.  However, Defendants Huge Legal, Barbo, Goldstein and Lamb announced the release of estate planning software on day one, October 2017, and began allowing people to test the software approximately six weeks later.  All of this suggests that Defendants Huge Legal, Barbo, Goldstein and Lamb already possessed fully-functional software, so there was no need to contain information while the software was developed.

## TrustandWill.com is operating Legacy's Software[64]

236)     Based on the lightening-fast timing of the launch of TrustandWill.com by individuals without estate planning experience, it is highly unlikely that Defendant Huge Legal developed the software from scratch.

---

[63] It took an expert software development team 6 months to build the second version of Legacy's Software even though most of the intellectual property assets required had already been created.

[64] Exhibit Group 18

237)     Plaintiffs believe Defendants Barbo, Goldstein and Lamb fraudulently-acquired Legacy's Software that was already fully-functional, then modified it, re-branded it, and called it their own. A comparison of Legacy's Software and TrustandWill.com is below:

| Table 1: Platform Features | | |
|---|---|---|
| | **Legacy's Software as of Jan 2017** | **TrustandWill.com as of Jan 2018** |
| Step-by-step guided document creation | X | X |
| Easy-to-navigate online platform | X | X |
| Real-time document editing capabilities | X | X |
| Mobile-compatible interface | X | X |
| Bank-level encryption for data protection | X | X |
| Secure document storage | X | X |
| End-to-end encryption | X | X |
| Customer support | Chat, email and phone | Chat and email |
| Expert team available for questions | X | X |
| Educational resources and guidance | X | X |
| 30-day membership access | X | X |
| Instant document downloads | X | X |
| Shipping of printed documents | Planned for 2017[65] | X |
| Digital safe for important document storage | Planned for 2017 | X |
| Ability to update documents as needed | X | X |
| Money-back guarantee | X | X |

---

[65] Reference to "Planned for" is the approximate year that Legacy estimated for the feature to be released within Legacy's business plan.

| Table 2: Core Services for Attorneys | | |
|---|---|---|
| | **Legacy's Software as of Jan 2017** | **TrustandWill.com as of Jan 2018** |
| Independent contractor status for attorneys | X | X |
| State-specific licensing and vetting process | X | X |
| Direct scheduling through the platform | Planned for 2017 | X |
| One-on-one consultations with clients | X | X |
| 12-month unlimited access for client support | X | X |
| Line-by-line document review | X | X |
| Consultation for blended families | X | X |
| Trust funding guidance | X | X |
| Access to client inputs and estate planning documents | X | X |
| Ability to review estate plans | X | X |
| Capability to suggest changes based on client circumstances | X | X |
| Flat fee for each client | X | X |

Brown et al v. ServiceNow et al  -  p91

| Table 3: Core Services for Consumers | | |
|---|---|---|
| | **Legacy's Software as of Jan 2017** | **TrustandWill.com as of Jan 2018** |
| Online living-trust based plan creation | X | X |
| Online living-trust based plan creation includes: | Living trust, pour-over will & guardianship, healthcare directives, HIPAA authorization, powers of attorney, state-specific legal documents | Same as Legacy |
| Stand-alone will and guardianship plans | Planned for 2017 | X |
| Renewable annual subscription for consumers beyond first year | Planned for 2017 | X |
| Online notarization | Planned for 2017 | No, Added integration approx 2020 |
| Online probate | Planned for 2018 | No, Acquired EZ-Probate approx 2022 |

Brown et al v. ServiceNow et al  -  p92

| Table 4: Other Similarities | |
|---|---|
| **Legacy** | **Huge Legal** |
| ***Promotional copy*** | |
| "Software is easier to use than LegalZoom" | "software is easier to use than LegalZoom" |
| Defendant Wilkins suggested Legacy use: "turbotax for legal trusts" | "turbotax for legal trusts and wills" |
| "A **huge** shift in the **legal** community regarding how estate plans will be prepared" | "could transform the business" |
| "Preparing for the largest wealth transfer in history" | "Capitalizing on this insight to transform estate planning in time for the largest wealth transfer in history to current generations and beyond." |
| Defendant Wilkins suggested Legacy change its domain from LegacyComplete.com to: TrustandWill.com or WillandTrust.com | Domain: TrustandWill.com |
| ***Marketing*** | |
| Social media marketing campaigns targeting individuals who recently had a major life events such as getting married or having a child. | "targeted social media campaigns, singling out people who've recently had a major life event, like getting married or having a child." |
| Social media marketing campaigns targeting older individuals including parents of college students and retirees who are already considering creating a will. | "targeting an older demographic that might have wills on their mind." |
| Team up with financial institutions to tap into their customers as they are already planning-focused | "teaming up with big players already in touch with their potential customer pool." |

### Fraudulent acquisition of Legacy's Software[66]

238)　　　Defendants Huge Legal, Barbo, Goldstein and Lamb have made inconsistent comments about the development of the software for TrustandWill.com.  They boast:

    A.　"Trust & Will's internal team has designed and developed all of their own software and their entire suite of products;[67] and,

    B.　Huge Legal's software is "Built by attorneys".[68]

239)　　　However, there are several issues with these representations including but not limited to:

    A.　there is no mention of an estate planning attorney on staff at Defendant Huge Legal before it launched TrustandWill.com. Thus, it is unclear which attorneys "built" the software on TrustandWill.com;

    B.　Without an attorney on staff, Defendant Huge Legal could not have created the customer decision tree or the conditional-logic legal templates; and,

---

[66] Exhibit Group 19

[67] FreshBrewedTech.com, *AzTech: Trust and Will*, January 18, 2019

[68] TrustandWill.com

    C. It is difficult to imagine that investors would invest in estate planning legal software that was not created by an attorney. However, investors would invest in software that was built by an attorney, such as Legacy's Software, then acquired by Defendant Huge Legal.[69]

240)    Plaintiffs believe Defendants Barbo, Goldstein, Lamb and Huge Legal not only acquired Legacy's Software to operate it as TrustandWill.com, but they also knew that they were acquiring Legacy's Software by improper means.

241)    There are several possible scenarios related to the fraudulent acquisition of Legacy's Software.  Two of the possible scenarios are:

    A. Defendants Barbo, Goldstein and Lamb improperly purchased Legacy's Software from one or more of the Defendants; or,

    B. One or more of the Defendants continue to retain majority control over Legacy's Software and installed Defendants Barbo, Goldstein and Lamb as the leadership team of Defendant Huge Legal.

---

[69] Legacy's Software was designed by an attorney, Ms. Brown, and she was engaged in every aspect of the design and software development process for more than four years.

Brown et al v. ServiceNow et al  -  p95

242)     Based on the timeline set forth herein, a possible timeline for the fraudulent-acquisition of Legacy's Software is this:

A.  Beginning in the fourth quarter of 2016, several of the Defendants made it known that Legacy's Software could be acquired improperly;

B.  4Q 2016 - 1Q 2017, Defendants Barbo and Goldstein became aware that Legacy's Software could be fraudulently acquired and expressed interest. Defendants Barbo and Goldstein requested California templates be included in the acquisition;

C.  1Q - 2Q 2017, Defendant Shannon repeatedly asked Ms. Brown to create California templates for Legacy's Software even though Ms. Brown had repeatedly told him that Legacy's Software would not be launching;

D.  2Q - 3Q 2017, Defendant Bellwether fraudulently- conveyed Legacy's Software to an unauthorized third party then filed paperwork in the State of Illinois to voluntarily dissolve Defendant Bellwether (June 2017),

E.  2Q - 3Q 2017, Defendant Barbo's former startup, Industry, fired Defendant Barbo even though Defendant Barbo had recently completed a successful funding round for industry. Plaintiffs believe Industry may have learned of Defendant

Barbo's intent to fraudulently-acquire Legacy's Software through improper means and they did not condone his actions;

F.  2Q - 3Q 2017, Defendant Barbo and Goldstein either improperly acquired Legacy's Software or agreed to be the leadership team for Defendant Huge Legal;

G.  4Q 2017, Defendants Huge Legal was formed;

H.  4Q 2017, Defendant Wilkins cleared the path for Defendant Huge Legal to be accepted into TechStars' accelerator which legitimized Defendant Huge Legal's lightening-fast growth and software creation;

I.  4Q 2017, Defendant Huge Legal and released Legacy's Software as their mvp software;

J.  2Q 2018, Defendant Huge Legal re-branded and tweeked Legacy's Software then launched it as TrustAndWill.com,

243)    There are several potential scenarios regarding how Defendants Barbo, Goldstein and Lamb became aware of the opportunity to improperly-acquire Legacy's Software, including but not limited to:

A.  Defendant Barbo became aware of the opportunity to acquire Legacy's Software while he was engaged in a funding round

for Industry and approaching venture capital companies. Defendant Barbo may have contacted Defendant Wilkins' venture capital company.

B. Punchkick, where Defendant Goldstein worked in 2017, was less than a half of a mile from Defendant Bellwether's office. Thus, Defendants Greeby, Vaske and Goldstein may have known each other and discussed the potential for improperly acquiring Legacy's Software;

C. Defendant Goldstein and Defendant Wilkins may have connected through their Alma Mater, University of Chicago Booth School of Business' alumni community, or through the Chicago entrepreneurship/innovation communities;

D. Defendant Goldstein grew up in Chicago and Defendants Wilkins and Tucker-Wilkins raised their family in Chicago. Publicly-available information suggests that Defendant Goldstein may be in the same age group as one or more of Defendants Wilkins' and Tucker-Wilkins' children. Thus, Defendants Wilkins and Tucker-Wilkins could have been connected to Defendant Goldstein through one of their children.

244)     Regardless of how Defendants Barbo, Goldstein and Lamb became aware that Legacy's Software could be improperly-acquired, it is clear that they acquired Legacy's Software and are currently operating it as TrustandWill.com.

**False information being circulated**[70]

245)     In 2016, after Defendants Bellwether, Vaske and Greeby refused to launch Legacy's Software, Ms. Brown attempted to jumpstart her law practice.  Ms. Brown's focus had been on Legacy since 2013, so referrals had dwindled.

246)     Ms. Brown tried tapping into her sphere of influence via phone and email.  However, after receiving no returned calls or emails, Ms. Brown discovered that her address book app had been corrupted and phone numbers and email addresses had been altered. Moreover, Ms. Brown's social media accounts were persistently inaccessible.

247)     Ms. Brown was able to reach a few of her past referral sources by contacting their companies directly. After a few weeks, prospective clients started contacting Ms. Brown.  However, Ms. Brown noticed something odd:

---

[70] Exhibit Group 20

A. The prospective clients who contacted Ms. Brown requested that Ms. Brown commit illegal/unethical acts for them;

B. The prospective clients who contacted Ms. Brown claimed to have been referred to Ms. Brown by one of Ms. Brown's referral sources. However, when Ms. Brown contacted the referral source, the referral source did not know the prospective clients.

248) Ms. Brown has a policy of not representing clients with questionable motives. As much as Ms. Brown needed the revenue, Ms. Brown declined to represent all of the above-referenced prospective clients. Unfortunately, Ms. Brown received few inquiries from legitimate prospective clients.

249) In 2017, Ms. Brown sought employment. However, she did not receive any interviews for jobs to which she applied.

250) While searching for prospective clients and employment, Ms. Brown became aware of a disinformation campaign circulating false information about her and Legacy. Ms. Brown believes the disinformation campaign effectively prevented Ms. Brown from operating her law firm and prevented her from finding employment.

251)     However, Ms. Brown did not know who had launched the disinformation campaign or who was spreading false information about her.

252)     Based on information Ms. Brown received in 2020 and 2023, Ms. Brown believes several of the Defendants created and spread an effective disinformation campaign intended to destroy Ms. Brown's reputation. Moreover, several Defendants have large spheres of influence[71] which made spreading false information easy.

253)     In addition, Ms. Brown believes that one or more of the Defendants used video footage of Ms. Brown to create a draft of an investigative news piece to give the disinformation campaign credibility and to aid in spreading false information.

---

[71]Defendant Tucker-Wilkins is a prominent investigative journalist for CBS News Chicago.  In addition, Defendant Tucker-Wilkins was the president of the National Association of Black Journalists (2019-2023), the largest group of journalists of color with more than 4,300 members.

Defendant Montgomery has been a hearing officer for the Illinois Attorneys' Registration and Disciplinary Committee ("ARDC") since approximately 2013.

Defendant Shannon was the Grand Keeper of Finance (approx. 2013-2016), the highest elected financial officer for Omega Psi Phi fraternity which has more than 250,000 members globally; and,

Defendant Wilkins manages a venture capital fund, Standing Oaks Venture Partners, and he is well-known in the innovation ecosystem. Defendant Wilkins is also the co-founder of the Chicago chapter of TechStars.

254)     Ms. Brown believes that video footage captured of Ms.

Brown included, but was not limited to:

A.  Video footage of Ms. Brown captured at the Daley Center:

and,

B.  Video footage of Ms. Brown captured at a Chase Meeting.

255)     Daley Center video footage:

A.  On or about December 15, 2017, Ms. Brown arrived at the

Daley Center to present a motion in the Unjust Enrichment

lawsuit that Ms. Brown filed against Defendants Bellwether,

Greeby and Vaske.

B.  Ms. Brown took the elevators to the assigned courtroom

floor.  When she exited the elevator, Defendant Tucker-

Wilkins and her camera woman were actively filming

people.[72] Ms. Brown had to walk past the camera to access

her assigned courtroom.

C.  Ms. Brown sat on a bench outside the courtroom to get

organized.  The news camera was in sight.

D.   After she sat down, a group of four men in business suits

congregated near Ms. Brown. Ms. Brown recognized one of

the four men as prominent attorney Samuel Mendenhall. Two

_____
[72] The camera woman was using a CBS camera to capture footage and
Defendant Tucker-Wilkins is an investigative journalist for CBS.

men in police uniforms joined the group.  Several of the men
and officers discussed, very loudly, that someone would be
arrested in the courtroom for taking advantage of an elderly
person.

E.  The discussion was so loud that Ms. Brown moved to a
quieter area.  However, when Ms. Brown moved, several
members of the group moved nearby Ms. Brown again.  Ms.
Brown moved again with the same result.  Finally, Ms. Brown
packed up her belongings and went into the courtroom.

F.  When Ms. Brown completed her task, Ms. Brown exited the
courtroom, Ms. Brown sat on a bench to organize her
belongings.  One of the four men and the remaining police
officers exited the courtroom a few minutes later.  The officer
asked the man whether he was needed for anything else. The
man responded that the police officer could leave.  No one
was arrested.

G.  When Ms. Brown walked towards the elevators, she noticed
that Defendant Tucker-Wilkins and her camerawoman had
packed up and were waiting for the elevator.  While in the
elevator, Ms. Brown asked Defendant Tucker-Wilkins whether
she was covering the same case as the case the group of men

were discussing.  She acknowledged it and replied that Ms. Brown would have to watch the news for details.

H. Ms. Brown, who was then a regular viewer of CBS News, never saw a story related to the discussion.

I. The narrative the group was discussing was so different than actual facts that Ms. Brown did not think the group at the Daley Center was discussing her.  However, in 2020, when statements in Defendant Montgomery's 2020 ARDC Response mirrored the false information that the group discussed at the Daley Center, Ms. Brown realized that the group's discussion may have been intended to intimidate Ms. Brown.

J. Ms. Brown does not know whether the video footage captured of Ms. Brown that day was limited to Ms. Brown exiting the elevator, or whether it included:

    i. the group of men discussing the false narrative and Ms. Brown's reactions;

    ii. Ms. Brown's repeatedly moving to find a quiet area; or,

    iii. Ms. Brown during her scheduled motion call.

256)    Video footage of Chase Meeting:

A. In or about 2016, Ms. Brown received a referral from Chase. Ms. Brown believes it was the first referral she received from Chase since Dr. Hamilton.

B. However, Chase requested something unusual with respect to the customer. Chase requested that Ms. Brown meet with the Chase customer in an unused meeting room at a Chase branch.[73]

C. Ms. Brown agreed to meet with the Chase customer at the Chase branch ("Chase Meeting").

D. When Ms. Brown arrived and saw the meeting room, Ms. Brown noticed two surveillance cameras within the meeting room. Ms. Brown asked the Chase manager whether the cameras were on. The Chase manager confirmed that the cameras were not on. The Chase manager also shared that the alert light on the cameras might flash occasionally but assured Ms. Brown that the cameras were not in use.

E. Ms. Brown asked the Chase manager when Chase changed its rules to allow outside vendors to utilize unused meeting rooms at Chase branches for client meetings. The Chase

---

[73] That request was unusual because Ms. Brown had previously requested to use a vacant office to meet with a Chase customer while her office was being rehabbed. Ms. Brown was told that Chase does not permit outside vendors from utilizing unused space at branches for client meetings.

manager stated that the rule had changed but she did not know when.

F.   The Chase manager mentioned that she had to leave to attend a meeting that was starting at a different Chase branch.

G.   Ms. Brown's planning meeting[74] with the referred client went smoothly. Several days after the planning meeting, Ms. Brown met with the referred client at the same Chase branch, in the same unused meeting room, to sign the estate plan that Ms. Brown prepared.  Again, everything proceeded smoothly.  Although everything went smoothly with the client, that client was the final client Chase referred to Ms. Brown.

H.   Based on information acquired in 2023, Ms. Brown believes that the Chase Meeting was intended to be an "expose'" type of meeting often utilized by investigative journalists, such as Defendant Tucker-Wilkins, in investigative news reports. Ms. Brown believes CBS and Chase agreed to conduct an expose' meeting, with Ms. Brown as the target, based on

_____

[74] Ms. Brown's living trust process required at least two meetings; a planning session and a delivery session.  The two meetings were typically at least one week apart. Occasionally, there was also an introductory meeting before the planning session.

false information from several Defendants, including but not limited to Defendants Tucker-Wilkins, Williams, Montgomery and Goldston.

I. Moreover, Ms. Brown now believes the cameras in the meeting room were not only recording but also streaming the Chase Meeting.

J. Ms. Brown is confident that any video footage surreptitiously captured of the Chase Meeting showed that Ms. Brown counseled the client professionally and ethically. However, the mere fact that an expose' meeting was scheduled by CBS, and agreed to by Chase, was enough to negatively impact Ms. Brown's reputation and business.

257) Ms. Brown believes that the video footage captured of her during the Chase Meeting and at the Daley Center was edited to create a draft of an investigative report segment.[75] Ms. Brown believes the video segment contained false information and was used as a means of quickly gaining credibility and spreading false information.

_____

[75] Ms. Brown does not believe the investigative report aired on CBS.

**A target of violence**[76]

258)     Ms. Brown frequently advocates against social injustice and she has been the target of violence because of it.  When Defendant Kohmedia refused to launch the App in December 2015, Ms. Brown thought Defendant Kohmedia's actions might have ties to Ms. Brown's recent advocacy for justice for LaQuan McDonald.

259)     When Defendant Bellwether refused to launch the Redesigned App in August 2016, Ms. Brown became even more convinced that the interference was tied to her social justice advocacy.

260)     Examples of social justice advocacy that garnered disfavor for Ms. Brown include, but are not limited to:

A.  In 2012, while serving on the board of directors of a community hospital in Chicago, a mammography machine was donated to the hospital.  However, hiring a mammography tech was not prioritized.  Ms. Brown advocated that the immediate hiring of a mammography tech should be the top priority of the hiring director.  Ms. Brown's advocacy brought her disfavor and threats.

---

[76] Exhibit Group 21

B. In or about October 2015, approximately a month before the App was scheduled to be released by Defendant Kohmedia, Ms. Brown began advocating against Chicago's City Council's handling of LaQuan McDonald's murder. Ms. Brown advocated that the police officers involved in LaQuan McDonald's shooting should be charged with murder and that the Chicago City Council should be sanctioned for covering-up his murder. Ms. Brown was warned that taking such a staunch public position would be dangerous.

261) The backlash for Ms. Brown's advocacy for justice for LaQuan McDonald was swift and far-reaching. From 2015-2018, Ms. Brown was terrorized in Chicago unlike anything she had experienced previously.

262) The violence that began in 2015 included but was not limited to:

A. Ms. Brown's home was frequently broken into even though there was almost always a Chicago police car parked within a couple hundred feet of Ms. Brown's home;[77]

_____

[77] When Ms. Brown asked one officer sitting in a police car in front of Ms. Brown's home about whether he witnessed the break-in that occurred earlier that day, the officer told Ms. Brown she needed better locks on her doors.

B. Ms. Brown was shoved into oncoming traffic on several occasions;

C. Ms. Brown had a gun pulled on her while she was gardening in front of her home. The perpetrator threatened Ms. Brown telling her: *you ain't gonna do nothing*;

D. Ms. Brown was repeatedly approached by strangers and told:

    i.  She was being taught a lesson; and,

    ii. She was never going to work again; and,

    iii. There was nowhere she could go where she could not be found.

E. Ms. Brown's Internet networks experienced advanced persistent cyber-attacks which often rendering Ms. Brown's networks completely unusable;

F. Ms. Brown's email and social media accounts were frequently compromised and unusable;

G. Ms. Brown's SIM on her mobile phone was frequently swapped remotely. On a frequent basis Ms. Brown's mobile phone would indicate it did not have a SIM in the evening. Then, in the morning, when the SIM was reactivated, Ms. Brown would receive texts with lewd photos from individuals who were "responding" to texts from Ms. Brown's number;

Brown et al v. ServiceNow et al - p110

H. Ms. Brown law firm number was a Google voice number and the Google account to which the Google Voice number was attached was compromised repeatedly which prevented Ms. Brown from receiving or making calls from her office phone;

I. When Ms. Brown could not mitigate the threats against her networks and devices, Ms. Brown was forced to close her estate planning firm out of concern for customer information becoming exposed.

263) In 2018, the violence intensified and Ms. Brown fled from Chicago in hopes of finding employment elsewhere.[78] Ms. Brown traveled to several business conferences in search of a job and another place to live.

264) However, leaving Chicago in 2018 did not end the terror. Typically, within the first week of Ms. Brown being in a new location, Ms. Brown would be approached by a stranger who would tell Ms. Brown that there was no place that Ms. Brown could go where she would be safe. On several occasions, that statement would come from an individual in a local law enforcement uniform.

265) After Ms. Brown fled Chicago in 2018, regardless of where Ms. Brown resided: rental unit, hotel, family members' home or

---

[78] Both of Ms. Brown's children were away at school by this point.

vehicle, Ms. Brown was terrorized by cruel conduct inflicted on her by unknown individuals.[79]  An example of what Ms. Brown experienced in one week while she lived in an RV in 2019, included but was not limited to:

    A.  strangers throwing food and beverages at Ms. Brown (her person, not vehicle);

    B.  strangers urinating into her RV's water tank intake;

    C.  strangers diverting the RV's exhaust to cause carbon monoxide to flood the vehicle;

    D.  strangers repeatedly dowsing Ms. Brown with dangerous fumes (in addition to carbon monoxide);

    E.  strangers breaking into the RV at least twice, once while Ms. Brown was asleep in the RV[80]; and,

    F.  strangers burglarizing the RV.

    266)    Even now, more than five years later, the terror continues.[81]

---

[79] At this point, Ms. Brown believed the terror she was experiencing was backlash for her social justice advocacy.  She was not aware that Legacy's Software had been fraudulently conveyed.

[80] The strangers attempted to unlock Ms. Brown's mobile phone using facial recognition and inadvertently took several photos of Ms. Brown sleeping.

[81] Examples include, but are not limited to:

Ms. Brown's home has been broken into repeatedly.  In or about October 2024, a thief made off with a stack of important papers from Ms. Brown's

## Holiday Inn Incident [82]

267)     Another example of how Ms. Brown was terrorized after

fleeing Chicago occurred while Ms. Brown was staying at Holiday Inn,

Catonsville, MD in 2019:

> A. On or about February 5, 2019, a hotel manager at Holiday
>
> Inn Express in Catonsville, Maryland four individuals
>
> claiming to be Baltimore County police officers ("Officers"),
>
> began banging on Ms. Brown's hotel room door where she
>
> was a paying guest.

_____

desk.

Several of Ms. Brown's former email accounts began forwarding email to
Ms. Brown's current email address recently even though Ms. Brown has
been locked out of those email accounts for years. This is an indication that
the email accounts have been compromised.

Ms. Brown is frequently blocked from reaching certain Internet
domains from her home and mobile networks.  In addition, ports necessary
for a VPN connection are often blocked upstream from Ms. Brown's home
modem.

Ms. Brown recently received a strange threat one morning in April
2025 while walking her dog in the park adjacent to her home, a stranger
approached Ms. Brown and said, "You look just like the lady in the photo
who is going to be raped and murdered tonight."  Ms. Brown asked the man
to repeat the threat so that she could include the exact wording in this
complaint. He repeated it, twice.

Ms. Brown's mail and package deliveries are frequently tampered
with before delivery.

[82] Exhibit Group 22

B. Without offering a reason, justification or probable cause, the police officers ("Officers") and the hotel manager demanded entry into Ms. Brown's hotel room.

C. Ms. Brown told the Officer she did not have any clothes on and asked for a few minutes to get dressed. When the officers threatened to knock her hotel room door down if Ms. Brown did not open the door immediately, Ms. Brown agreed to allow the female Officer to enter Ms. Brown's hotel room.

D. However, once the female Officer entered, she prevented Ms. Brown from closing the door. The female Officer allowed the male Officers and the manager into the room without giving Ms. Brown an opportunity to get dressed.

E. Once inside Ms. Brown's hotel room, the Officers threatened to throw Ms. Brown out of the window if she did not leave the hotel immediately. The Officers gave no reason why they were forcing Ms. Brown to leave the hotel.

F. Ms. Brown requested that the Officers turn around or leave the room so that Ms. Brown could get dressed. They refused and prevented Ms. Brown from going into the bathroom.

G. Ms. Brown was forced to get dressed in front of the hotel manager and Officers. The Officers laughed at Ms. Brown

Brown et al v. ServiceNow et al - p114

while she searched for clothes and tried to get dressed. They joked about watching their body cam video footage later.

H. While Ms. Brown dressed, the Officers rummaged through Ms. Brown's belongings, and tossed Ms. Brown's belongings into garbage bags.

I. Once Ms. Brown was dressed, two of the Officers dragged Ms. Brown, and her belongings that the Officers had collected, out of the hotel room while Ms. Brown yelled for someone to help her.

J. The Officers dropped Ms. Brown and her belongings at Ms. Brown's rental car in the parking lot. When Ms. Brown gathered her belongings off the ground, Ms. Brown noticed that the Officers had not gathered all of Ms. Brown's belongings from her hotel room. Ms. Brown was denied re-entry into her hotel room to gather her remaining belongings.[83]

K. As awful as the Holiday Inn incident was, it was exacerbated by the possibility that one of the four Officers was not an

---

[83] Approximately three days before the Holiday Inn incident, Ms. Brown was a paid guest at Bon Secours Conference Center in Marriotsville, Maryland. Ms. Brown's hotel room at Bon Secours was burglarized and Ms. Brown's laptop was stolen. Some of the items that the officers did not return to Ms. Brown during the Holiday Inn Incident were items related to the theft of Ms. Brown's laptop from her Bon Secours hotel room three days earlier.

actual police officer.  Ms. Brown believes that at least one of the Officers was a civilian wearing a police officer uniform ("Imposter").

i.  Imposter was a twenty-something, African-American male.

ii.  Imposter was the first Officer to knock on Ms. Brown's door and he was alone.  Ms. Brown conversed with Imposter through the closed door.  Although Imposter was wearing a police uniform, Ms. Brown could see that he was not wearing a name tag.

iii. Imposter introduced himself to Ms. Brown by one name, but he was referred to as "Wilkinsson" or "Wilkin's son" by someone over the police radio.

iv. When Ms. Brown pointed out the discrepancy, Imposter left from outside Ms. Brown's hotel room.  He returned after the other Officers and hotel manager had entered Ms. Brown's hotel room.  At that point, he was wearing a name tag with a third name on it.

v.  Imposter was one of the two Officers who physically dragged Ms. Brown from her hotel room.

268)    Following the incident, Ms. Brown spent hours contacting local media and attorneys.  Only one attorney returned her call and

that attorney declined to represent Ms. Brown. None of the other attorneys and none of the media that Ms. Brown contacted returned Ms. Brown's calls.

269)     Ms. Brown contacted the Baltimore County Police Department and submitted a request to preserve the body cam footage from the Officers and she requested confirmation that Imposter was an officer.  Ms. Brown never received a response to her requests.

270)     Ms. Brown attempted to file suit pro se against Holiday Inn, the Baltimore County Police Department and others related to the incident:

A.  Beginning in or about April 2019, Ms. Brown made at least two attempts to file suit for the Holiday Inn Incident by mailing her complaint to the Maryland District Courthouse. However, the clerk of court never received the complaints.

B.  In 2022, Ms. Brown hired a courier service to hand deliver her Holiday Inn complaint to the clerk of the court at the Maryland District Courthouse. The courier was able to successfully deliver Ms. Brown's Holiday Inn complaint to the Maryland District Court clerk of court on or about February

2, 2022.  The clerk filed the "Holiday Inn Complaint".[84] However, the clerk refused to allow the courier to pay the filing fee for the Holiday Inn Complaint using the courier's credit card.

C.  Ms. Brown directed the courier to return to the clerk with a cashier's check. However, the courier did not submit the cashier's check to the clerk.

D.  Ms. Brown did not receive notice that the filing fee remained unpaid until two months later, after the Court dismissed the case for unpaid filing fee and mailed the dismissal order to Ms. Brown.  Prior to the dismissal, there was not a status conference for the case during which Ms. Brown could have learned that the filing fee remained unpaid. In addition, Ms. Brown did not receive mailed notice or electronic notification of the unpaid fee.[85]

E.  When Ms. Brown learned the Holiday Inn complaint had been dismissed, Ms. Brown hired an attorney ("Attorney Tucker") to reinstate the case and represent her in it.  However, Attorney Tucker waited more than six months after Ms.

---

[84] Brown v Holiday Inn, District of Maryland District Court 1:22-cv-00281

[85] The docket shows a notice was mailed to Ms. Brown.  However, the notice was not delivered to Ms. Brown until after the complaint was dismissed.

Brown retained him before filing a motion to reinstate the complaint.  The court denied the motion.

F.  Because of the timing of Attorney Tucker's delayed motion, Ms. Brown not only lost the right to pursue the causes of action that she included in the Holiday Inn Complaint, Ms. Brown also lost the right to pursue additional causes of action that were identified after the Holiday Inn Complaint was filed.

G.  Ms. Brown filed a post-judgment motion to attempt to reinstate the complaint.  However, the case manager at the clerk of the court refused to file/docket the post-judgment motion.  Ms. Brown submitted the post-judgment motion at least four times using various means.  With each rejection, Ms. Brown would correct the cited deficit and resubmit the post-judgment motion. However, the post-judgment motion was never docketed.

H.  Ms. Brown believes she is out of options to obtain justice for the horrific Holiday Inn Incident.

### Law Bulletin's Headline Advertisement [86]

271)     Several years into the disinformation campaign launched against Ms. Brown, Ms. Brown sought to determine the origin of the false information. Two particularly damaging pieces of false information being circulated about Ms. Brown are that Ms. Brown had lost, or would be losing, her law license and that Ms. Brown had taken advantage of a former client.

272)     In an attempt to clear her name, in 2020, Ms. Brown filed a request for an investigation with the Illinois Attorney Registration and Disciplinary Commission ("ARDC") and requested that the ARDC assess her actions[87], as well as Defendant Montgomery's actions, in relation to Legacy and Dr. Hamilton.[88]

273)     Within her response to the ARDC ("Montgomery's 2020 ARDC Response"), Defendant Montgomery asserted several verifiably false statements about Ms. Brown which statements were substantially similar to the false statements the four men and police officers were discussing during the Daley Center incident in 2018. Moreover, she admitted to conducting an unsanctioned investigation.

---

[86] Exhibit Group 23

[87] ARDC declined to investigate Ms. Brown and Ms. Brown retains her Illinois law license.

[88] Defendant Montgomery has been a hearing officer for the ARDC for more than 13 years.

274)    As such, Ms. Brown filed a lawsuit against Defendants

Montgomery, Goldston and Williams.[89]  One of the claims in the

lawsuit is that Defendant Montgomery committed defamation by

intentionally sharing verifiably false statements with individuals who

were not privileged to receive the communication, including the two

individuals Defendant Montgomery copied on her 2020 ARDC

Response.  Ms. Brown also claims that Defendant Montgomery later

forwarded her 2020  ARDC Response to other individuals.

275)    In March 2022,  the trial court granted the Defendants'

motions to dismiss and granted Ms. Brown leave to amend the

complaint.

276)    Approximately two days after the ruling was issued,

Defendant Law Bulletin published an article ("Article") on its online

platform regarding the ruling.

277)    In addition to publishing the Article, Law Bulletin

separately published an advertisement (the "Headline Ad") for the

Article on its online platform.  Law Bulletin published false statements

in the Headline Ad and included Ms. Brown's name.[90]  The Headline

---

[89] Brown v. Montgomery, Illinois Northern District, 1:20-cv-04893

[90] Ms. Brown filed suit against Defendant Law Bulletin for defamation and
fraud with respect to the false statements contained in the Headline Ad.
Defendant Law Bulletin motioned to dismiss the complaint arguing that the
Headline Ad qualified for the fair reporting privilege.  The trial court held

Ad, which contains the false statements, is free to view and publicly-accessible, whereas a Law Bulletin subscription must be purchased ($395) to view the clarifying information in the Article.

---

that a fair reporting analysis of the Article (which is not the subject of Ms. Brown's defamation claims) along with the analysis of the Headline Ad (the subject of Ms. Brown's defamation claims) is an accurate abridgment of the court's opinion. The trial court dismissed Ms. Brown's complaint with prejudice and denied Ms. Brown's request for leave to amend her complaint.

Ms. Brown filed an appeal, arguing the content in the Article should not have been included in the fair reporting privilege for the Headline Ad because:

A. The Headline Ad is the subject of her claims;

B. The Article and Headline Ad are two separately published items that Defendant Law Bulletin published at separate times to accomplish different goals. The Article was published to disseminate public information whereas the Headline Ad was published to sell subscriptions to Law Bulletin;

C. The Headline Ad, which contains the false statements, is free to view, whereas a Law Bulletin subscription must be purchased ($395) to view the Article

D. The Article is a fair abridgment of the court's opinion and qualifies for the fair reporting privilege. However, the Headline Ad (which is less than 100 words) is an abridgment of the Article, not an abridgment of the court's opinion (which is 26 pages); and,

E. If evaluated on its own, without factoring in the content of the Article, the Headline Ad does not qualify for the fair reporting privilege.

The appellate court affirmed the trial court's dismissal of the defamation claims but remanded the fraud claims to the trial court finding that the fair reporting privilege is not an affirmative defense to fraud. The Illinois Supreme Court denied Ms. Brown

Brown et al v. ServiceNow et al - p122

278)    Ms. Brown believes that Defendant Law Bulletin was asked to include Ms. Brown's name and false statements in the Headline Ad:

A. To ensure the Law Bulletin's Headline Ad would be listed at the top of Internet search results of Ms. Brown's name;[91]

B. To ensure the false representations within the Headline Ad would be available to everyone to view for free;

C. To ensure that viewers who access the Headline Ad, but are not willing to pay $395 to purchase a Law Bulletin subscription to view the related Article, could instead use Ms. Brown's name to search on free legal sites to access the court's opinion;

D. To add credibility to the disinformation campaign launched against Ms. Brown; and,

E. To affect Ms. Brown's then-current employment and future employability.

───────────────

petition for cert. The case is ongoing: Brown v. Law Bulletin Media, Cook County Illinois, Circuit Court, Law Division, 2023 L 003001.

[91] The content within Law Bulletin's articles is private, paid content and is likely not indexed by search engines. Thus, if Ms. Brown's name was only included within a Law Bulletin article, it is unlikely the Headline Ad or the associated article would be highly ranked for searches of Ms. Brown's name.

**ServiceNow Employment**[92]

279)     In or about August 2021, during COVID, Ms. Brown
obtained remote employment at ServiceNow on its expert services
risk management team.

280)     Ms. Brown enjoyed her job and her team members, and
she was progressing in her position.  In fact, Ms. Brown won an
innovation award from her business unit within her first six months
working at ServiceNow.  In addition, Ms. Brown was named a 2022
Employee Group Leader of the year for co-founding and leading the
neurodiversity pillar of ServiceNow's people with disabilities group.

281)     Ms. Brown had no reason to believe she was at risk of
losing her job at ServiceNow as she had not received negative
feedback from her manager. However, less than one month after Law
Bulletin published the Headline Ad, Ms. Brown's manager exercised
an advanced disciplinary tool against Ms. Brown and attempted to
terminate Ms. Brown.

282)     After attempting to terminate Ms. Brown, her manager
mentioned seeing negative information online about Ms. Brown. When
Ms. Brown searched her name on an Internet search engine, the

---

[92] Exhibit Group 24

Headline Ad was the top search result. Ms. Brown believes her manager viewed the false information in the Headline Ad and attempted to terminate Ms. Brown because of it.

283) The reasons her manager gave Ms. Brown for exercising the advanced disciplinary tool were discriminatory. As such, Ms. Brown filed a request for inquiry with the Equal Employment Opportunity Commission ("EEOC").[93]

284) Ultimately, Ms. Brown submitted two separate charging documents to the EEOC regarding ServiceNow's actions, citing approximately 32 claims total.

    A. Ms. Brown submitted her first EEOC charging document, #440-2022-05262, on or about January 20, 2023 and she subsequently filed a supplement/rebuttal. Together, the charging document and the ancillary documents that Ms. Brown filed are referred to as "EEOC #5262". Ms. Brown alleged approximately thirty claims in EEOC #5262.

---

[93] Before an EEOC charge can be filed, a claimant has to file a request and meet with an EEOC investigator. The calendars of EEOC investigators in the Chicago office are booked several months in advance. Ms. Brown filed the initial request related to EEOC Charge #262 in 2022 shortly after her manager attempted to fire her. However, Ms. Brown did not meet with the EEOC Investigator until 2023.

B. Ms. Brown submitted an additional EEOC charging document, #440-2024-00608[94], on or about November 15, 2023 and subsequently filed a supplement/rebuttal  Together the charging document and the ancillary documents that Ms. Brown filed are referred to as "EEOC #0608".  Ms. Brown alleged approximately three violations in EEOC #0608.

C. Together, EEOC #5262 and EEOC #0608 are referred to as the "EEOC Charges".

285)      During the investigation for EEOC #5262, ServiceNow argued that since there was a mandatory arbitration agreement in

---

[94]Ms. Brown submitted EEOC #608 after ServiceNow terminated her.

place[95], Ms. Brown could not pursue an EEOC action against

ServiceNow.

286)     The EEOC confirmed that Ms. Brown could submit the

EEOC Charges for investigation.  In addition, the EEOC investigator

clarified that:

A.   An employee can file an EEOC charge even if there is a

mandatory arbitration agreement in place;

B.   The EEOC, not Ms. Brown, would file the lawsuit against

ServiceNow if the EEOC decides there is sufficient evidence

that Ms. Brown's claims are valid;

---

[95]     Ms. Brown signed a mandatory arbitration agreement ("Arbitration
Agreement") with ServiceNow when she accepted employment. Pursuant to
that agreement, Ms. Brown does not assert any claims in this complaint
related to her employment at ServiceNow or her termination.  The claims in
this complaint are limited to the false statements Ms. Brown alleges
ServiceNow made to a federal agency with respect to two EEOC Charges
Ms. Brown submitted.  Moreover:
  1)   ServiceNow's false statements to the EEOC continued after she was
terminated from ServiceNow and the Arbitration Agreement does not cover
post-employment activities;
  2)   Even if ServiceNow's false statements were covered by the
Arbitration Agreement, it would be unconscionable and unenforceable for an
arbitration agreement to permit an employer to intentionally provide false
information to a federal agency in order to bypass oversight by the federal
agency; and
  3)   It is a crime under federal law to knowingly and willfully make false
statements to the US government (Sections 1001 and 287 of Title 18 of the
US Code).  Criminal acts are out of scope of the Arbitration Agreement.
Thus, ServiceNow making false statements to the EEOC are separate and
apart from Ms. Brown's employment or termination, and are not covered by
the Arbitration Agreement.

Brown et al v. ServiceNow et al  -  p127

C.  If the employer provides sufficient evidence to the EEOC to
    prove that there is no basis for the claims cited, the EEOC
    will decline to pursue litigation and issue a Right to Sue
    determination letter that governs the required timing for the
    claimant, Ms. Brown, file a lawsuit.  At that point, the
    mandatory arbitration agreement governs;

D.  The timing governed by the Right to Sue is not applicable to
    arbitration unless stated in the arbitration agreement.[96]

287)    Several claims that Ms. Brown made in the EEOC
Charges are indisputable.  The only way to counter the claims is to
provide false information.

288)    However, shortly before the EEOC issued its
determinations, the EEOC investigator stated to Ms. Brown that
ServiceNow presented sufficient evidence to counter each of the more
than thirty claims that Ms. Brown cited in the two EEOC Charges.

289)    In addition, the EEOC investigator stated that this was
not an instance where the EEOC was refusing to litigate because of a

_____

[96] In arbitration, ServiceNow has asserted that, even though there is nothing
in the Arbitration Agreement referencing a time limitation to initiate
arbitration, the timing within the EEOC's Right to Sue letter governs Ms.
Brown's timing to initiate an arbitration. Moreover, ServiceNow asserts that
since Ms. Brown failed to initiate arbitration within the mandated Right to
Sue time period, her employment and termination claims against
ServiceNow should be dismissed with prejudice and the arbitration should
be terminated.

Brown et al v. ServiceNow et al  -  p128

backlog of cases.  The EEOC determined that, based on information that ServiceNow provided to the EEOC, Ms. Brown's claims were baseless.

290)      The EEOC issued its determination for:

    A.  EEOC #262 on March 27, 2024; and,

    B.  EEOC #608 on April 5, 2024;

291)      Since evidence does not exist to counter several of Ms. Brown's claims, Ms. Brown believes that ServiceNow knowingly provided false information to the EEOC, a federal agency, to influence the EEOC's determinations.


## COUNTS

## Kohmedia Contracts

### COUNT 1: BW Trust claims Defendant Kohmedia breached the Kohmedia Contracts

292)      BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

293)      BW Trust alleges that Defendant Kohmedia breached the Kohmedia Contract and Kohmedia Confidentiality Agreement.  Based on information and belief, BW Trust claims:

A. Legacy and Defendant Kohmedia executed two written contracts, the Kohmedia Contract and the Kohmedia Confidentiality Agreement, in or about June 2015 (together referenced as "Kohmedia Contracts").

B. In the Kohmedia Contracts, Defendant Kohmedia agreed to terms including but not limited to:

    i. Creating and completing an online software application for Legacy (the "App") as the first version of Legacy's Software;

    ii. Providing post-launch support for the App; and,

    iii. Ensuring the confidentiality of Legacy's trade secrets.

C. Legacy agreed to pay Defendant Kohmedia $40,000 for its performance for the Kohmedia Contracts.

D. Legacy performed its obligations under the Kohmedia Contracts by making payments to Defendant Kohmedia by or before the dates the payments were due.[97]

E. Defendant Kohmedia defaulted on the Kohmedia Contracts by failing to perform its obligations under the Kohmedia Contracts, including but not limited to:

    i. not delivering a complete and functioning App to Legacy;

---

[97] Remainder of contract payments never became due.

ii. not providing post-launch support to Legacy; and,

iii. failing to keep Legacy's trade secrets confidential.

F. Beginning in or about December 2015, Legacy repeatedly notified Defendant Kohmedia that Defendant Kohmedia was in default of the Kohmedia Contracts and requested that Defendant Kohmedia cure the default.

G. Following Defendant Kohmedia's default, Legacy attempted to mitigate damages by hiring another developer to complete the App. However, the new developer was unable to debug the App's software code. Thus, Legacy's damages were not mitigated.

H. Legacy declared Defendant Kohmedia was in breach of the Kohmedia Contracts on or about January 6, 2017.

294) In addition, based on belief and information acquired in 2023, BW Trust alleges that Defendant Kohmedia also defaulted on the Kohmedia Contracts by:

A. misappropriating Legacy's trade secrets; and,

B. fraudulently transferring the App and Legacy's trade secrets to an unauthorized third party.

295) BW Trust claims that Defendant Kohmedia:

A. Knew that their actions would cause harm to Legacy;

B. Intended to harm Legacy; and,

C. Defendant Kohmedia's actions, or conspiracy to act, are a direct and proximate cause of Legacy's damages.

296)     Legacy suffered significant damages as a result of Defendant Kohmedia's actions, or conspiracy to act, in an amount to be proven at trial.

297)     BW Trust alleges that Defendant Kohmedia actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Legacy from becoming aware of its harm. The concealed material facts include, but are not limited to,

A. Defendant Kohmedia's reason for defaulting on the Kohmedia Contracts;

B. Unauthorized third-party access Defendant Kohmedia provided to the App;

C. The conveyance of a corrupted version of the App to Legacy; and,

D. The conveyance of a functional version of the App to an unauthorized third party.

298)     Legacy did not have actual or constructive knowledge of the concealed material facts. Legacy believed the misrepresentations

and could not independently verify the concealed facts. As such, BW

Trust asserts that the discovery rule applies to this claim and that the

date of discovery was in or about October 2023.


**COUNT 2: Plaintiffs claim Defendants Brown, Goldston, Kohmedia, Koht, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams violated the Illinois Deceptive Trade Practices Act (815 ILCS 510/1-7) and/or the Illinois Consumer Fraud Act (815 ILCS 505/1-12) and fraudulently concealed their actions with respect to the App**

299)     Plaintiffs re-allege and incorporate by this reference each

paragraph contained in this Complaint as if fully set forth here.

300)     Based on belief and information acquired in 2023,

Plaintiffs allege Defendants Brown, Goldston, Kohmedia, Koht,

Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams violated

the Illinois Deceptive Trade Practices Act and/or the Illinois Consumer

Fraud Act by engaging in deceptive trade practices, or conspiring to

do so, with respect to the App.  In addition, Plaintiffs claim the named

Defendants intentionally and fraudulently devised, executed, or

conspired to execute, a plan to conceal material facts from Plaintiffs.

301)     Based on belief and information acquired in 2023,

Plaintiffs claim Defendant Kohmedia intentionally took, and/or

conspired with one or more of the named Defendants to take, actions

including but not limited to one or more of the following:

A. Accepting payments from Legacy knowing that Defendant Kohmedia would not deliver the completed App to Legacy;

B. Misrepresenting to Plaintiffs that Legacy's trade secrets were being kept confidential, then placing them, and the App's software code, on one or more unauthorized Internet domains including but not limited to the domain BuildDeployDestroy.com;

C. Misrepresenting to Plaintiffs that Defendant Kohmedia routinely places software projects under development on two separate domains during testing;

D. Representing to Plaintiffs that the App installed on the second domain was for internal testing only. Then, allowing unauthorized users to access the App's software code and trade secrets via the second domain which prevented Ms. Brown from becoming aware that unauthorized users had been given access to the App;

E. Misrepresenting that Defendant Kohmedia transferred the most complete version of the App's software code to the new developer that  Legacy hired to mitigate damages after Defendant Kohmedia's breach. Then, transferring a corrupted version of the App's software code to Legacy's new

developer which corruption rendered the App's software code useless;

F.  Misrepresenting to Legacy that Defendant Kohmedia had not completed the App, when in fact Defendant Kohmedia had finished the App and transferred the completed App to an unauthorized third party;

G.  Receiving compensation for sharing the App's software code with unauthorized individuals; and,

H.  Receiving compensation for making false representations to Plaintiffs;

302)    Moreover, based on belief and information acquired in 2023, Plaintiffs claim the named Defendants took, or conspired to take, actions including but not limited to one or more of the following:

A.  Accessing the App's software code and trade secrets knowing that Legacy had not granted access;

B.  Providing or receiving compensation for sharing the App's software code with unauthorized individuals;

C.  Providing or receiving compensation for making false representations to Plaintiffs;

D.  Concealing, or conspiring to conceal, actions to prevent Plaintiffs from learning the truth behind the concealed facts.

303)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim which prevented Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

304)     Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

305)     Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

**COUNT 3: Plaintiffs claim that Defendants Brown, Goldston, Koht, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams tortuously interfered with the Kohmedia Contracts**

306) Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

307) Based on belief and information acquired in 2023, Plaintiffs allege that Defendants Brown, Goldston, Koht, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams tortuously interfered, or conspired to interfere, with the Kohmedia Contracts and intentionally caused their breach.

308) Based on belief and information acquired in 2023, Plaintiffs claim:

A. The named Defendants were aware that the Kohmedia Contracts were valid contracts when the named Defendants interfered with them;

B. The named Defendants intentionally and willfully induced, or conspired to induce, Defendant Kohmedia to breach the Kohmedia Contracts by taking, or conspiring to take, actions described herein; and,

C. Defendant Kohmedia did in fact breach the Kohmedia Contracts.

309) Plaintiffs claim that:

A. the named Defendants knew that the named Defendants' actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

310)     Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

311)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim which prevented Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 4: BW Trust claims Defendants Brown, Goldston, Kohmedia, Koht, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams misappropriated, and/or conspired to misappropriate Legacy's trade secrets violating 18 U.S.C. §1836 and/or the Illinois Trade Secrets Act 765 ILCS 1065/1 et seq with respect to the App**

312)     BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

313)     Based on belief and information acquired in 2023, BW Trust alleges Defendants Brown, Goldston, Kohmedia, Koht, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams intentionally misappropriated, or conspired to misappropriate, Legacy's trade secrets with respect to the App.

314)     BW Trust alleges that Defendant Kohmedia acknowledged in the Kohmedia Contracts that it was in possession of Legacy's trade secrets and promised to keep Legacy's trade secrets confidential. However, based on belief and information acquired in 2023, BW Trust claims:

    A. Defendant Kohmedia placed the App's software code on an unauthorized domain(s) and allowed unauthorized third parties to access Legacy's trade secrets; and/or

    B. The named Defendants, or agents acting on their behalf, intentionally accessed Legacy's trade secrets knowing that

Legacy had not given permission for their trade secrets to be revealed.

315)     Legacy's trade secrets were misappropriated by the named Defendants' actions and the misappropriation affected interstate commerce.

316)     BW Trust claims that:

A. the named Defendants knew that their actions would cause harm to Legacy;

B. the named Defendants intended to harm Legacy; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Legacy's damages.

317)     Legacy suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

318)     BW Trust alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim which prevented Legacy from becoming aware of its injuries. Legacy did not have actual or constructive knowledge of the concealed material facts. Legacy believed the misrepresentations and could not independently verify the concealed facts. As such, BW Trust asserts

that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNTS 5 and 6:  Plaintiffs claim that Defendants Brown, Goldston, Kohmedia, Koht, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams committed, or conspired to commit, mail fraud 18 U.S.C. §1341 (Count 5) and/or wire fraud 18 U.S.C. §1343 (Count 6) with respect to the Kohmedia Contracts**

319)     Plaintiffs re-allege and incorporate by this reference each paragraph contained in this Complaint as if fully set forth here.

320)     Based on belief and information acquired in 2023, Plaintiffs allege Defendants Brown, Goldston, Koht, Kohmedia, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams committed, or conspired to commit mail fraud, and/or wire fraud by carrying out a scheme to utilize the US Mail, phone and/or electronic communications to defraud Plaintiffs with respect to the Kohmedia Contracts.

321)     Based on belief and information acquired in 2023, Plaintiffs claim Defendant Kohmedia intentionally took, and/or conspired with one or more of the named Defendants to take, actions including but not limited to one or more of the following:

A.  Accepting Legacy's payments for the Kohmedia Contracts delivered via US Mail and/or electronic transfer;

B. Hosting daily and weekly meetings with Plaintiffs over the phone and/or Internet to deceptively gather information from Plaintiffs;

C. Requesting via phone and/or electronic communications for Ms. Brown to use her time and effort in the App development process knowing that Legacy would not reap the benefit of her effort;

D. Conspiring via phone and/or electronic communications to provide access to the App to unauthorized third parties;

E. Providing unauthorized access to the App's software code on one or more unauthorized Internet domains; and,

F. Using electronic communications to conceal their fraudulent acts from Plaintiffs.

322)     In addition, based on belief and information acquired in 2023, Plaintiffs allege the named Defendants, or an agent acting on behalf of one or more of the named Defendants, took actions including but not limited to:

A. Conspiring with Defendant Kohmedia via phone and electronic communication to carry out fraudulent actions described herein; and,

  B. Knowingly and fraudulently accessing the App's software

    code over the Internet without authorization from Legacy.

 323) The named Defendants' deception, or conspiracy to

deceive, occurred in the course of interstate commerce.

 324) Plaintiffs claim that:

  A. the named Defendants knew that their actions would cause

    harm to Plaintiffs;

  B. the named Defendants intended to harm Plaintiffs; and,

  C. the named Defendants' actions, or conspiracy to act, are a

    direct and proximate cause of Plaintiffs' damages.

 325) Plaintiffs suffered significant damages as a result of the

named Defendants actions, or conspiracy to act, in an amount to be

proven at trial.

 326) Plaintiffs allege that the named Defendants actively

misled, engaged in affirmative acts to conceal, and/or conspired to

mislead or conceal, material facts related to this claim to prevent

Plaintiffs from becoming aware of their harm.  Plaintiffs did not have

actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently

verify the concealed facts.  As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was in or about October 2023.

## Legacy Operations

### COUNT 7: Plaintiffs claim Defendants Goldston and Montgomery breached their fiduciary duty to Legacy

327)     Plaintiffs re-allege and incorporate by this reference each paragraph contained in this Complaint as if fully set forth here.

328)     Plaintiffs allege Defendants Goldston and Montgomery had a fiduciary duty to Legacy based on the following:

A.  Dr. Hamilton is an equity owner of Legacy;

B.  As a condition of Dr. Hamilton's ownership, Dr. Hamilton was required to appoint a representative to handle his ownership responsibilities;

C.  In May 2015, Dr. Hamilton assigned Defendant Goldston as his representative for his Legacy ownership responsibilities;

D.  In or about October 2015, Dr. Hamilton added Defendant Montgomery as a representative for his Legacy ownership responsibilities;

E.  As Dr. Hamilton's representatives for Legacy, Defendants Montgomery and Goldston inherited Dr. Hamilton's fiduciary

duty to Legacy, which includes but is not limited to, a duty of loyalty, good faith, care, confidentiality and prudence;

F. As Dr. Hamilton's representatives, Defendants Goldston[98] and Montgomery have scope to exercise discretionary power over Dr. Hamilton's equity interest in Legacy and can unilaterally affect Dr. Hamilton's interest in Legacy.

329) Based on information contained in Montgomery's July 2020 ARDC Response ("2020 ARDC Response"), Plaintiffs allege that Defendants Goldston and Montgomery took, or conspired to take, actions that breached their fiduciary duty including, but not limited to:

A. Failing to respond to Ms. Brown's attempts to complete the equity-to-debt conversion of Dr. Hamilton's ownership share;

B. Failing to present the signed equity-to-debt documents to Dr. Hamilton that Ms. Brown mailed to Defendant Montgomery for Dr. Hamilton's signature;

C. Maliciously misrepresenting to third parties that Ms. Brown was the reason the equity-to-debt conversion did not occur;

D. Maliciously preventing Legacy from raising capital or securing debt financing;

_____
[98]Plaintiffs believes Defendant Goldston has become the trustee of Dr. Hamilton's trust which owns the equity interest in Legacy.

E.  Maliciously sharing false information that accuses Ms. Brown
of mismanaging Legacy's finances and taking advantage of
Dr. Hamilton;

F.  Maliciously sharing false information about Plaintiffs with
third-parties, including but not limited to, regulatory bodies,
law enforcement officials and media sources.

330)    In addition, based on belief and information Plaintiffs
acquired in 2023, Plaintiffs allege that Defendants Goldston and
Montgomery took, or conspired with one or more of the Defendants to
take, actions that breached their fiduciary duty to Legacy including,
but not limited to:

A.  Misappropriating Legacy's trade secrets;

B.  Fraudulently conveying Legacy's Software;

C.  Concealing their fraudulently acts from Legacy;

D.  Misusing proprietary information acquired from Legacy;

E.  Personally benefiting from sharing Legacy's proprietary
information with third parties;

F.  Diverting business opportunities away from Legacy;

G.  Setting up a competing business using Legacy's proprietary
information;

H.  Failing to disclose conflicts of interest to Legacy;

I. Launching a disinformation campaign to damage Ms. Brown's reputation;

J. Intentionally causing Legacy to become financially insolvent by:

    i. refusing to complete the equity-to-debt conversion;

    ii. preventing Legacy from selling additional equity;

    iii. preventing Legacy from securing institutional debt financing; and,

    iv. disparaging Legacy and its software to deter a potential buyer of Dr. Hamilton's equity.

331) Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

332) Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

333) Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to

mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their injuries. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about July 2020 or October 2023 as indicated above.

**COUNT 8: Plaintiffs claim that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia fraudulently concealed, and/or conspired to fraudulently conceal, material facts related to Legacy's operations**

334)     Plaintiffs re-allege and incorporate by this reference each paragraph contained in this Complaint as if fully set forth here.

335)     Based on belief and information acquired in 2020 and 2023, Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts from Plaintiffs related to Legacy's operations.

336)     Based on belief and information acquired in 2020 and 2023, Plaintiffs allege that the named Defendants, or agents acting on their behalf, concealed, or conspired to conceal, material facts related to:

    A.  False information being shared about Plaintiffs with third-parties;

    B.  Maliciously preventing Legacy from: raising capital, securing financing, converting Dr. Hamilton's equity to debt and/or finding an investor to purchase Dr. Hamilton's equity;

    C.  Engaging with law enforcement officials, media sources and regulatory bodies to encourage the entities to take improper actions against Plaintiffs;

    D.  Fraudulently conveying Legacy's Software and trade secrets to an unauthorized third party;

    E.  Operating Legacy's Software under a new, competing business without compensating Legacy;

    F.  Generating revenue by operating Legacy's Software as a new business without compensating Legacy.

337)     Plaintiffs did not have actual or constructive knowledge of the concealed material facts.  Plaintiffs assert that they became aware of these concealed facts through two occurrences:

A. Montgomery's July 2020 ARDC Response to a request for an ARDC investigation that Ms. Brown initiated; and,

B. Email advertisements sent to Ms. Brown in 2023 from Defendant Gartner which alerted Ms. Brown that software similar to Legacy's Software existed;

C. But for these two events, it would have been difficult, if not impossible, for Plaintiffs to have identified the concealed facts.

338)     Ms. Brown exercised due diligence in trying to uncover the concealed facts, including but not limited to:

A. Diligently searching the Internet;

B. Filing a request for investigation with the ARDC against Defendant Montgomery and herself; and,

C. Filing lawsuits against several of the named Defendants. However, none of the none of the named Defendants answered Ms. Brown's complaints.  Thus, no facts were uncovered through the lawsuits.

339)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have

actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim. The date of discovery for information discovered in Montgomery's 2020 ARDC Response is July 2020 and the date of discovery for information related to the unauthorized conveyance of Legacy's Software is October 2023.

340) Plaintiffs claim that:

    A. the named Defendants knew that their actions would cause harm to Plaintiffs;

    B. the named Defendants intended to harm Plaintiffs; and,

    C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

341) Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

**COUNT 9: Plaintiffs claim that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia tortuously interfered, and/or conspired to tortuously interfere with Legacy's operating agreement**

342)     Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

343)     Based on belief and information acquired in 2023, Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia tortuously interfered, or conspired to tortuously interfere, with Legacy's operating agreement.

344)     Plaintiffs claim that Legacy's operating agreement is a valid written agreement between BW Trust and Dr. Hamilton that governs the operations of Legacy. Legacy was created with the purpose of developing and operating estate planning software which allowed consumers to efficiently and affordably create effective and enforceable estate plans.

345)     Plaintiffs allege that Legacy successfully developed two versions of Legacy's Software, the App and the Redesigned App. Legacy completed the development of both versions of Legacy's Software and they were ready for launch. However, the named

Defendants tortuously interfered with Legacy's ability to achieve its mission by preventing Legacy's launch of one or both of the versions of Legacy's Software.

346)     Based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants intentionally took, or conspired to take, actions including but not limited to one or more of the following:

A. Conspiring with Defendants Goldston and/or Montgomery to breach Legacy's Operating Agreement;

B. Conspiring with Defendants Goldston and/or Montgomery to prevent Legacy from raising capital or taking on debt with the goal of causing Legacy to become financially insolvent;

C. Conspiring with Defendants Goldston and/or Montgomery to fraudulently convey Legacy's assets;

D. Conspiring with Defendants Goldston and/or Montgomery to reveal Legacy's confidential information to unauthorized third parties;

E. Conspiring with Defendants Goldston and/or Montgomery to intentionally share false information about Legacy's Software and its management with third parties, including but not

limited to, regulatory bodies, law enforcement officials and media sources; and,

F.  Conspiring with Defendants Goldston and/or Montgomery to enable an unauthorized company to market and operate Legacy's assets to generate revenue that belongs to Legacy.

347)    Plaintiffs claim that:

A.  the named Defendants knew that their actions would cause harm to Plaintiffs;

B.  the named Defendants intended to harm Plaintiffs; and,

C.  the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

348)    Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

349)    Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was in or

about October 2023.

**COUNTS 10, 11 and 12: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia violated, or conspired to violate, the Illinois Deceptive Trade Practices Act (815 ILCS 510/2) and/or the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (Count 10), and/or committed, or conspired to commit, mail fraud 18 U.S.C. §1341 (Count 11), and/or wire fraud 18 U.S.C. §1343 (Count 12), with respect to Legacy's operations**

350)     Plaintiffs re-allege and incorporate by this reference each

paragraph contained in this Complaint as if fully set forth here.

351)     Based on belief and information acquired in 2023,

Plaintiffs allege Defendants Barbo, Brown, Goldstein, Goldston,

Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske,

Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia fraudulently

carried out a scheme to defraud, or conspired to defraud, Plaintiffs

related to Legacy's Operating Agreement by utilizing the US Mail,

phone and/or wire communications and in so doing violated, or

conspired to violate, the Illinois Deceptive Trade Practices Act, and/or

the Illinois Consumer Fraud Act.

352)     Based on belief and information acquired in 2023,

Plaintiffs claim Defendants Goldston and Montgomery intentionally

took, and/or conspired with one or more of the named Defendants to take, actions including but not limited to one or more of the following:

A. Attending phone conferences with Plaintiffs to discuss critical matters related to Legacy, even though steps were being taken to cause Legacy to become insolvent;

B. Appearing to negotiate the equity-to-debt conversion of Dr. Hamilton's equity interest via US mail, phone and/or electronic communications, even though Defendants Goldston and Montgomery did not intend to complete the equity-to-debt conversion;

C. Misrepresenting to third parties via phone and/or electronic communications that Ms. Brown was the cause of the failed equity-to-debt conversion, even though Ms. Brown had transmitted signed documents to Defendant Montgomery via US Mail on at least two occasions;

D. Providing false information to regulatory bodies and third parties via phone and/or electronic communications and US Mail about one or both Plaintiffs;

E. Intentionally misrepresenting the quality of Legacy's Software via US Mail, phone and/or electronic

communications to deter potential purchasers of Dr.
Hamilton's equity share;

F. Conspiring via phone and/or electronic communications to
fraudulently convey Legacy's assets to an unauthorized third
party;

G. Participating, or conspiring to participate, in the
unauthorized conveyance of Legacy's assets to an
unauthorized third party via US Mail, phone and/or
electronic communications;

H. Enabling revenue from the operation of Legacy's Software
and trade secrets to be paid to an unauthorized third party
via electronic communications rather than being paid to
Legacy;

I. Engaging in communications via US Mail and/or wire that
create the likelihood of confusion of the true owner of
Legacy's assets.

353) Plaintiffs claim that:

A. the named Defendants knew that their actions would cause
harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a
direct and proximate cause of Plaintiffs' damages.

354)     Plaintiffs suffered significant damages as a result of the
named Defendants actions, or conspiracy to act, in an amount to be
proven at trial.

355)     Plaintiffs allege that the named Defendants actively
misled, engaged in affirmative acts to conceal, and/or conspired to
mislead or conceal, material facts related to these claims to prevent
Plaintiffs from becoming aware of their harm. Plaintiffs did not have
actual or constructive knowledge of the concealed material facts.
Plaintiffs believed the misrepresentations and could not independently
verify the concealed facts. As such, Plaintiffs assert that the discovery
rule applies to this claim and that the date of discovery was in or
about October 2023.

## Bellwether & Joint Venture Contracts

### COUNT 13:  BW Trust claims Defendant Bellwether breached the Bellwether Contracts

356)     BW Trust re-alleges and incorporates by this reference
each paragraph in this Complaint as if fully set forth here.

357)     BW Trust alleges that Defendant Bellwether breached the
Bellwether Contract.  BW Trust claims:

A. Defendant Bellwether and Legacy signed a confidentiality and non-disclosure agreement in December 2015 for Defendant Bellwether to assess the software code Defendant Kohmedia developed for the App;

B. In January 2016, Defendant Bellwether and Legacy signed a written contract for Defendant Bellwether to patch the App's software code developed by Defendant Kohmedia. Together the non-disclosure agreement and the Bellwether contract are referred to as the "Bellwether Contracts";

C. Defendant Bellwether was able to repair some of the App's software code but was not able to patch the App such that it operated consistently;

D. Legacy paid Defendant Bellwether the contracted amounts on or before the dates in the Bellwether Contracts;

E. During joint venture negotiations and without Legacy's authorization, in March 2016, Defendant Bellwether disabled the patched App;

F. Disabling the patched App made it impossible for Legacy to utilize the patched App to generate revenue or to demo the patched App for potential investors;

G. Defendant Bellwether refused to re-enable the patched App.

Brown et al v. ServiceNow et al - p159

358)    Legacy notified Defendant Bellwether that it was in default of the Bellwether Contracts in or about March 2016. However, Legacy did not declare Defendant Bellwether's default to be a breach of the Bellwether Contracts at that time.

359)    Beginning in or about September 2016, Legacy notified Defendant Bellwether that it was in default of the Bellwether Contracts and demanded the patched App be reactivated. However, Defendant Bellwether did not reactivate the patched App.

360)    Legacy notified Defendant Bellwether that it was in breach of the Bellwether Contracts on or about January 6, 2017.

361)    BW Trust claims that:

    A.  Defendant Bellwether knew that their actions would cause harm to Legacy;

    B.  Defendant Bellwether intended to harm Legacy; and,

    C.  Defendant Bellwether's actions, or conspiracy to act, are a direct and proximate cause of Legacy's damages.

362)    Legacy suffered significant damages as a result of Defendant Bellwether's actions in an amount to be proven at trial.

363)    BW Trust alleges that Defendant Bellwether actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent

Legacy from becoming aware of its harm. Concealed material facts include but are not limited to:

    A.  Defendant Bellwether's intent behind disabling the patched App;

    B.  Communications with unauthorized third parties related to the patched App;

    C.  Access provided to the patched App to unauthorized third parties; and,

    D.  The disposition of the patched App.

364)     Legacy did not have actual or constructive knowledge of the concealed material facts. Legacy believed the misrepresentations and could not independently verify the concealed facts. As such, BW Trust asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 14: BW Trust claims Defendants Bellwether, Vaske and Greeby breached the Joint Venture Agreement**

365)     BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

366)     BW Trust alleges Defendants Bellwether, Vaske and Greeby breached the Joint Venture Agreement with Legacy. BW Trust claims:

A. In March 2016, Legacy entered a joint venture with Defendants Bellwether, Vaske and Greeby to build and operate the Redesigned App;

B. Legacy and Defendants Bellwether, Greeby and Vaske memorialized the joint venture with written terms and those terms are referred to as the Joint Venture Agreement;

C. Legacy completed performance of its obligations under the Joint Venture Agreement; and,

D. Defendants Bellwether's, Vaske's and Greeby's did not perform its obligations under the Joint Venture Agreement and breached the Joint Venture Agreement.

E. Although Defendants Vaske, Greeby and Bellwether built the Redesigned App, BW Trust alleges that after the Redesigned App was functional, Defendants Bellwether, Vaske and Greeby:

   i.  Refused to launch the Redesigned App;

   ii.  Refused to provide post-launch technical support; and,

   iii. Refused to allow the Joint Venture, or Legacy, to release the Redesigned App to a tech support team so that the Redesigned App could be launched.

Brown et al v. ServiceNow et al  -  p162

F. Moreover, based on belief and information acquired in 2023, BW Trust alleges Defendants Bellwether, Greeby and Vaske:

    i. Gave unauthorized third parties access to the Redesigned App; and,

    ii. Transferred the Redesigned App to an unauthorized third party.

G. By taking these actions, Defendants Bellwether, Vaske and Greeby defaulted on the Joint Venture Agreement.

367) Legacy notified Defendants Bellwether, Vaske and Greeby that they were in default of the Joint Venture Agreement on several occasions beginning in or about September 2016.

368) Legacy notified Defendants Bellwether, Vaske and Greeby that they were in breach of the Joint Venture Agreement on or about January 6, 2017.

369) BW Trust claims that:

A. the named Defendants knew that their actions would cause harm to Legacy;

B. the named Defendants intended to harm Legacy; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Legacy's damages.

370)     Legacy suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

371)     BW Trust alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Legacy from becoming aware of its harm. Concealed material facts include but are not limited to:

   A. The named Defendants' intent behind creating the Joint Venture and breaching the Joint Venture Agreement;

   B. The unauthorized access the named Defendants gave to the Joint Venture's assets; and,

   C. The named Defendants' disposition of the Redesigned App.

372)     Legacy did not have actual or constructive knowledge of the concealed material facts. BW Trust believed the misrepresentations and could not independently verify the concealed facts. As such, BW Trust asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 15: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal fraudulently concealed, or conspired to fraudulently conceal, material facts related to the Bellwether Contracts, the Joint Venture Agreement, the patched App and/or the Redesigned App**

373)     Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

374)     Based on belief and information acquired in 2023, Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts from Plaintiffs with respect to the Bellwether Contracts, the Joint Venture Agreement, the patched App, and/or the Redesigned App.

375)     Based on belief and information acquired in 2023, Plaintiffs claim Defendants Bellwether, Greeby and Vaske intentionally took, and/or conspired with one or more of the named Defendants to take, actions including but not limited to one or more of the following:

    A. Convincing Plaintiffs that the Joint Venture Agreement would be honored even though the named Defendants had no intention of honoring the Joint Venture;

B. Falsely representing that the patched App needed to be disabled in order to start building the Redesigned App when, in fact, the patched App was intentionally disabled to prevent Legacy from using the patched App to raise capital or generate revenue for Legacy;

C. Falsely representing to Ms. Brown that she would be paid deferred compensation from the Joint Venture once the Redesigned App launched, while knowing that the named Defendants had no intention of launching the Redesigned App or compensating Ms. Brown;

D. Concealing that during the development of the Redesigned App, unauthorized third parties were allowed access to Legacy's Software code and trade secrets;

E. Concealing that an unauthorized third party was given access to the Joint Venture's meetings;

F. Concealing that the Redesigned App's code was fraudulently conveyed away from the Joint Venture to an unauthorized third party;

G. Concealing that Legacy's and the Joint Venture's trade secrets were misappropriated;

H. Concealing that Defendants Greeby and Vaske were actively working against the interests of the Joint Venture;

I. Preventing Ms. Brown from discovering the existence of TrustandWill.com by actively blocking Plaintiffs' devices from accessing the domain;

J. Concealing that Legacy's Software is being operated as TrustandWill.com and is generating revenue for an unauthorized third party.

376)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts.  As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

377)     Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to damage Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a

direct and proximate cause of Plaintiffs' damages.

378)    Plaintiffs suffered significant damages as a result of the

named Defendants actions, or conspiracy to act, in an amount to be

proven at trial.

**COUNT 16:  Plaintiffs claim that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams and Huge Legal tortuously interfered, and/or conspired to tortuously interfere, with the Bellwether Contracts and/or the Joint Venture Agreement**

379)    Plaintiffs re-allege and incorporate by this reference each

paragraph in this Complaint as if fully set forth here.

380)    Based on belief and information acquired in 2023,

Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston,

Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins

and Williams tortuously interfered, or conspired to tortuously

interfere, with the Bellwether Contracts and intentionally caused their

breach.

381)    Moreover, based on belief and information acquired in

2023, Plaintiffs allege that Defendants Barbo, Brown, Goldstein,

Goldston, Lamb, Montgomery, Shannon, Tucker-Wilkins, Wilkins and

Williams tortuously interfered, or conspired to tortuously interfere,

with the Joint Venture Agreement and intentionally caused their breach.

382)     Plaintiffs claim that the Bellwether Contracts are valid agreements between Legacy and Defendant Bellwether to repair and patch the first version of Legacy's Software, the App.  The Bellwether Contracts set forth that Legacy owns the App, the patched App, their software code and trade secrets.

383)     Based on belief and information acquired in 2023, Plaintiffs claim:

A. The named Defendants knew that the Bellwether Contracts existed when they interfered, or conspired to interfere, with the Bellwether Contracts.

B. The named Defendants intentionally and willfully induced, or conspired to induce, Defendant Bellwether to breach the Bellwether Contracts;

C. The named Defendants intentionally and willfully induced, or conspired to induce, Defendant Bellwether to fraudulently convey Legacy's patched App and trade secrets;

D. Defendant Bellwether did in fact breach the Bellwether Contracts.

384) In addition, based on belief and information acquired in 2023, Plaintiffs claim:

    i. The named Defendants knew that the Joint Venture Agreement existed when they interfered, or conspired to interfere, with it;

    ii. The named Defendants intentionally and willfully induced, or conspired to induce, Defendant Bellwether, Vaske and/or Greeby to breach the Joint Venture Agreement; and,

    iii. Defendants Bellwether, Greeby and Vaske did in fact breach the Joint Venture Agreement.

385) Plaintiffs claim that:

    A. the named Defendants knew that their actions would cause harm to Plaintiffs;

    B. the named Defendants intended to harm Plaintiffs; and,

    C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

386) Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

387)     Plaintiffs allege that the named Defendants actively

misled, engaged in affirmative acts to conceal, and/or conspired to

mislead or conceal, material facts related to this claim to prevent

Plaintiffs from becoming aware of their harm. Plaintiffs did not have

actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently

verify the concealed facts.  As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was in or

about October 2023.


**COUNT 17: Plaintiffs claim Defendants Bellwether, Vaske and Greeby breached their fiduciary duty to Legacy and the Joint Venture**

388)     Plaintiffs re-allege and incorporate by this reference each

paragraph contained in this Complaint as if fully set forth here.

389)     Plaintiffs allege that Legacy and Defendants Bellwether,

Vaske and Greeby were partners in the Joint Venture and because of

that relationship, Defendants Bellwether, Greeby and Vaske owed

duties of good faith and fair dealing to Plaintiffs and the Joint Venture.

390)     Based on belief and information acquired in 2023,

Plaintiffs claim that Defendants Bellwether, Vaske and Greeby

breached their duty by taking actions including but not limited to:

A. Meeting with unauthorized third parties to discuss Legacy's Software and its progress;

B. Sharing the content of Joint Venture's team meetings with unauthorized third parties;

C. Misappropriating, and conspiring to misappropriate, trade secrets owned by Legacy and the Joint Venture;

D. Failing to safeguard Legacy's and the Joint Venture's confidential information;

E. Fraudulently conveying, and conspiring to fraudulently convey, Legacy's Software to an unauthorized third party;

F. Usurping Legacy's manager's time and energy to create additional content and trade secrets for the Joint Venture knowing she would not be compensated;

G. Failing to disclose material facts to Plaintiffs;

H. Failing to avoid conflicts of interest that compromised the named Defendants' loyalty to the Joint Venture and Legacy;

I. Seizing profit opportunities for themselves that belonged to the Joint Venture; and,

J. Acting in their own self-interest rather than the Joint Venture's business interests.

391) Plaintiffs claim that:

Brown et al v. ServiceNow et al - p172

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

392)     Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

393)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts.  As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 18: BW Trust claims Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal misappropriated, and/or conspired to misappropriate, Legacy's and/or the Joint Venture's trade secrets violating Defend Trade Secrets Act, 18 U.S.C. §1836 and/or the Illinois Trade Secrets Act 765 ILCS 1065/1 et seq. with respect to the Redesigned App and the patched App**

394)      BW Trust re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

395)      Based on belief and information acquired in 2023, BW Trust alleges Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether and Huge Legal misappropriated, or conspired to misappropriate, Legacy's and/or the Joint Venture's, trade secrets violating Defend Trade Secrets Act, 18 U.S.C. §1836, and the Illinois Trade Secrets Act 765 ILCS 1065/1 et seq. with respect to the trade secrets contained in the Redesigned App and/or the patched App

396)      Based on belief and information acquired in 2023, BW Trust claims the named Defendants:

A. Knew that the Redesigned App and patched App contained trade secrets owned by Legacy and/or the Joint Venture;

B. Knew that Legacy had not given authorization for third parties to access the trade secrets; and,

C. Intentionally accessed, allowed access to, or conspired to access the trade secrets improperly.

397)     In addition, based on belief and information acquired in 2023, BW Trust claims Defendants Bellwether, Greeby and Vaske:

A. Acknowledged the presence of trade secrets;

B. Promised to keep Legacy's and the Joint Venture's trade secrets confidential and to prevent unauthorized access;

C. Allowed the named Defendants access to the Redesigned App and patched App's trade secrets without Legacy's knowledge or permission;

D. Transferred, or conspired to transfer, the Redesigned App's and/or the patched App's software code, and the trade secrets they contained, to one or more of the named Defendants or agents working on their behalf; and,

E. Legacy's and the Joint Venture's trade secrets were misappropriated by the named Defendants' actions. The misappropriation affected interstate commerce.

398)     BW Trust claims that:

A. the named Defendants knew that their actions would cause harm to Legacy;

B. the named Defendants intended to harm Legacy; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Legacy's damages.

399)     Legacy suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

400)     BW Trust alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Legacy from becoming aware of its harm. Legacy did not have actual or constructive knowledge of the concealed material facts. Legacy believed the misrepresentations and could not independently verify the concealed facts. As such, BW Trust asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 19: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal violated the Illinois Deceptive Trade Practices Act (815 ILCS 510/1-7) and/or the Illinois Consumer Fraud Act (815 ILCS 505/1-12) with respect to the patched App and/or the Redesigned App**

401)     Plaintiffs re-allege and incorporate by this reference each paragraph contained in this Complaint as if fully set forth here.

402)    Based on belief and information acquired in 2023, Plaintiffs claim Defendants Barbo, Bellwether, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether and Huge Legal violated, or conspired to violate, the Illinois Deceptive Trade Practices Act and Illinois Consumer Fraud Act with respect to the patched App and/or the Redesigned App.

403)    Based on belief and information acquired in 2023, Plaintiffs claim Defendants Bellwether, Greeby and/or Vaske intentionally took, and/or conspired with one or more of the named Defendants to take, actions including but not limited to one or more of the following:

    A. Accepting Legacy's payment made pursuant to the Bellwether Contracts to patch the App's code, then disabling the patched App without Legacy's authorization.

    B. Entering a joint venture with Legacy even though Defendants Bellwether, Greeby and Vaske did not intend to honor the terms of the Joint Venture Agreement;

    C. Intentionally misrepresenting to Legacy whether access to the Redesigned App's code had been provided to unauthorized individuals;

D. Intentionally misrepresenting the reason behind the defaults of the Bellwether Contracts and the Joint Venture Agreement;

404)    In addition, based on belief and information acquired in 2023, the named Defendants took, or conspired to take, actions including but not limited to one or more of the following:

A. Participating in the unauthorized transfer of the Redesigned App and its trade secrets to one or more named Defendants or agents working on their behalf;

B. Misrepresenting the true ownership of the software being operated as TrustandWill.com;

C. Operating Legacy's Software as TrustandWill.com;

D. Mislabeling documents generated using Legacy's Software as TrustandWill.com;

E. Fraudulently utilizing Legacy's Software to generate revenue for one or more of the named Defendants.

405)    Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

406) Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

407) Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNTS 20 and 21: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal committed, or conspired to commit, fraud and mail fraud 18 U.S.C. §1341 (Count 20), and wire fraud 18 U.S.C. §1343 (Count 21) with respect to the Bellwether Contracts, the Joint Venture Agreement, Legacy's Software and/or its trade secrets**

408) Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

Brown et al v. ServiceNow et al  -  p179

409) Based on belief and information acquired in 2023, Plaintiffs allege that on specific occasions, Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal committed, or conspired to commit, mail fraud and/or wire fraud by carrying out a scheme to utilize the US Mail, phone and electronic communications to defraud Plaintiffs with respect to the Bellwether Contract, the Joint Venture Agreement, the Redesigned App, the patched App, and/or its trade secrets.

410) Based on belief and information acquired in 2023, Plaintiffs claim Defendants Bellwether, Greeby and Vaske intentionally took, and/or conspired with one or more of the named Defendants to take, actions including but not limited to one or more of the following:

A. Requesting and accepting payments from Legacy for the Bellwether Contracts via electronic communications and US Mail with no intention of honoring the Bellwether Contracts;

B. Negotiating and solidifying terms of a Joint Venture Agreement with Legacy over the phone and electronic communications with no intention of honoring the Joint Venture;

C. Negotiating with Ms. Brown over the phone and by electronic communications for Ms. Brown to defer her compensation until Legacy's Software launched with no intention of honoring the commitment;

D. Attending phone conferences with Legacy to discuss matters related to Legacy's Software; and the Joint Venture with no intention of releasing Legacy's Software;

E. Conspiring with unauthorized third parties via phone and electronic communications to give access to Legacy's Software, and the Joint Venture's trade secrets, to the unauthorized third parties;

F. Enabling unauthorized access to Legacy's Software via the Internet and electronic communications;

G. Negotiating terms via phone and electronic communication to fraudulently convey Legacy's Software and trade secrets to an unauthorized third party; and/or,

H. Conveying Legacy's Software and the Joint Venture's trade secrets to an unauthorized third party over the Internet;

411) Based on belief and information acquired in 2023, Plaintiffs claim the named Defendants, or agents acting on their

behalf, took or conspired to take, actions including but not limited to one or more of the following:

    A. Conspiring via phone and electronic communications to conceal fraudulent acts from Plaintiffs;

    B. Intentionally sending emails to Plaintiffs that opened certain ports on Plaintiffs' devices and networks, then using the open ports to exfiltrate, corrupt, alter or add data on Legacy's network and devices;

    C. Acquiring Ms. Brown's login credentials for her online accounts by directing Ms. Brown to connect to intentionally compromised networks;

    D. Using Plaintiffs' harvested credentials to access Plaintiffs' online accounts without authorization, then tampering with information therein;

    E. Orchestrating persistent cyber attacks against Plaintiffs' networks and devices to block Plaintiffs from accessing certain domains, including but not limited to TrustandWill.com.

412) Plaintiffs claim that:

    A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

413) Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

414) Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

## COUNT 22: Plaintiffs claim Grand Prix is responsible for Defendant Bellwether's debts and obligations[99]

415) Plaintiffs re-allege and incorporate by reference each paragraph in this Complaint as if fully set forth here.

_____

[99]All references to Defendant Bellwether are to Bellwether Creation before the merger and to Grand Prix after the merger.

416)     Plaintiffs allege that Bellwether Creation Company LLC, an Illinois LLC, merged its assets with Grand Prix Printing LLC, an Iowa LLC and because of that merger, Grand Prix Printing is responsible for Bellwether Creation Company's debts and obligations.

417)     Based on belief and information gathered in 2023, Plaintiffs claim:

    A. The entity with whom Legacy executed the Bellwether Contracts and the Joint Venture Agreement was Bellwether Creation Company LLC ("Bellwether Creation").

    B. In or about May 2016, Defendants Bellwether, Vaske and Greeby represented to Legacy that Bellwether Creation would be merging with another business and that Bellwether Creation's assets, including its ownership stake in the Joint Venture, would be included in that merger.

    C. After breaching the Bellwether Contracts, Ms. Brown filed an unjust enrichment case against Bellwether Creation.  After the case was filed, Defendants Vaske and Greeby voluntarily dissolved Bellwether Creation in Illinois on or about June 30, 2017 then merged Bellwether Creation's assets with Grand Prix Printing LLC ("Grand Prix"), an Iowa LLC.

D. Grand Prix is owned by Kent Vaske who is the father of Defendant Vaske (a co-owner of Bellwether Creation).

E. When Bellwether Creation merged with Grand Prix, Grand Prix was aware that Ms. Brown had an individual lawsuit pending against Bellwether Creation and was aware that Legacy would likely file a lawsuit against Bellwether Creation as well.

F. Following the merger, Defendant Vaske stopped operating under the Bellwether Creation name and continued servicing existing Bellwether Creation contracts under a business alias of Grand Prix.

418)     Plaintiffs claim that since Bellwether Creation merged with Grand Prix, Grand Prix is responsible for Bellwether Creation's debts and obligations, including claims referred to herein and the Bellwether Judgment.

419)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Concealed facts include but are not limited to the entity with which Bellwether Creation merged.  Plaintiffs did not have actual or constructive knowledge of

the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**Merit Contracts**

### COUNT 23: Ms. Brown claims Defendant Merit Law breached the Merit Contracts

420) Ms. Brown re-alleges and incorporates by reference each paragraph in this Complaint as if fully set forth here.

421) Ms. Brown alleges Defendant Merit Law and Ms. Brown entered a written retainer agreement for Defendant Merit Law to collect the Bellwether Judgment for Ms. Brown.

422) Defendant Merit Law and Ms. Brown also entered a separate written retainer agreement for Defendant Merit Law to represent Ms. Brown in a lawsuit against a home contractor that Ms. Brown utilized ("Contractor Case"). Together the two retainer agreements between Ms. Brown and Defendant Merit Law are referred to as the "Merit Contracts".

423) Ms. Brown performed all acts under the Merit Contracts which required Ms. Brown's performance;

424)     Ms. Brown alleges Defendant Merit Law breached both of the Merit Contracts by:

A. Failing to perform its duties under one or both Merit Contracts, including but not limited to, assigning attorneys who failed to exercise reasonable care, skill, and diligence commonly used by attorneys in similar situations providing legal services;

B. Ceasing collection efforts on the Bellwether Judgment collection without notifying Ms. Brown and without collect any of the $436,000 Bellwether Judgment awarded to Ms. Brown;

C. Failing to withdraw as attorney of record for the Bellwether Judgment collection when efforts to collect the Bellwether Judgment ceased;

D. Dismissing the Contractor Case without Ms. Brown's authorization after Ms. Brown had won liability on summary judgment; and,

E. Failing to safeguard critical damage documentation that Ms. Brown provided to Defendant Merit Law.

425)     Ms. Brown notified Defendants Gartner and Merit Law
that they were in default of the Merit Contracts in or about October
2019.

426)     Ms. Brown claims that:

A.  the named Defendants knew that their actions would cause
    harm to Ms. Brown;

B.  the named Defendants intended to harm Ms. Brown; and,

C.  the named Defendants' actions, or conspiracy to act, are a
    direct and proximate cause of Ms. Brown's damages.

427)     Ms. Brown suffered significant damages as a result of the
named Defendants actions, or conspiracy to act, in an amount to be
proven at trial.

428)     This claim is based on facts and claims asserted in Brown
v. Gartner, Northern District of Illinois, 1:20-cv-05195 and relates
back to the filing date of that complaint, September 2, 2020.

429)     In addition, Ms. Brown alleges that the named Defendants
actively misled, engaged in affirmative acts to conceal, and/or
conspired to mislead or conceal, material facts related to this claim to
prevent Ms. Brown from becoming aware of her injuries. Concealed
facts include but are not limited to the named Defendants intentions,
motivations and timing for committing the actions described.   Ms.

Brown did not have actual or constructive knowledge of the concealed material facts. Ms. Brown believed the misrepresentations and could not independently verify the concealed facts. As such, Ms. Brown asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 24: Ms. Brown claims Defendants Kingsley, Gartner, Merit Law and Kingsley Law breached their fiduciary duties and committed legal malpractice with respect to the Contractor Case and/or the Bellwether Judgment collection**

430) Ms. Brown re-alleges and incorporates by reference each paragraph in this Complaint as if fully set forth here.

431) Ms. Brown claims Defendants Kingsley, Gartner, Merit Law and Kingsley Law committed legal malpractice with regard to their handling of the Contractor Case and/or the Bellwether Judgment collection for Ms. Brown. Ms. Brown alleges:

A. The named Defendant agreed to represent Ms. Brown in the Contractor Case and in the Bellwether Judgment collections matters;

B. Ms. Brown agreed to compensate the named Defendants and did in fact compensate the named Defendants.

C. As a result of the attorney-client relationship created by the above conduct of the parties, Defendants Kingsley, Gartner,

Merit Law and Kingsley Law had a duty to represent Ms. Brown with reasonable care, skill, and diligence possessed and exercised by a professional attorney in a similar situation. However, the named Defendants breached that duty of care, loyalty, honesty, fidelity, and good faith; and,

D. The conduct with respect to the legal services provided by Defendants Kingsley, Gartner, Merit Law and Kingsley Law fell below the applicable standard of care and breached the professional duties owed to Ms. Brown.

432)    In addition, Ms. Brown alleges Defendants Kingsley, Gartner, Merit Law and Kingsley Law breached their duties owed to Ms. Brown by taking actions, including but not limited to:

A. Failing to exercise reasonable skill and diligence in their actions, or lack thereof, as alleged herein, and failing to exercise such skill, prudence, and diligence as attorneys of ordinary skill and capacity ordinarily possessed by other attorneys of good standing practicing in the same or similar locality under similar circumstances;

B. Violating the standards of professional conduct and ethics, set forth in the Illinois Rules of Professional Conduct;

C.  Failing to expeditiously pursue and collect the Bellwether Judgment;

D.  Failing to communicate, and/or misrepresenting, material information to Ms. Brown about the Bellwether Judgment collection;

E.  Making decisions and taking actions in the Bellwether Judgment collection without Ms. Brown's authorization and/or consent;

F.  Ceasing efforts to collect the Bellwether Judgment without notifying Ms. Brown;

G.  Failing to file an action to pursue collection of the Bellwether Judgment from Defendants Greeby and Vaske individually;

H.  Failing to establish that the company that Defendant Bellwether merged with is responsible for Defendant Bellwether's debt;

I.  Failing to withdraw as counsel of record on the Bellwether Judgment collection;

J.  Failing to zealously pursue and competently prosecute the Contractor Case;

K.  Encouraging Ms. Brown to engage in settlement discussions with Contractor for an amount far less than she would have

otherwise received or been awarded had the Contractor Case been properly prosecuted;

L. Making unauthorized decisions and taking unauthorized actions in the Contractor Case for which Ms. Brown had already been awarded liability on summary judgment;

M. Dismissing the Contractor Case with prejudice without receiving authorization from Ms. Brown and before a written settlement agreement was circulated or executed;

N. Refusing to vacate the dismissal of the Contractor Case after dismissing the Contractor Case without Ms. Brown's authorization;

O. Withdrawing from representing Ms. Brown on the Contractor Case settlement after dismissing the Contractor Case with prejudice;

P. Leaving Ms. Brown to represent herself in settlement negotiations and/or a complex damages hearing for the Contractor Case;

Q. Misrepresenting material information to Ms. Brown and to the court, including but not limited to, the status of the Contractor Case settlement;

Brown et al v. ServiceNow et al  -  p192

R. Failing to inform, and/or misrepresenting, material information to Ms. Brown and the court including but not limited to, the status of the Contractor Case, settlement discussions, and the unauthorized actions taken;

S. Failing to respond timely and honestly to Ms. Brown's questions about the Contractor Case, the work actually performed, settlement discussions, and actions taken;

T. Withholding critical documentation related to the Contractor Case from Ms. Brown including but not limited to Ms. Brown's damages documentation; and,

U. Incurring unauthorized costs for the Contractor Case.

433)    It was reasonably foreseeable to the named Defendants that their actions would adversely affect Ms. Brown's claims in the Contractor Case and the Bellwether Judgment collection and would cause Ms. Brown to sustain damages.

434)    Ms. Brown relied on the representations made by the named Defendants and the named Defendants acted to the detriment of Ms. Brown's causes of action in the Contractor Case and the Bellwether Judgment collection.

435)    Ms. Brown alleges that as a result of the named Defendants' breaches, including but not limited to dismissing the

Contractor Case without authorization and failing to return damage documentation to Ms. Brown, Ms. Brown is barred and precluded from pursing actual damages she incurred related to the Contractor Case for which the Contractor had already been found to be liable on summary judgment.

436)     Ms. Brown alleges that but for the named Defendants' breaches, Ms. Brown would have recovered damages and experienced one of the two outcomes for the Contractor Case in 2019:

A. If the settlement negotiations were successful, the parties would have executed a settlement agreement and Ms. Brown would have received a monetary settlement in 2019; or,

B. If the settlement negotiations were not successful, the parties would have participated in a damages prove-up hearing for the Contractor Case in October 2019. In addition, Ms. Brown would have been awarded damages and reimbursed for attorney's fees and court costs in an amount far in excess of the settlement amount.

C. However, because of the named Defendants' breaches of their duties, neither of these occurred.

437)     Ms. Brown claims that:

    A. the named Defendants knew that their actions would cause harm to Ms. Brown;

    B. the named Defendants intended to harm Ms. Brown; and,

    C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Ms. Brown's damages.

438)    As a result of the named Defendants' breaches, Ms. Brown sustained substantial financial loss and hardship, pecuniary loss, mental anguish, anxiety and emotional distress. Ms. Brown's injuries also include the full value of her claims, loss of verdict, settlement, or award, and interest that Ms. Brown would have recovered in the Contractor Case and the Bellwether Judgment collection.

439)    Ms. Brown seeks exemplary damages for conduct on the part of the named Defendants:

    A. Defendant Gartner failed to ask, and did not receive, Ms. Brown's permission prior to dismissing the Contractor Case with prejudice after Ms. Brown had won liability on summary judgment, and.

    B. Defendants Kingsley and Merit Law intentionally stopped the collection process for the Bellwether Judgment without Ms. Brown's knowledge or authorization.

440)     This claim is based on facts and claims asserted in Brown v. Gartner, Northern District of Illinois, 1:20-cv-05195 and relates back to the filing date of that complaint, September 2, 2020.

441)     In addition, Ms. Brown alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Ms. Brown from becoming aware of her injuries. Concealed facts include but are not limited to the named Defendants intentions and motivations to commit the actions described.   Ms. Brown did not have actual or constructive knowledge of the concealed material facts. Ms. Brown believed the misrepresentations and could not independently verify the concealed facts.  As such, Ms. Brown asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 25:  Ms. Brown claims that Defendants Barbo, Brown, Gartner, Goldstein, Goldston, Greeby, Kingsley, Kingsley Law, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins and Williams tortuously interfered, or conspired to interfere, with the Merit Contracts**

442)     Ms. Brown re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

443)     Based on belief and information acquired in 2023, Ms. Brown alleges that Defendants Barbo, Brown, Gartner, Goldstein,

Goldston, Greeby, Kingsley, Kingsley Law, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins and Williams tortuously interfered, or conspired to interfere, with the Merit Contracts.

444)     Based on belief and information acquired in 2023, Ms. Brown alleges:

    A. The Merit Contracts are two separate written contracts between Ms. Brown and Defendant Merit Law:

        i. For legal services related to the collection of the Bellwether Judgment ($436,000) for Ms. Brown, and,

        ii. For legal services related to a home contractor's breach of contract to repair Ms. Brown's home.

    B. The named Defendants intentionally and willfully conspired to induce Defendant Merit Law to breach the Merit Contracts.  The named Defendants' goal was to cause financial hardship for Ms. Brown;

    C. The named Defendants interfered, or conspired to interfere, knowing that the Merit Contracts were valid contracts;

    D. Because of the named Defendants' interference, Defendant Merit Law breached the Merit Contracts;

445)     Ms. Brown claims that:

Brown et al v. ServiceNow et al  -  p197

A. the named Defendants knew that their actions would cause harm to Ms. Brown;

B. the named Defendants intended to harm Ms. Brown; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Ms. Brown's damages.

446) Ms. Brown suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

447) Ms. Brown alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Ms. Brown from becoming aware of her injuries. Ms. Brown did not have actual or constructive knowledge of the concealed material facts. Ms. Brown believed the misrepresentations and could not independently verify the concealed facts. As such, Ms. Brown asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNTS 26 and 27: Ms. Brown claims Defendants Barbo, Brown, Gartner, Goldstein, Goldston, Greeby, Kingsley, Kingsley Law, Lamb, Merit Law, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal violated, and/or conspired to violate, the Illinois Deceptive Trade Practices Act (815 ILCS 510/1-7) and/or the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (Count 26) and fraudulently concealed material facts (Count 27) with respect to the Merit Contracts**

448)     Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

449)     Based on belief and information acquired in 2023, Ms. Brown alleges Defendants Barbo, Brown, Gartner, Goldstein, Goldston, Greeby, Kingsley, Kingsley Law, Lamb, Merit Law, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, and Huge Legal violated, or conspired to violate, the Illinois Deceptive Trade Practices Act and/or the Illinois Consumer Fraud Act with respect to the Merit Contracts.  In addition, Ms. Brown alleges the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts with respect to the Merit Contracts.

450)     Based on belief and information acquired in 2023, Ms. Brown claims the named Defendants took, or conspired to take actions, including but not limited to:

A. Defendants Gartner and Kingsley accepting Ms. Brown's payment made pursuant to the Merit Contracts knowing that they would not be performing the contracted services;

B. Misrepresenting to the Contractor Case's court that a settlement agreement had been entered into when the parties were still negotiating the settlement;

C. Misrepresenting to the Contractor Case's court that Defendant Gartner had authority to dismiss the Contractor Case when he did not. Then, dismissing the Contractor Case with prejudice, without Ms. Brown's permission, and without filing an appearance with the court to act on Ms. Brown's behalf;

D. Misrepresenting to Ms. Brown that the Contractor's attorneys were insisting on the inclusion of undesirable terms in the proposed settlement agreement;

E. Misrepresenting to Ms. Brown that collections were underway for the Bellwether Judgment, even though collection efforts had stopped;

F. Remaining listed as attorney of record on the Bellwether Judgment after stopping collection efforts, which potentially

prevented Ms. Brown from being contacted by Defendant Bellwether's asset holders.

451)    Ms. Brown claims that:

A.  the named Defendants knew that their actions would cause harm to Ms. Brown;

B.  the named Defendants intended to harm Ms. Brown; and,

C.  the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Ms. Brown's damages.

452)    Ms. Brown suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

453)    Ms. Brown alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Ms. Brown from becoming aware of her injuries.  Ms. Brown did not have actual or constructive knowledge of the concealed material facts. Ms. Brown believed the misrepresentations and could not independently verify the concealed facts.  As such, Ms. Brown asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNTS 28 and 29: Ms. Brown claims Defendants Barbo, Brown, Gartner, Goldstein, Goldston, Greeby, Kingsley, Kingsley Law, Lamb, Merit Law, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, and Williams committed, and/or conspired to commit, fraud and mail fraud (Count 28) and wire fraud 18 U.S.C. §1343 (Count 29) with respect to the Merit Contracts**

454)     Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

455)     Based on information and belief acquired in 2023, Ms. Brown alleges Defendants Barbo, Brown, Gartner, Goldstein, Goldston, Greeby, Kingsley, Kingsley Law, Lamb, Merit Law, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins. and Williams committed, or conspired to commit, fraud and/or wire fraud by carrying out a scheme to utilize US Mail, phone, and/or electronic communications to defraud Ms. Brown with respect to the Merit Contracts.

456)     Based on information and belief acquired in 2023, Ms. Brown alleges Defendant Merit Law took, and the named Defendants conspired with Defendant Merit to take, actions including but not limited to one or more of the following:

A. Using phone or electronic communications and US Mail to delay the Contractor prove-up hearing for approximately one year while representing to Ms. Brown that the October 2019

prove-up hearing date was the earliest date available following the summary judgment award in May 2018;

B. Coordinating with Contractor's attorneys via phone or electronic communications and/or US Mail to file an agreed order to dismiss the Contractor Case with prejudice without Ms. Brown's knowledge or consent;

C. Informing Ms. Brown via phone or electronic communications and/or US Mail that Defendant Gartner dismissed the Contractor Case with prejudice without first obtaining Ms. Brown's permission to dismiss it;

D. Representing to Ms. Brown via phone or electronic communications and/or US Mail that dismissing the Contractor Case before a settlement agreement was signed was standard practice;

E. Attending phone conferences with Ms. Brown to discuss critical matters related to the settlement of the Contractor Case, even though steps were not being taken to finalize the settlement agreement;

F. Representing to Ms. Brown via phone or electronic communications and/or US Mail that the Contractor Case

settlement payments would begin immediately, knowing that information was false;

G. Representing to Ms. Brown via phone or electronic communications and/or US Mail that the Contractor's attorneys were not flexible on certain provisions in the settlement agreement, which representations were false;

H. Conspiring with third parties via phone and/or electronic communications and/or US Mail to prevent Ms. Brown from receiving the damages she had been awarded in the Bellwether Judgment and the Contractor Case settlement;

I. Representing to Ms. Brown via phone and/or electronic communications and/or US Mail that citations to discover Defendant Bellwether's assets had been mailed to Defendant Bellwether's account holders, but responses were not received;

J. Communicating with Defendant Bellwether's asset holders via phone and/or electronic communications and/or US Mail, yet not collecting the assets to satisfy the Bellwether Judgment; and/or,

K. Discussing with Ms. Brown via phone and/or electronic communications, the filing of an action to access Defendant

Brown et al v. ServiceNow et al - p204

Bellwether's owners' personal assets to satisfy the
Bellwether Judgment, then not filing the action.

457) Based on information and belief acquired in 2023, Ms.
Brown claims that:

A. the named Defendants knew that their actions would cause
harm to Ms. Brown;

B. the named Defendants intended to harm Ms. Brown; and,

C. the named Defendants' actions, or conspiracy to act, are a
direct and proximate cause of Ms. Brown's damages.

458) Ms. Brown suffered significant damages as a result of the
named Defendants actions, or conspiracy to act, in an amount to be
proven at trial.

459) Ms. Brown alleges that the named Defendants actively
misled, engaged in affirmative acts to conceal, and/or conspired to
mislead or conceal, material facts related to this claim to prevent Ms.
Brown from becoming aware of her injuries. Ms. Brown did not have
actual or constructive knowledge of the concealed material facts. Ms.
Brown believed the misrepresentations and could not independently
verify the concealed facts. As such, Ms. Brown asserts that the
discovery rule applies to this claim and that the date of discovery was
in or about October 2023.

**Shannon Contract**

**COUNT 30: Plaintiffs claims Defendant Shannon breached his duty to Legacy and breached his independent contractor agreement with BW Trust**

460)     BW Trust re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

461)     Based on information and belief acquired in 2023, Plaintiffs allege that Legacy and Defendant Shannon entered a written non-disclosure and non-compete, business development independent contractor agreement ("Shannon's Contractor Agreement") when Defendant Shannon accepted a role as an independent contractor business development representative with Legacy in 2015.  Because of the Shannon's Contractor Agreement, Defendant Shannon had a duty to Plaintiffs to act in good faith.  Defendant Shannon breached that duty and breached the Shannon Contractor Agreement.

462)     In addition, based on belief and information acquired in 2023, Plaintiffs allege that Defendant Shannon breached the Shannon Contractor Agreement, his duty to act in good faith, and his duty to keep Legacy's information confidential, by taking actions including but not limited to:

    A.  Failing to safeguard Legacy's confidential information;

    B.  Failing to disclose material facts;

C. Failing to avoid or disclose conflicts of interest;

D. Seizing profit opportunities that belonged to Legacy;

E. Acting in opposition to Legacy's interest;

F. Conspiring to fraudulently convey Legacy's Software to an unauthorized third-party;

G. Conspiring to misappropriate Legacy's trade secrets;

H. Conspiring to create a competing business utilizing Legacy's trade secrets and Legacy's Software; and,

I. Concealing, and conspiring to conceal, fraudulent acts from Legacy.

463)    Moreover, Plaintiffs claim that:

A. Defendant Shannon knew that his actions would cause harm to Plaintiffs;

B. Defendant Shannon intended to harm Plaintiffs; and,

C. Defendant Shannon's actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

464)    Plaintiffs suffered significant damages as a result of Defendant Shannon actions, or conspiracy to act, in an amount to be proven at trial.

465)    Plaintiffs alleges that Defendant Shannon actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or

conceal, material facts related to this claim to prevent Legacy from becoming aware of its injuries.  Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts.  As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNTS 31 and 32: Plaintiffs claim Defendant Omega is negligent for not maintaining proper controls (Count 31) and Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, Kohmedia, and Omega invaded, or conspired to invade, Plaintiffs' privacy (Count 32)**

466)    Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

467)    Based on belief and information acquired in 2023, Plaintiffs allege Defendant Omega did not maintain proper controls to ensure that its officers could not make false representations regarding the status of contracts presented to Defendant Omega. In addition, Plaintiffs claim Defendant Omega is negligent for not maintaining proper controls to ensure its officers and agents could not intentionally compromise Omega's Internet Networks.

468)     In addition, based on belief and information acquired in 2023, Plaintiff alleges that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, Kohmedia, utilized or conspired to utilize one or more of the compromised Omega Internet Networks to invade, or conspire to invade, Plaintiffs' privacy.

469)     Based on belief and information acquired in 2023, Plaintiffs allege that in 2015, Defendant Shannon took, and the named Defendants conspired to take, actions including but not limited to:

A. Representing that he was the proper person to negotiate group sales agreement for Defendant Omega;

B. Requesting that Ms. Brown attend an urgent meeting in Atlanta in 2015 with Defendant Omega's executive director regarding a group sales agreement between Legacy and Defendant Omega for Legacy's Software;

C. Arranging for Ms. Brown to stay in the Omega Corporate House during her trip to Atlanta to meet with Omega's executive director;[100]

---

[100] Ms. Brown and Defendant Shannon's interactions were strictly professional, not social. Ms. Brown was the only guest residing in a guest room on the top level of the Omega Corporate House. Ms. Brown hopes that Defendant Shannon's impropriety at the Omega Corporate House was limited to tampering with the Omega House Network.

D. Tampering with, or conspiring to tamper with, the Wi-Fi networking devices in the Omega Corporate House ("Omega House Network") in order to gain access to Plaintiffs' devices;

E. Providing Wi-Fi credential to Ms. Brown to the Omega House Network which had intentionally been compromised;

F. Providing agents acting on behalf of the named Defendants access to the compromised Omega House Network in order to tamper with Ms. Brown's devices while connected to the Omega House Network. The agents gained access to Ms. Brown's devices, data and online account credentials.

470) In addition, based on belief and information acquired in 2023, Plaintiffs allege that in 2016, Defendant Shannon took, and the named Defendants conspired to take, actions including but not limited to:

A. Requesting that Ms. Brown give an estate planning presentation at Defendant Omega's national convention in Las Vegas, NV;

B. Providing Ms. Brown with presenters-only Wi-Fi credentials ("Omega's Presenter WiFi ") a few minutes before her presentation at the convention. However, several of Plaintiffs'

devices crashed within minutes of Ms. Brown connecting
them to Omega's Presenter WiFi; and,

C.  Providing agents acting on behalf of the named Defendants
access to the compromised Omega Presenter Network in
order to tamper with Ms. Brown's devices while connected to
the Omega's Presenter Network.  The agents successfully
gained access to Plaintiffs' devices and data while Ms. Brown
was connected to Omega's Presenter WiFi.

471)    Because Defendant Shannon represented that Ms.
Brown's presence in Atlanta was necessary to complete a bulk sales
agreement with Defendant Omega and because Ms. Brown agreed to
give a complimentary presentation at Defendant Omega's national
convention, Defendant Shannon, or an agent acting on behalf of the
named Defendants, was able to leverage the compromised Omega
Internet Networks to gain unauthorized access to Plaintiffs' devices,
data and online credentials.  If Defendant Omega had proper controls
in place, Plaintiffs' privacy would not have been invaded.

472)    Plaintiffs claim that Defendant Omega:

A.  Is negligent for not maintaining proper controls to ensure
parties interested in contracting with Defendant Omega

Brown et al v. ServiceNow et al  -  p211

receive accurate information about the status of pending

contracts;

B. Is negligent for not maintaining proper controls to protect its

Omega Internet Networks from unauthorized changes made

by Omega's officers, or agents; and,

C. Is negligent For providing Wi-Fi credentials to Omega's

Internet Network to guests, and represented that Omega's

Internet Networks were protected networks, without

providing a warning that Omega's officers and agents had

the authority to intentional compromise Omega's Internet

Networks.

473)      Plaintiffs claim that:

A. Defendant Omega knew or should have known that failing to

have adequate controls on Omega's Internet Networks could

cause significant injuries for guests/invitees using Omega

Internet Networks;

B. Defendant Omega knew or should have known that failing to

have adequate controls regarding the status of contract

negotiations could cause significant injuries for the

contracting party;

C. Defendant Omega's inadequate controls are a direct and proximate cause of Plaintiffs' damages; and,

D. Plaintiffs suffered significant damages as a result of the Defendant Omega's negligence in an amount to be proven at trial.

474) Moreover, Plaintiffs claim that:

A. The named Defendants knew that accessing Plaintiffs' devices and data without Plaintiffs' knowledge or authorization would cause harm to Plaintiffs;

B. The named Defendants intended to harm Plaintiffs; and,

C. The named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

D. Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

475) Plaintiffs allege that the named Defendants, by or through their agents, actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations

and could not independently verify the concealed facts.  As such,

Plaintiffs assert that the discovery rule applies to this claim and that

the date  of discovery was in or about October 2023.


**COUNTS 33 and 34: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, Kohmedia, and Omega violated or conspired to violate the Illinois Deceptive Trade Practices Act (815 ILCS 510/1-7) and/or the Illinois Consumer Fraud Act (815 ILCS 505/1-12) (Count 33), committed wire fraud (18 U.S.C. §1343) and fraudulently concealed material facts (Count 34) with respect to the Shannon Contractor Agreement with Legacy**

476)      Plaintiffs re-allege and incorporate by this reference each

paragraph contained in this Complaint as if fully set forth here.

477)      Based on belief and information acquired in 2023,

Plaintiffs allege that with respect to the Shannon Contractor

Agreement, Defendants Barbo, Brown, Goldstein, Goldston, Greeby,

Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins,

Williams, Bellwether, Huge Legal, Kohmedia, and Omega violated, or

conspired to violate, the Illinois Deceptive Trade Practices Act and/or

the Illinois Consumer Fraud Act, and/or committed, or conspired to

commit, fraud and/or wire fraud.  In addition, Plaintiffs claim that the

named Defendants actively misled, engaged in affirmative acts to

conceal, or conspired to mislead or conceal, material facts from

Plaintiffs.

478)    Based on belief and information acquired in 2023, Plaintiffs claim that Defendant Shannon took, and the named Defendants conspired to take, actions including but not limited to, one or more of the following:

A.  Utilizing phone and electronic communications to negotiate and enter the Shannon Contractor Agreement with Legacy under the guise of becoming a business development representative for Legacy;

B.  Utilizing phone and electronic communications to request that Ms. Brown introduce him to Legacy's software developers;[101]

C.  Utilizing phone and electronic communications to communicate with Legacy's software developers to convince them to fraudulently-convey Legacy's Software;

D.  Misrepresenting to Ms. Brown via phone and/or electronic communications that she urgently needed to travel to Atlanta to meet with Defendant Omega's executive director to finalize and execute a group sales agreement with Defendant Omega for Legacy's Software;

---

[101] Ms. Brown introduced Defendant Shannon to Defendants Koht and Kohmedia in 2015 and to Defendants Greeby, Vaske and Bellwether in 2016.

E.   Misrepresenting to Legacy via phone or electronic communications that Defendant Omega's executive director had signed the group sales agreement with Legacy;

F.   Arranging via phone and electronic communications for Ms. Brown to stay in a guest room at the Omega Corporate House in Atlanta then tampering with electronic networking devices in the Omega Corporate House in order to gain access to Plaintiffs' devices and data;

G.   Utilizing the compromised Omega House Network to access, alter, delete and insert files onto Plaintiffs' devices;

H.   Utilizing the compromised Omega House Network to acquire Ms. Brown's credentials for her online and administrative accounts;

I.   Utilizing the compromised Omega House Network to fingerprint Ms. Brown's devices and applications;

J.   Utilizing the compromised Omega House Network to download and install surveillance applications on Ms. Brown's devices;

K.   Providing Ms. Brown with credentials to a compromised Wi-Fi network at Defendant Omega's national convention ("Omega's Presenter Wi-Fi") in Las Vegas at which Defendant

Shannon arranged for Ms. Brown to be a presenter via wire communications;

L.  Utilizing the compromised Omega's Presenter Wi-Fi to perform similar actions on Ms. Brown's devices, data and accounts as were performed on the Omega House Network;

M.  Utilizing phone and electronic communications to collect insider, and/or improperly-obtained, information to assist in fraudulently convey or acquire Legacy's Software;

N.  Utilizing phone and electronic communications to devise and execute the scheme to fraudulently convey or acquire Legacy's Software;

O.  Utilizing electronic communications to demo Legacy's Software to third parties who were interested in fraudulently-acquiring Legacy's Software;

P.  Utilizing phone and/or electronic communications to attempt to convince Ms. Brown to create California templates for Legacy's Software in an effort to meet the needs of individuals interested in fraudulently-acquiring Legacy's Software; and/or,

Q.  Utilizing phone and/or electronic communications to broker the fraudulent conveyance/acquisition of Legacy's Software.

Brown et al v. ServiceNow et al  -  p217

R.  These acts of wire fraud affected interstate commerce.

479)  Plaintiffs claim that:

A.  the named Defendants knew that their actions would cause harm to Plaintiffs;

B.  the named Defendants intended to harm Plaintiffs; and,

C.  the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

480)  Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

481)  Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts.  As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**Theft of Legacy's Software**

**COUNT 35: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal and Kohmedia, committed, or conspired to commit, the theft and unlawful transport of the Redesigned App, and/or the App, violating18 U.S.C. §2314**

482)     Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

483)     Based on belief and information acquired in 2023, Plaintiffs allege that Defendants Barbo, Brown,  Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal and Kohmedia, committed, or conspired to commit, the theft and unlawful transport of the App (the first version of Legacy's Software) and its trade secrets, and/or the Redesigned App (the second version of Legacy's Software) and its trade secrets, violating 18 U.S.C. §2314.

484)     Based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants:

A. Knew that the App and/or the Redesigned App belonged to Legacy and/or the Joint Venture;

B. Knew that none of the named Defendants had the right to sell, transfer or transmit the software code for the App or the Redesigned App to a third party;

C. Knew that none of the named Defendants had the right to sell, transfer or expose Legacy's and/or the Joint Venture's trade secrets; and,

D. Knew that the App and Redesigned App were each worth more than $5,000.

485) Based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants, or an agent operating on their behalf, committed or conspired to commit, one or more of the following actions including but not limited to:

A. Selling, transferring and/or transmitting the software code for the App and/or Redesigned App without Legacy's authorization, and for compensation or consideration;

B. Selling, transferring and/or exposing Legacy's and/or the Joint Venture's trade secrets without authorization and for compensation or consideration;

C. Selling, transferring, transmitting and/or exposing the App or Redesigned App or their trade secrets via the Internet or across state lines; and/or

Brown et al v. ServiceNow et al - p220

    D. Acting, or conspiring to act, willfully and deliberately.

486)     Plaintiffs claim that:

    A. the named Defendants knew that their actions would cause harm to Plaintiffs;

    B. the named Defendants intended to harm Plaintiffs; and,

    C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

487)     Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

488)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 36: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal and Kohmedia received, or conspired to receive, Legacy's Software which is stolen property (18 U.S.C. §2315)**

489)     Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

490)     Based on belief and information acquired in 2023, Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal and Kohmedia received, or conspired to receive, Legacy's Software and trade secrets, which are stolen property, violating 18 U.S.C. §2315.

491)     Based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants, or an agent operating on their behalf committed or conspired to commit, one or more actions including but not limited to:

    A.  Fraudulently acquiring the App and/or the Redesigned App;

    B.  Intentionally operating a modified version of Legacy's Software as their own;

    C.  Intentionally mislabeling Legacy's Software and trade secrets as TrustandWill.com;

Brown et al v. ServiceNow et al  -  p222

D. Intentionally mislabeling the documents created using Legacy's Software as being created by "TrustandWill.com" instead of Legacy's Software;

E. Accepting payment from customers who used the modified version of the fraudulently-acquired Legacy's Software; and/or,

F. The named Defendants' actions affect interstate commerce.

492) Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

493) Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

494) Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently verify the concealed facts.  As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 37: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal and Kohmedia engaged in monetary transactions in property derived from unlawful activity (18 U.S.C. §1957) and/or laundered monetary instruments (18 U.S.C. §1956)**

495)     Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

496)     Based on belief and information acquired in 2023, Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal and Kohmedia engaged in monetary transactions in property derived from unlawful activity and/or laundered monetary instruments.

497)     Based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants, or an agent operating on their behalf, used or conspired to use, proceeds from the theft of Legacy's Software to operate a competing business while:

A. Knowing that the funds used to operate the competing business were proceeds from the theft of Legacy's Software;

B. Knowing that portions of the proceeds from the theft of Legacy's Software are used to compensate individuals hired to inflict harm on Ms. Brown; and/or,

C. Intending to conceal the nature, location, source and ownership of the proceeds of the theft of Legacy's Software by funneling them through a competing business.

498)    Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

499)    Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

500)    Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have

actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently

verify the concealed facts.  As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was in or

about October 2023.

**COUNT 38:  Plaintiffs claim that Defendants Barbo, Bellwether, Brown, Goldstein, Goldston, Greeby, Kohmedia, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, and Kohmedia tortuously interfered, and/or conspired to tortuously interfere, with the business expectancy of Legacy's Software**

501)  Plaintiffs re-allege and incorporate by this reference each

paragraph in this Complaint as if fully set forth here.

502)  Based on belief and information acquired in 2023,

Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston,

Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske,

Wilkins, Williams, Bellwether, Huge Legal and Kohmedia tortuously

interfered, or conspired to interfere, with Legacy's business

expectancy of operating Legacy's Software and Ms. Brown's

expectation of being compensated for her employment.

503)  Plaintiffs allege that the named Defendants, committed or

conspired to commit, one or more tortuous act including but not

limited to:

A. Conspiring with Defendant Kohmedia to have Defendant Kohmedia transfer an intentionally corrupted version of the App (first version of Legacy's Software) to Plaintiffs while representing to Plaintiffs that the transferred version of the App was the most complete, version of the App. By Defendant Kohmedia transferring a corrupted version of the App to Legacy, Legacy was unable to launch the App to generate revenue as expected;

B. Conspiring with Defendant Kohmedia to fraudulently convey the fully-functional and launch-ready version of the App to one or more of the named Defendants, instead of Legacy. By Defendant Kohmedia transferring a functioning version of the App to one or more named Defendants, the named Defendants were able to use Legacy's asset to generate revenue and raise capital for the named Defendants;

C. Conspiring with Defendants Bellwether, Greeby and Vaske to disable the patched App without Legacy's authorization. By Defendants Greeby, Vaske and Bellwether, Greeby and Vaske disabling the patched App, Plaintiff were unable to use the patched App for customer feedback, to generate revenue and/or raising capital for Legacy;

D. Conspiring with Defendants Bellwether, Greeby and Vaske to prevent the launch of the complete, fully-functional Redesigned App. By Defendants Greeby, Vaske and Bellwether refusing to launch the Redesigned App, Legacy was unable to generate revenue as expected;

E. Conspiring with Defendants Bellwether, Greeby and Vaske to fraudulently convey the fully-functional and launch-ready Redesigned App to one or more of the named Defendants. By Defendants Bellwether, Greeby and Vaske transferring the fully-functional Redesigned App to one or more of the named Defendants, the named Defendants were able to:

   i. fraudulently collect payments from customers who were using Legacy's Software, that had been re-branded as TrustandWill.com, when the payments should have been paid to Legacy;

   ii. generate more than 500,000 users by operating Legacy's Software as TrustandWill.com. Those users and revenue would have been Legacy's if the named Defendants had not tortuously interfered.

F. Moreover, by causing the App and/or the Redesigned App to be fraudulently conveyed away from Legacy, Legacy was

unable to pay Ms. Brown's her deferred or annual compensation which Ms. Brown reasonably expected to receive.

G. The named Defendants' actions not only lost Legacy revenue from customers purchasing the software, but the named Defendants also usurped Legacy's competitive advantage of being the first product to market.

504)     Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

505)     Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

506)     Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

**COUNT 39: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, Kohmedia and Omega violated, and/or conspired to violate, the Computer Fraud and Abuse Act (18 U.S.C. §1030) with respect to one or both versions of Legacy's Software**

507) Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

508) Based on belief and information acquired in 2023, Plaintiffs allege that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Koht, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, Huge Legal, Kohmedia and Omega violated, and/or conspired to violate, the Computer Fraud and Abuse Act (18 U.S.C. §1030).

509) Based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants, or agents acting on their behalf, intentionally committed, or conspired to commit, one or more actions without Legacy's permission or authorization including but not limited to:

Brown et al v. ServiceNow et al - p230

A. Allowing unauthorized access to Legacy's digital assets which were in the care of Defendant Kohmedia and/or Defendant Bellwether and/or stored on servers owned and/or controlled by Defendants Bellwether, Greeby, Kohmedia, Koht, and/or Vaske;

B. Cloning Legacy's Software code without permission;

C. Modifying networking devices in order to use device to access Plaintiffs' devices;

D. Providing Wi-Fi credentials to intentionally compromised internet networks;

E. Installing malware on Plaintiff's devices to allow unauthorized third-party remote access to Plaintiffs' protected devices, including but not limited to, Plaintiffs' computers, phones, networking devices and/or storage devices, which devices Plaintiffs' used in interstate communications and commerce;

F. Utilizing malware to assist in accessing, exfiltrating, altering, adding, and/or deleting information on Plaintiffs' devices;

G. Transferring electronic data belonging to Legacy and/or the Joint Venture to an unauthorized third party;

H. Utilizing a scanning receiver to intercept electronic communications on Plaintiffs' devices;

I. Remotely swapping SIM cards on Plaintiffs' devices in order to obtain unauthorized access to Plaintiffs' accounts and financial services;

J. Transmitting unauthorized electronic communications by impersonating Plaintiffs; and/or

K. Accessing, exfiltrating, altering, adding, and/or deleting information in Plaintiffs' electronic communications, electronic calenders and electronic address book;

510)     The value of the data obtained is greater than $5,000 and the named Defendants' actions affect interstate commerce.

511)     Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

512)     Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

513)     Plaintiffs allege that the named Defendants actively

misled, engaged in affirmative acts to conceal, and/or conspired to

mislead or conceal, material facts related to this claim to prevent

Plaintiffs from becoming aware of their harm. Plaintiffs did not have

actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently

verify the concealed facts.  As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was in or

about October 2023.

## Disinformation Claims

**COUNTS 40 and 41: Plaintiffs claim Defendants Goldston, Montgomery, Shannon, Tucker-Wilkins, Wilkins and Williams, CBS, Chase, Goldston Firm, Montgomery Firm, Omega, TechStars and Standing Oaks are negligent for not maintaining proper controls, invading Ms. Brown's privacy, and/or and fraudulently concealing material facts (Count 40) and/or misappropriating Ms. Brown's trade secrets (18 U.S.C. §1836 and/or 765 ILCS §1065/1 et seq.) (Count 41)**

514)     Plaintiffs re-allege and incorporate by this reference each

paragraph in this Complaint as if fully set forth here.

515)     Based on belief and information acquired in 2023,

Plaintiffs allege that Defendants Goldston, Montgomery, Shannon,

Tucker-Wilkins, Wilkins and Williams, CBS, Chase, Goldston Firm,

Montgomery Firm, TechStars and Standing Oaks were involved in,

had been involved in, or conspired in, the fraudulent conveyance, fraudulent acquisition and/or the unauthorized operation of Legacy's Software.  The named Individual Defendants then used their employment or agency to cause harm to Plaintiffs.

516)    Based on belief and information acquired in 2023, Plaintiffs allege that the named Corporate Defendants were negligent by not maintaining proper controls to prevent their employees and/or agents from taking actions within their scope of employment/agency to harm persons or entities in which the employee/agent has an interest.

517)    In addition, based on belief and information acquired in 2023, Plaintiffs allege that the named Defendants used their employment/agency, or conspired to use their employment/agency to invade Ms. Brown's privacy, misappropriate Ms. Brown's trade secrets and fraudulently conceal material facts by taking, or conspiring to take, one or more actions including but not limited to:

A. *Conducting an expose' meeting in 2016*: Plaintiffs allege that within the scope of their employment, one or more of the named Defendants arranged and conducted an expose'-type of meeting at a Defendant Chase branch with Ms. Brown as the target and took actions including but not limited to::

i. An agent of the named Defendants invited Ms. Brown to conduct her estate planning meeting[102] for a Chase customer and required that the Chase Meeting be conducted at a Chase branch;

ii. One or more of the Defendants, or an agent acting on their behalf, installed cameras in the meeting room to surreptitiously view the Chase Meeting;

iii. The branch manager represented to Ms. Brown that the cameras were not operational and that the meeting room was private;

iv. Ms. Brown reasonably believed the meeting room was private;

v. However, based on belief and information acquired in 2023, Ms. Brown now believes the Chase Meeting was an expose-type of meeting intentionally conducted to damage Ms. Brown's reputation and future employability. Moreover, Ms. Brown alleges that:

---

[102]Ms. Brown conducted, at minimum, two meetings with estate planning clients, a planning session and a delivery session. The two sessions were typically at least one week apart. Together, the planning session and delivery session for the Chase customer at the Chase branch are referred to as the "Chase Meeting".

vi.  The video cameras were operational, and were recording and/or streaming video footage of the Chase Meeting;

vii.    By recording and/or streaming video footage of the Chase Meeting, Ms. Brown's process for client counseling was exposed to unauthorized individuals, which process included trade secrets;[103]

viii.    The named Defendants intentionally made several misrepresentations to Ms. Brown, including but not limited to:

1.  the nature and intent of the Chase Meeting;

2.  whether Defendant Chase allowed client meetings in unused meeting rooms in its Chase branches; and,

3.  the level of privacy of the Chase Meeting.

ix. The named Defendants took these actions knowing that Ms. Brown and Legacy would be severely harmed by the fact that Defendant Chase and CBS agreed to conduct an expose' meeting targeting Ms. Brown even though the expose' meeting did not reveal any impropriety.

---

[103] Ms. Brown did not allow her client planning session to be recorded. However, Ms. Brown did allow the delivery session to be recorded, if the client requests.

B. *Daley Center footage in 2017*:  Based on belief and information acquired in 2023, Ms. Brown alleges that within the scope of their employment, one or more of the named Defendants arranged and conducted a scheme to intimidate Ms. Brown into dropping her Unjust Enrichment lawsuit against Defendants Greeby, Vaske and Bellwether by taking actions including the following:

i. Defendant Tucker-Wilkins, or an agent acting on her behalf, captured video footage of Ms. Brown while she was at the Daley Center for a motion conference for her Unjust Enrichment lawsuit against Defendant Bellwether, Greeby and Vaske;

ii. The named Defendants had a group that included police officers stand nearby Ms. Brown and loudly discuss a false narrative that misrepresented Ms. Brown's actions.  The narrative being discussed was that a perpetrator of elder abuse would be arrested in the same courtroom as Ms. Brown's scheduled motion conference. Ms. Brown moved twice to a quieter area and both times the group moved to be near Ms. Brown.

iii. No one was arrested and the final member of the group and police officer left the courtroom moments after Ms. Brown concluded her motion conference; and,

iv. Defendant Tucker-Wilkins acknowledged that the footage she captured was related to the group's discussion and the footage would be broadcast on the news. However, Ms. Brown watched the CBS News afterwards and did not see any coverage of the story;

v. Initially, Ms. Brown was unaware that the group's discussion might be related to Ms. Brown because Ms. Brown did not behave in the manner described. It was not until Ms. Brown received Defendant Montgomery's 2020 ARDC Response that Ms. Brown realized that the group's discussion was substantially similar to statements in Montgomery' 2020 ARDC Response.

vi. It was not until 2023, that Ms. Brown realized Defendant Tucker-Wilkins might be connected to the fraudulent conveyance of Legacy's Software and that Defendant Tucker-Wilkins may have utilized her employment to harm Ms. Brown;

Brown et al v. ServiceNow et al - p238

C. *Editing footage:* Plaintiffs allege that one or more of the named Defendants, or agents acting on their behalf, utilized Defendant CBS's resources to edit video footage from the Daley Center and the Chase Meeting to create a draft of an investigative news report to facilitate the spread of false information about Ms. Brown.

D. *TechStars Accelerator admission*:  Plaintiffs allege that Defendant Wilkins, as an agent of Defendants TechStars and Standing Oaks, recommended Defendant Huge Legal be admitted into a TechStars Accelerator.  Plaintiffs further allege:

   i.  Defendant Wilkins took this action knowing that Defendants Huge Legal fraudulently-acquired Legacy's Software.  In addition, Defendant Huge Legal's admission into a TechStars Accelerator made it appear as if Defendants Huge Legal's lightening-fast software development was legitimate rather than a fraudulent acquisition;

   ii.  TechStars did not have adequate controls in place to prevent its employees and agents from recommending or

admitting businesses that are known to be operating, or in
possession of, stolen assets.

E. Plaintiffs allege that the named Individual Defendants were
able to take these actions, or conspire to take them, because
the named Corporate Defendants did not have controls in
place to prevent employees or agents from taking actions
within their scope of employment to affect entities in which
the employee/agent had an interest.

518)    Plaintiffs allege that:

A. the named Defendants knew or should have known that
Plaintiffs would experience significant harm because of the
named Defendants actions;

B. the named Defendants did not have proper controls in place
to prevent harm to Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a
direct and proximate cause of Plaintiffs' damages.

519)    Plaintiffs suffered significant damages as a result of the
named Defendants actions, or conspiracy to act, in an amount to be
proven at trial.

520)    Plaintiffs allege that the named Defendants actively
misled, engaged in affirmative acts to conceal, and/or conspired to

mislead or conceal, material facts related to this claim to prevent

Plaintiffs from becoming aware of their harm. Plaintiffs did not have

actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently

verify the concealed facts.  As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was July 2020

or October 2023 as indicated above.


**COUNT 42: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, CBS, Chase, Huge Legal, Standing Oaks and TechStars committed, or conspired to commit, fraud and wire fraud (18 U.S.C. §1343), with respect to the Daley Center, and the Chase Meeting**

521)     Plaintiffs re-allege and incorporate by this reference each

paragraph in this Complaint as if fully set forth here.

522)     Based on belief and information acquired in 2023,

Plaintiffs allege Defendants Barbo, Brown, Goldstein, Goldston,

Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins,

Williams, Bellwether, CBS, Chase, Huge Legal, Montgomery Firm,

Standing Oaks and TechStars committed, or conspired to commit,

fraud and wire fraud.

523) Based on belief and information acquired in 2023, Plaintiffs claim the named Defendants took, or conspired to take, one or more actions including but not limited to:

A. Misrepresenting to CBS and Chase management via phone and/or electronic communications that Ms. Brown conducted herself in a dishonest or deceptive manner;

B. Contacting Ms. Brown via phone and electronic communications to schedule and confirm the Chase Meeting;

C. Live streaming the Chase Meeting via the Internet without Ms. Brown's knowledge or authorization;

D. Setting up an Internet-connected CBS camera at the Daley Center to record footage of Ms. Brown;

E. Utilizing electronic communications to edit the video footage collected at the Daley Center and Chase Meeting into a draft of an investigative report video segment about one or both Plaintiffs; and,

F. Sharing the draft video segment via electronic communications to facilitate the spread of false information about Plaintiffs.

524) Plaintiffs allege the goals of the fraud were to:

A.  Cause irreparable financial and emotional harm to Plaintiffs'
and their reputations; and,

B. Prevent Ms. Brown from discovering the fraudulent-
conveyance of Legacy's Software.

525)     Plaintiffs allege the fraud affected interstate commerce.

526)     Plaintiffs allege that:

A. the named Defendants knew that their actions would cause
harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a
direct and proximate cause of Plaintiffs' damages.

527)     Plaintiffs suffered significant damages as a result of the
named Defendants actions, or conspiracy to act, in an amount to be
proven at trial.

528)     Plaintiffs allege that the named Defendants actively
misled, engaged in affirmative acts to conceal, and/or conspired to
mislead or conceal, material facts related to this claim to prevent
Plaintiffs from becoming aware of their harm. Plaintiffs did not have
actual or constructive knowledge of the concealed material facts.
Plaintiffs believed the misrepresentations and could not independently
verify the concealed facts.  As such, Plaintiffs assert that the discovery

rule applies to this claim and that the date of discovery was in or

about October 2023.

**Violence towards Ms. Brown**

**COUNTS 43 and 44: Plaintiffs claim Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins and Williams traveled, or conspired to travel, in aid of racketeering enterprises (18 U.S.C. §1952) (Count 43), and/or tampered with, or conspired to tamper with, a witness or victim (18 U.S.C. §1512) (Count 44)**

529)     Plaintiffs re-allege and incorporate by this reference each

paragraph in this Complaint as if fully set forth here.

530)     Plaintiffs allege Defendants Barbo, Brown, Goldstein,

Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins,

Vaske, Wilkins, Williams, tampered, or conspired to tamper with a

victim, and traveled, or conspired to travel, in aid of racketeering

enterprise, Enterprise 1.

531)     Based on belief and information acquired in 2023,

Plaintiffs claim the named Defendants conducted, or conspired to

conduct, interstate travel, with the intent to:

    A. Distribute the proceeds from the theft of Legacy's Software

        including but not limited to using the proceeds to hire

        individuals to commit unlawful acts against Ms. Brown;

B. Commit crimes in furtherance of unlawful activities including but not limited to the Holiday Inn Incident;

C. Promote additional investment in fraudulently-acquired Legacy's Software;

D. Tamper with Plaintiffs' devices to prevent Ms. Brown from being able to produce critical records and documents for official federal proceedings.

532)    Plaintiffs claim that:

A. the named Defendants knew that their actions would cause harm to Plaintiffs;

B. the named Defendants intended to harm Plaintiffs; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

533)    Plaintiffs suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

534)    Plaintiffs allege that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from becoming aware of their harm. Plaintiffs did not have actual or constructive knowledge of the concealed material facts.

Plaintiffs believed the misrepresentations and could not independently verify the concealed facts.  As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

### Holiday Inn Incident Claims

**COUNTS 45 and 46: Ms. Brown claims Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams and Huge Legal committed, or conspired to commit, trespass, false imprisonment, intentional infliction of emotional distress, invasion of privacy, theft and/or fraudulent concealment (Count 45), and/or interfered with commerce by threats or violence, 18 U.S.C. §1951 (Count 46), with respect to the Holiday Inn Incident**

535)     Ms. Brown re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

536)     Based on belief and information acquired in 2023, Ms. Brown claims Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams and Huge Legal committed, or conspired to commit, trespass to land, false imprisonment, intentional infliction of emotional distress, invasion of privacy, theft, fraudulent concealment and/or interfered with interstate commerce by threats of violence with respect to the Holiday Inn Incident.

537)     Ms. Brown alleges that the named Defendants conspired to cause one or more of the following actions:

A.  On or about February 5, 2019, four police officers ("Officers"), including one man who Ms. Brown believes was impersonating a police officer ("Imposter"), and the hotel manager demanded entry into Ms. Brown's hotel room where Ms. Brown was a lawful, paid guest;

B.  Ms. Brown had the right to exclusive possession of the hotel room.  The Officers did not have the authority, or a warrant, to enter Ms. Brown's hotel room and their threat to do so interfered with interstate commerce.

C.  When the Officers threatened to use a battering ram to enter Ms. Brown's hotel room, Ms. Brown, who was wearing only a bra, agreed to allow the female Officer into her hotel room. The female Officer then allowed the other Officers and hotel manager into Ms. Brown's hotel room over Ms. Brown's objection.

D.  The Officers physically prevented Ms. Brown from going to the bathroom to get dressed.  Moreover, they refused to leave the room or turn around while Ms. Brown got dressed;

E.  The Officers told Ms. Brown she needed to leave the hotel immediately either using the door or they could throw her out of the window;

F.  The Officers videotaped Ms. Brown on their body cams, including videoing Ms. Brown getting dressed.

G.  The Officers laughed at Ms. Brown while she dressed and the Officers joked about watching the video recording of Ms. Brown (naked and in tears) later for laughs.

H.  While Ms. Brown got dressed, the Officers conducted a warrant-less search of Ms. Brown's hotel room.  The Officers gathered Ms. Brown's belongings and threw them into garbage bags.

I.  Two Officers, one being the Imposter, dragged Ms. Brown out of the hotel room and tossed her in the parking lot, all without cause and without a warrant.

J.  Following the incident, Ms. Brown discovered some of her belongings were missing.  The Officers and hotel manager refused to allow Ms. Brown to return to her hotel room to retrieve her items.

K. The Officers made Ms. Brown feel, and intended to make Ms. Brown feel, that Ms. Brown was powerless to stop the individuals who were terrorizing her.

538) Ms. Brown alleges that significant material facts were concealed from her related to the Holiday Inn Incident. The concealed facts include, but are not limited to, whether the Imposter was actually a police officer, and the identity of the Imposter. There several items that suggested the Imposter was not a police officer:

A. At the beginning of the Holiday Inn Incident, Imposter, who was not wearing a name tag, introduced himself to Ms. Brown by one name but over the police radio, Imposter was referred to by a different name: "Wilkinsson" or "Wilkins' son". When Ms. Brown inquired about the name discrepancy, the Imposter left and returned with a name tag which had a third name on it.

B. Moreover, during the Holiday Inn Incident, the Officers took affirmative steps to conceal the truth:

i. Ms. Brown requested the Officers show identification. However they refused.

Brown et al v. ServiceNow et al  -  p249

ii. Ms. Brown attempted to call 911 to verify the Officers'
identities but the hotel phone no longer worked and her
mobile phone no longer had a signal.

iii. The Holiday Inn manager allowed the Imposter to enter
the hotel and approach and interact with Ms. Brown as if
he was an Officer;

iv. An Officer and the Imposter forcibly removed Ms. Brown
from the hotel room she was lawfully occupying, in front
of the Holiday Inn manager, without the Holiday Inn
manager intervening.

C. Following the Holiday Inn incident, Ms. Brown tried to
uncover concealed facts by taking actions including but not
limited to:

i. Ms. Brown contacted, or believed she was contacting, the
Baltimore County Police Department, news stations and
attorneys immediately after the incident and on numerous
occasions in 2019. However, her calls were not returned.

ii. Ms. Brown filed, or believed she was filing, FOIA requests
to access and preserve the body cam footage and to
confirm the identities of the Officers;

Brown et al v. ServiceNow et al - p250

iii. Ms. Brown attempted to file at least three separate complaints in Maryland District Court to assert claims against Holiday Inn and Baltimore County Police Department. However, none of her attempts proceeded to litigation.

D. Prior to Ms. Brown discovering in 2023 that Legacy's Software had been fraudulently conveyed and was being operated as TrustandWill.com, Ms. Brown had no reason to believe Defendants Wilkins or Tucker-Wilkins had anything to do with the campaign of terror to which Ms. Brown is being subjected. Thus, although Ms. Brown knew Imposter was referred to as "Wilkinsson" or "Wilkins' son" over the police radio, Ms. Brown did not associate, and had no reason to associate, Defendants Wilkins or Tucker-Wilkins with the actions.

E. However, based on belief and information acquired in 2023, Ms. Brown believes that the Officers were acting as agents of the named Defendants. Moreover, Ms. Brown alleges that the Imposter is either the son of Defendants Wilkins and/or Tucker-Wilkins or another person who has an actual or

perceived relationship with Defendant Tucker-Wilkins and/or Wilkins.

539)     Since material facts were concealed from Ms. Brown, including but not limited to, whether Imposter was actually a police officer and the identity of the Imposter, Ms. Brown was prevented from acting on the information.  If Ms. Brown had known Imposter was a civilian and had known the identity of Imposter, Ms. Brown would have filed suit against Imposter.

540)     Ms. Brown alleges that the named Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Ms. Brown from becoming aware of her injuries.  Ms. Brown did not have actual or constructive knowledge of the concealed material facts. Ms. Brown believed the misrepresentations and could not independently verify the concealed facts.  As such, Ms. Brown asserts that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

541)     The conduct of the Officers, including Imposter, was extreme and outrageous and resulted in Ms. Brown suffering severe emotional distress.  The named Defendants knew that Ms. Brown would experience harm because of the Officers' actions.

542) Ms. Brown claims that:

    A. the named Defendants knew that their actions would cause harm to Ms. Brown;

    B. the named Defendants intended to harm Ms. Brown; and,

    C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Ms. Brown's damages.

543) Ms. Brown suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

**COUNTS 47 and 48: Ms. Brown claims that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams and Huge Legal committed, or conspired to commit, fraud and mail fraud 18 U.S.C. §1341 (Count 47) and/or wire fraud 18 U.S.C. §1343 (Count 48) with respect to the Holiday Inn Incident**

544) Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

545) Ms. Brown alleges Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams and Huge Legal committed, or conspired to commit, mail fraud and/or wire fraud by carrying out a scheme to utilize the US Mail, phone and electronic communications to defraud Ms. Brown with respect to the Holiday Inn Incident.

546)     Based on belief and information acquired in 2023, Ms.
Brown claims that on several specific dates, the named Defendants
took, or conspired to take, intentional actions including but not
limited to one or more of the following:

A. At the beginning of the Holiday Inn Incident, Ms. Brown used
   the phone in her hotel room to call 911 and Holiday Inn's
   Corporate Office (Inter Continental) and the phone was
   operational.

   i.  However, once the Officers began to threaten to force
       their way into Ms. Brown's hotel room, neither the phone
       in her hotel room nor her mobile phone worked.

   ii. Ms. Brown alleges the named Defendants, or an agent
       acting on their behalf, intentionally disabled the hotel
       room phone and jammed the cellular signal to prevent Ms.
       Brown from calling for help.

   iii. This wire fraud affected interstate commerce.

B. Ms. Brown attempted to file a lawsuit related to the Holiday
   Inn Incident by mailing the complaint to the US District
   Courthouse in the District of Maryland on at least two
   separate occasions in 2019.  However, neither of her mailed
   complaints reached the District Court.  Ms. Brown alleges

the named Defendants, or agents acting on their behalf, intercepted the mail somewhere along the delivery path to prevent the Holiday Inn Incident complaint from being filed and prosecuted.  Moreover, Plaintiff alleges;

1. When Ms. Brown hired a courier to hand-deliver the complaint in 2022, the clerk filed the Holiday Inn Incident complaint ("Holiday Inn Complaint") but refused to allow the courier to pay the filing fee with the courier's credit card.  The clerk mailed a notice to Ms. Brown that the filing fee remained unpaid. However, that notice was intercepted from US Mail.

2. Ms. Brown alleges that each of these incidents of mail or wire fraud affected interstate commerce.

C. Ms. Brown attempted to contact news agencies, attorneys and police officials immediately after the Holiday Inn Incident, and for a significant amount of time following the Holiday Inn Incident:

i. However, Ms. Brown received no returned calls and was often blocked from making outgoing calls and blocked from using data.

Brown et al v. ServiceNow et al  -  p255

    ii. In addition, Ms. Brown was persistently blocked from accessing her social media and email accounts.

    iii. Ms. Brown alleges that an agent acting on behalf of one or more of the named Defendants utilized a call-site simulator and/or modified networking devices to affect Ms. Brown's ability to use her mobile phone and connect to the Internet.

    iv. This wire fraud affected interstate commerce.

D. When the Holiday Inn Complaint was dismissed for failure to pay the filing fee, Ms. Brown retained Maryland attorney Charles Tucker to reinstate the Holiday Inn case ("Attorney Tucker").

    i. Attorney Tucker communicated with Ms. Brown exclusively via phone and electronic communications.

    ii. Attorney Tucker represented via phone and electronic communications that he was taking all necessary steps to reinstate the Holiday Inn Complaint. However, Attorney Tucker was not taking steps to reinstate the case. Ms. Brown alleges that the named Defendants conspired with Attorney Tucker via phone and electronic communications to have Attorney Tucker allow the statutes of limitation to

expire on Ms. Brown's potential claims which were not

included in the Holiday Inn Complaint, before filing a

motion to reinstate Holiday Inn Complaint.

   iii. This wire fraud affected interstate commerce.

547)     Ms. Brown claims that:

   A. the named Defendants knew that their actions would cause

harm to Ms. Brown;

   B. the named Defendants intended to harm Ms. Brown; and,

   C. the named Defendants' actions, or conspiracy to act, are a

direct and proximate cause of Ms. Brown's damages.

548)     Ms. Brown suffered significant damages as a result of the

named Defendants actions, or conspiracy to act, in an amount to be

proven at trial.

549)     Ms. Brown alleges that the named Defendants actively

misled, engaged in affirmative acts to conceal, and/or conspired to

mislead or conceal, material facts related to this claim to prevent Ms.

Brown from becoming aware of her injuries. Ms. Brown did not have

actual or constructive knowledge of the concealed material facts. Ms.

Brown believed the misrepresentations and could not independently

verify the concealed facts. As such, Ms. Brown asserts that the

discovery rule applies to this claim and that the date of discovery was in or about October 2023.

## Headline Ad Claims

**COUNTS 49 and 50: Ms. Brown claims that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Huge Legal, and Law Bulletin tortuously interfered, or conspired to tortuously interfere, with Ms. Brown's business expectancy (Count 49) and/or committed, or conspired to commit wire fraud 18 U.S.C. §1343 (Count 50) with respect to Law Bulletin's Headline Ad**

550) Ms. Brown re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

551) Based on belief and information acquired in 2023, Ms. Brown alleges that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Huge Legal and Law Bulletin tortuously interfered, or conspired to interfere, with Ms. Brown's employment and with her future ability to secure employment. In addition, Ms. Brown claims the named Defendants committed, or conspired to commit wire fraud with respect to Law Bulletin's Headline Ad.

552) Based on belief and information acquired in 2023, Ms. Brown alleges that, at the request of one or more of the named

Defendants, or an agent acting on their behalf, Defendant Law Bulletin took actions including but not limited to:

A. In or about April 2022, Law Bulletin published a headline ad ("Headline Ad") on its online publication, Chicago Law Bulletin;

B. Law Bulletin intentionally included false information in the Headline Ad that cast doubt on Ms. Brown's character;

C. Law Bulletin intentionally included Ms. Brown's name in the Headline Ad, but Law Bulletin obscured her name from plain view since Ms. Brown is not a public figure and having her name visible in the Headline Ad does not add value to the Headline Ad.

D. Ms. Brown alleges Law Bulletin included Ms. Brown's name in the Headline Ad:

   i. to ensure that the Headline Ad would be listed on the top of Internet search results of Ms. Brown's name;

   ii. to ensure the false statements in the Headline Ad would be publicly-accessible; and,

   iii. to lend Law Bulletin's credibility to a disinformation campaign launched against Ms. Brown.

E. Law Bulletin ignored Ms. Brown's emails requesting the false statements be corrected.

553)     Ms. Brown alleges Law Bulletin knew that the Headline Ad would be leveraged to negatively and improperly affect Ms. Brown's then-current employment, and her future employability;

554)     Ms. Brown was an at-will employee at ServiceNow when Law Bulletin published the Headline Ad.  Ms. Brown alleges:

A. A few weeks prior to Law Bulletin publishing the Headline Ad, Ms. Brown won an innovation award from her business unit at ServiceNow and she expected that her employment at ServiceNow would continue;

B. Prior to Law Bulletin publishing the Headline Ad, Ms. Brown had not received any negative performance feedback;

C. However, within one month of the Headline Ad being published, Ms. Brown's manager at ServiceNow attempted to fire Ms. Brown without having previously shared any performance concerns with Ms. Brown. Moreover, the reasons the manager cited for attempting to terminate Ms. Brown were baseless and discriminatory;

D. Ms. Brown's manager later made a comment that he saw negative information about Ms. Brown online and believed the false representations it contained;

E. Ms. Brown searched her name online and the Headline Ad was at the top of the results;

F. Ms. Brown's position required achieving a customer billable hours threshold. However, after the Headline Ad was published, Ms. Brown was not assigned to active customer accounts from the remainder of the year (approximately 8 months). Ms. Brown was later terminated;

G. Ms. Brown has not obtained employment since being terminated from ServiceNow.

555) Ms. Brown claims that:

A. the named Defendants knew that their actions would cause harm to Ms. Brown;

B. the named Defendants intended to harm Ms. Brown; and,

C. the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Ms. Brown's damages.

556) Ms. Brown suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

Brown et al v. ServiceNow et al  -  p261

557)     Ms. Brown alleges this claim relates back to the filing date of the ongoing case, Brown v. Law Bulletin, Cook County, Illinois, Law Division, 2023L003001 as it arose out of the conduct and shares a sufficiently close relationship to the asserted facts.  Ms. Brown is asserting this allegation in this complaint rather than Brown v. Law Bulletin as Ms. Brown is also asserting a federal question claim.  Ms. Brown requested to transfer the fraud claim in that litigation to this litigation.  However, Law Bulletin refused.

**ServiceNow Claims**

**COUNTS 51, 52 and 53:  Ms. Brown claims that ServiceNow committed fraud and mail fraud, 18 U.S.C. §1341 (Count 51) and wire fraud, 18 U.S.C. §1343 (Count 52) and obstruction of justice, 18 U.S.C. §1513(e) (Count 53) related to Ms. Brown's EEOC Charges against ServiceNow**

558)     Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

559)     Based on belief and information, Ms. Brown alleges that ServiceNow committed:

    A.  mail fraud related to EEOC Charge #262 and/or EEOC Charge #608 (Count 51);

    B.  wire fraud related to EEOC Charge #262 and/or EEOC Charge #608 (Count 52); and,

C.   obstructed justice related to EEOC Charge #262 and/or

EEOC Charge #608 (Count 53).

560)      Based on belief and information, Ms. Brown alleges that

on specific occasions between the period of January 20, 2023 and

April 5, 2024[104], ServiceNow intentionally made false representations

to the EEOC during the EEOC investigation for EEOC Charge #262

and/or EEOC Charge #608.  Moreover, Ms. Brown alleges:

A.  ServiceNow's communications with the EEOC were carried

out exclusively via mail, phone, and electronic

communications and the communications affected interstate

commerce.

B.   Ms. Brown alleges ServiceNow's goals included, but were

not limited to:

i.   obstructing the EEOC's federal investigation of EEOC

#262 and/or EEOC #608;

ii.  influencing the federal agency's decision regarding

whether to litigate one or both of the EEOC Charges;

iii. depriving Ms. Brown of her right to relief from the EEOC,

a federal agency; and,

---

[104]Ms. Brown will provide specific dates and specific false information
following discovery.

Brown et al v. ServiceNow et al  -  p263

iv. forcing Ms. Brown to arbitrate her discrimination-related employment and termination claims.

C. ServiceNow intended for the EEOC to rely on the false information ServiceNow provided to the EEOC rather than the truthful information Ms. Brown provided to the EEOC.

D. Because of the false information that ServiceNow provided to the EEOC, the EEOC refused to litigate either EEOC Charge and issued its determination for:

i. EEOC #262 on March 27, 2024; and,

ii. EEOC #608 on April 5, 2024;

561)    ServiceNow knew that Ms. Brown would experience significant financial and emotional harm because of ServiceNow's actions and ServiceNow intended to cause harm to Ms. Brown.

562)    Ms. Brown did in fact suffer significant harm in an amount to be proven at trial.  ServiceNow is a direct or proximate cause of Ms. Brown's harm.

**COUNT 54: Ms. Brown claims ServiceNow violated the R.I.C.O Act 18 U.S.C. §1964 by violating 18 U.S.C. §1962(c)**

563)    Ms. Brown re-alleges and incorporates by this reference each paragraph contained in this Complaint as if fully set forth here.

564) Ms. Brown alleges ServiceNow violated the R.I.C.O Act 18 U.S.C. §1964 by participating in racketeering activities that affect interstate commerce in violation of the RICO Act 18 U.S.C. §1962(c-d). Ms. Brown further alleges:

A. **Enterprise:** ServiceNow is the enterprise.

B. **Scheme to defraud and statutes violated**:

   i. **18 U.S.C. §1962(c)** ServiceNow sought to avoid potential liability on one or both of the federal EEOC Charges that Ms. Brown filed against ServiceNow. ServiceNow achieved that goal by intentionally providing false information to the EEOC. The EEOC chose not to litigate either EEOC Charge based on the false information ServiceNow provided to the EEOC.

   ii. **18 U.S.C. §1962(d):** Ms. Brown alleges ServiceNow conspired with Enterprise 1 to conduct racketeering activities, including but not limited to conspiring to commit fraud and obstruct justice related to the EEOC Charges. The goal was to eliminate Ms. Brown's financial resources (to prevent an action to reclaim Legacy's Software.)

C. **Predicate Acts:**

Brown et al v. ServiceNow et al - p265

  i. Mail fraud (18 U.S.C. §1341) as set forth in Count 51;

  ii. Wire fraud (18 U.S.C. §1343) as set forth in Count 52; and,

  iii. Obstruction of Justice (18 U.S.C. §1513(e)) as set forth in

   Count 53

565) **Interstate commerce:** ServiceNow's activities affect interstate commerce. ServiceNow is headquartered in California and Ms. Brown worked remotely from Illinois. In addition, the EEOC is a federal agency.

566) **Continued threat:** Pursuant to the mandatory Arbitration Agreement, Ms. Brown has initiated arbitration with ServiceNow regarding her employment and her termination. Ms. Brown believes ServiceNow will continue to commit mail, phone and wire fraud by asserting false statements in the arbitration similar to the statements it made to the EEOC.

567) **Unnamed Participants:** Ms. Brown believes that there may be unnamed participants involved which will be determined during discovery.

568) **RICO Damages:** Ms. Brown seeks treble actual damages, court costs and attorney fees.

## Ongoing Mail Fraud

**COUNTS 55 and 56: Ms. Brown claims that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, and Huge Legal committed fraud and mail fraud, 18 U.S.C. §1341 (Count 55) and wire fraud, 18 U.S.C. §1343 (Count 56) with respect to Ms. Brown's receipt of US Mail**

569)     Ms. Brown re-alleges and incorporates by this reference each paragraph in this Complaint as if fully set forth here.

570)     Based on belief and information, Ms. Brown alleges that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams and Huge Legal are intentionally interfering, or conspiring to interfere, with delivery of Ms. Brown's US mail, mail app, and package deliveries.

571)     Ms. Brown claims:

A. For at least the past five years, regular mail and certified mail pieces and/or packages addressed to Ms. Brown are frequently intercepted and do not reach Ms. Brown or reach Ms. Brown already open.

B. Moreover, an unknown signatory has repeatedly signed to accept Ms. Brown's certified mail. On some occasions, improperly-accepted certified mail items are placed in Ms.

Brown's mailbox at some later point, including but not limited to:

    i.  US Mail Certified #7016-3010-0000-6037-0233.

    ii.  US Mail Certified #9589-0710-5270-2047-8734-08.

    iii. US Mail Certified #7019-2280-0001-7855-0449.

    iv. US Mail Certified #7016-1370-0001-5216-7128.

C. Ms. Brown is frequently prevented from accessing US Mail's app and website to view her delivered mail or to gather details regarding who signed for her registered mail.

D. In addition, one or more mail redirection agreements have been filed with the US Postal Service to temporarily redirect Ms. Brown's US Mail to a different address without Ms. Brown's authorization.

572)    As a result of the unauthorized actions,

A. senders of mail to Ms. Brown assume Ms. Brown is in receipt of a mail item when she may not be; and,

B. Ms. Brown believes that one or more of her two-factor authorization accounts and passwords was reset via US mail.

573)     To no avail, Ms. Brown has repeatedly attempted to ascertain the individual who signs to accept her certified mail, and the address to which her mail has been redirected.[105]

574)     Ms. Brown alleges that:

A.  the named Defendants knew that their actions would cause harm to Ms. Brown;

B.  the named Defendants intended to harm Ms. Brown; and,

C.  the named Defendants' actions, or conspiracy to act, are a direct and proximate cause of Ms. Brown's damages.

575)     Ms. Brown suffered significant damages as a result of the named Defendants actions, or conspiracy to act, in an amount to be proven at trial.

---

[105]Ms. Brown learned of one redirection agreement from an Amazon package tracking update.  An Amazon item Ms. Brown ordered was arriving by US Mail and the tracking noted that the item had been sent to a different address because a US Mail redirection agreement was in place for Ms. Brown.  However, Amazon could not access the address to which Ms. Brown's mail was being redirected and Ms. Brown did not receive a response from the US Postmaster.

## Enterprise 1 R.I.C.O. Claims

**COUNT 57: Plaintiffs claim Defendants Barbo, Brown, Gartner, Goldstein, Goldston, Greeby, Kingsley, Kingsley Law, Kohmedia, Koht, Lamb, Merit Law, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether, CBS, Chase, Huge Legal, Kohmedia, Law Bulletin, Omega, TechStars, and Standing Oaks violated the R.I.C.O Act 18 U.S.C. §1964, by violating 18 U.S.C. §1962(a-d)**

576)    Plaintiffs re-allege and incorporate by this reference each paragraph contained in this Complaint as if fully set forth here.

577)    **Enterprise:** Plaintiffs claim that Defendants Barbo, Brown, Goldstein, Goldston, Greeby, Lamb, Montgomery, Shannon, Tucker-Wilkins, Vaske, Wilkins, Williams, Bellwether and Huge Legal are acting as an association-in-fact ("Enterprise 1") with respect to the fraudulent acquisition, disposition and operation of Legacy's Software and trade secrets. Moreover, Plaintiffs claim Enterprise 1 conducts business and/or participates in racketeering activities that affect interstate commerce in violation of the RICO Act 18 U.S.C. §1962(a-d).

578)    **Scheme to defraud and statutes violated:**

A. **18 U.S.C. §1962(a):** Plaintiffs allege Enterprise 1 utilized income derived from the theft of Legacy's Software to start a new business, Defendant Huge Legal, to operate Legacy's Software.  Defendant Huge Legal operates Legacy's stolen

software and trade secrets as TrustandWill.com. The revenue derived from the operation of the stolen asset is then reinvested in Defendant Huge Legal and utilized to fund other racketeering activities.

B. **18 U.S.C. §1962(b):** Plaintiffs allege Enterprise 1 conducted a series of racketeering activities to fraudulently acquire Legacy's Software and trade secrets. Moreover, Enterprise 1 is currently operating Legacy's Software to generate income for Enterprise 1 as if Legacy's Software is their own.

C. **18 U.S.C. §1962(c):** Plaintiffs allege Enterprise 1 conducts business through a pattern of racketeering activities. In addition to using racketeering activities to fraudulently acquire and operate Legacy's Software, Plaintiff alleges Enterprise uses racketeering activities to take whatever actions necessary to:

i. Minimize the likelihood that Ms. Brown would become aware that Legacy's Software had been fraudulently conveyed to an unauthorized third party and is being operated as TrustandWill.com; and,

    ii.  Minimize the likelihood that Ms. Brown would have the financial resources to start an action to reclaim Legacy's Software.

D. **18 U.S.C. §1962(d):** Plaintiffs allege Enterprise 1 conspires with other individuals and entities to conduct its racketeering activities. Enterprise 1's conspirators include, but are not limited to:

1. Enterprise 1 conspired with Defendants Kohmedia, Koht and others as set forth in Counts 4-6 ;

2. Enterprise 1 conspired with Defendants Gartner, Kingsley, Kingsley Law, Merit Law and others as set forth in Count 28-29;

3. Enterprise 1 conspired with Defendant Omega and others as set forth in Count 34;

4. Enterprise 1 conspired with Defendants CBS, Chase, Standing Oak, TechStars and others as set forth in Counts 41-42;

5. Enterprise 1 conspired with Baltimore County Police, Holiday Inn, Attorney Tucker, and others as set forth in Counts 46-48; and,

Brown et al v. ServiceNow et al  -  p272

6. Enterprise 1 conspired with Defendant Law Bulletin and others to publish the Headline Ad as set forth in Counts 50;

7. Enterprise 1 conspired with Defendant ServiceNow and others to commit fraud and obstruct justice as set forth in Counts 51-53.

579) **Predicate racketeering acts**: Plaintiffs allege Enterprise 1 has conducted racketeering activities to achieve the goals listed herein, including predicate acts such as:

A. With respect to Kohmedia Contracts:

i. Misappropriating trade secrets (18 U.S.C. §1836) as set forth in Count 4;

ii. Mail fraud (18 U.S.C. §1341) as set forth in Count 5; and,

iii. Wire fraud (18 U.S.C. §1343) as set forth in Count 6.

B. With respect to Legacy Operations:

i. Mail fraud (18 U.S.C. §1341) as set forth in Count 11; and,

ii. Wire fraud (18 U.S.C. §1343) as set forth in Count 12.

C. With respect to Bellwether Contracts:

i. Misappropriating trade secrets (18 U.S.C. §1836) as set forth in Count 18;

ii. Mail fraud (18 U.S.C. §1341) as set forth in Count 20; and,

iii. Wire fraud (18 U.S.C. §1343) as set forth in Count 21.

D.  With respect to Merit Contracts:

    i.  Mail fraud (18 U.S.C. §1341) as set forth in Count 28; and.

    ii.  Wire fraud (18 U.S.C. §1343) as set forth in Count 29.

E.  With respect to Shannon Contract:

    i.  Wire fraud (18 U.S.C. §1343) as set forth in Count 34.

F.  With respect to theft of Legacy's Software:

    i.  Theft and unlawful transport (18 U.S.C. §2314) as set forth in Count 35;

    ii.  Receipt of stolen property (18 U.S.C. §2315) as set forth in Count 36;

    iii. Money laundering (18 U.S.C. §1956 and 18 U.S.C. §1957) as set forth in Count 37; and,

    iv.  Computer Fraud and Abuse Act (18 U.S.C. §1030) as set forth in Count 39.

G.  With respect to disinformation campaign,

    i.  Misappropriated trade secrets (18 U.S.C. §1836) as set forth in Count 41; and,

    ii.  Wire fraud (18 U.S.C. §1343) as set forth in Count 42.

H.  With respect to violence towards Ms. Brown

      i.   Traveled, or conspired to travel, in aid of racketeering enterprises (18 U.S.C. §1952) as set forth in Count 43; and,

      ii.  Tampered with, or conspired to tamper with a victim (18 U.S.C. §1512) as set forth in Count 44;

I. With respect to the Holiday Inn Incident:

      i.   Interfering with commerce by threats or violence, (18 U.S.C. §1951) as set forth in Count 46;

      ii.  Mail fraud (18 U.S.C. §1341) as set forth in Count 47; and,

      iii. Wire fraud (18 U.S.C. §1343) as set forth in Count 48.

J. With respect to the Headline Ad:

      i.   Wire fraud (18 U.S.C. §1343) as set forth in Count 50.

K. With respect to ServiceNow:

      i.   Mail fraud (18 U.S.C. §1341) as set forth in Count 51;

      ii.  Wire fraud (18 U.S.C. §1343) as set forth in Count 52;

      iii. Obstruct justice (18 U.S.C. 1513(e)) as set forth in Count 53.

L. With respect to ongoing mail interception

      i.   Mail fraud (18 U.S.C. §1341) as set forth in Count 55; and,

      ii.  Wire fraud (18 U.S.C. §1343) as set forth in Count 56.

580) **Interstate commerce:** Plaintiffs allege Enterprise 1's actions affect interstate commerce as indicated in the individual counts.

581) **Continued threat:** Plaintiffs allege Enterprise 1, through its agents, continues to pose a threat to Plaintiffs, including but not limited to:

   A. Continuing to exert ownership of Legacy's Software and operating Legacy's Software as if it is their own;

   B. Continuing to intercept Ms. Brown's mail, electronic and voice communications;

   C. Continuing to compromise Ms. Brown's online accounts, devices and networks; and,

   D. Continuing to inflict physical harm onto Ms. Brown.

582) **Unnamed Participants:** Plaintiff's believes that there are several additional individuals who Ms. Brown has not yet identified who are also members of Enterprise 1. In addition, there is an entity Ms. Brown knows only as the Think Tank, described herein, that Ms. Brown believes is also a member of Enterprise 1. Ms. Brown is confident she will be able to confirm the identity of the additional associates of Enterprise 1 during discovery.

583)    **RICO Damages:** Plaintiffs seek treble actual damages, court costs and attorney fees.  Plaintiff's actual damages include, but are not limited to:

    A. Legacy:

        i.  The current value of TrustandWill.com;

        ii.  All revenue generated on TrustandWill.com.

    B. Ms. Brown:

        i.  Unpaid compensation;

        ii.  Economic damage to Ms. Brown's reputation.

## Other Claims

### COUNT 58:  Plaintiffs claims Defendants Intentionally Inflicted Emotional Distress

584)    Plaintiffs re-allege and incorporate by this reference each of the preceding paragraphs as if they are fully set forth here.

585)    Plaintiffs claim the Defendants willfully and intentionally took, or conspired to take, numerous actions set forth herein which intentionally caused severe emotional distress for Plaintiffs.

586)    Plaintiffs claim that:

    A. the Defendants knew that their actions would cause one or both Plaintiffs to experience financial hardship, pecuniary losses, mental anguish, and extreme emotional distress

B. the Defendants intended to harm Plaintiffs; and,

C. the Defendants' actions, or conspiracy to act, are a direct and proximate cause of Plaintiffs' damages.

587)     Plaintiffs have suffered, and continues to suffer emotional distress, mental anguish, embarrassment, and anxiety because of the Defendants' conduct.

588)     Plaintiffs alleges that the Defendants actively misled, engaged in affirmative acts to conceal, and/or conspired to mislead or conceal, material facts related to this claim to prevent Plaintiffs from knowing who was harming them. Plaintiffs did not have actual or constructive knowledge of the concealed material facts. Plaintiffs could not determine or independently verify the concealed facts. As such, Plaintiffs assert that the discovery rule applies to this claim and that the date of discovery was in or about October 2023.

## COUNT 59:  Plaintiffs claim Corporate Defendants are vicariously liable for the acts of their agents and employees

589)     Plaintiffs re-allege and incorporate by this reference each paragraph in this Complaint as if fully set forth here.

590)     Plaintiffs claim that each of the Corporate Defendants are responsible for the acts of their agents, employees, members, and/or

representatives, who were working within the scope of their employment or agency.

## DAMAGES

591)    Plaintiffs pray for judgment against each named Defendant as follows:

A.  That this Court enter judgment in Legacy and Ms. Brown's favor against Defendants jointly and severally, for all actual, compensatory, exemplary, punitive, and incidental damages provided by law;

i. For the full current value of Legacy's Software and the trade secrets that were fraudulently conveyed;

ii. For R.I.C.O claims, treble actual damages;

iii. For reimbursement for all attorney's fees and costs;

iv. For reimbursement of all contract payments that Legacy or Ms. Brown made on the Kohmedia Contracts, Bellwether Contracts and Merit Contracts;

v. For the difference between the value of the damages incurred related to the Contractor Case and the settlement amount;

vi. For the uncollected damages awarded to Ms. Brown for the Bellwether Judgment;

vii. For damages in an amount which is sufficient to properly and adequately compensate Legacy and Ms. Brown for all direct and proximate losses resulting from Defendants' acts and omissions and for such other and further relief as justice may require;

viii. For prejudgment and post judgment interest;

ix. For consequential damages resulting from losses incurred including but not limited to emotional distress, mental pain and anguish,

B. Grant such other and further relief as this Court deems just and proper.

**Respectfully Submitted: May 19, 2025**

/s/ Kimberly Jean Brown

Kimberly Jean Brown, individually
1026 E. 46th St, Unit 2E
Chicago, IL. 60653
(773) 673-0324
Kim@PrivacyGladiators.com
***Plaintiff,***

and,

Brown et al v. ServiceNow et al - p280

By:   /s/ Kimberly Jean Brown

Kimberly Jean Brown as Assignee
of the Brown Washington Trust's
interest in Legacy Complete
1026 E. 46th St, Unit 2E
Chicago, IL. 60653
(773) 673-0324
Kim@PrivacyGladiators.com
***Derivative Plaintiff on behalf
of Legacy Complete***

## Brown v. ServiceNow
## LIST OF DEFENDANTS

**Named Corporate Defendant**

ServiceNow, Inc.

c/o Bill McDermott, CEO
225 Lawson Lane

Santa Clara, CA 95054

Ashley L. Orler

Constangy, Brooks, Smith & Prophete
LLP

20 N. Wacker Dr, Suite 4120,
Chicago, IL 60606

**Individual Defendants**

**Represented by**

Cody Barbo
6534 Oriole Dr.
Dallas, TX 75209-5307

Cody Barbo
c/o Huge Legal Tech Co. Inc.
8605 Santa Monica Blvd, #40156
West Hollywood, CA  90069-1094
or,
961 West Laurel Street
San Diego, CA 92101

Gorman Edward Brown
9407 Kynaston Ct
Bowie, MD 20721

Daniel Goldstein
3321 Stanford Ave
Dallas, TX 73225

Daniel Goldstein
c/o Huge Legal Tech Co.
8605 Santa Monica Blvd, #40156
West Hollywood, CA  90069-1094
or,
961 West Laurel Street
San Diego, CA 92101

| **Individual Defendants** | **Represented by:** |
|---|---|
| Lila Goldston | Lee Pulliam |
| c/o Lila Goldston Consulting LLC | Lee Pulliam and Associates |
| 5201 S. Cornell, Unit 25D | 70  E Lake St, Suite 200 |
| Chicago,IL  60615 | Chicago, IL 60602 |
| | (312) 759-8800 |
| | Lpulliamlaw@sbcglobal.net |
| | |
| Michael Greeby | Michael Greeby |
| 1643 N. Humboldt Blvd, Apt 1 | c/o Wilson Sporting Goods |
| Chicago, IL 60647 | 1 Prudential Plaza |
| or | 130 E. Randolph St. |
| 111 W. Polk St, Apt 813 | Chicago, IL 60601 |
| Chicago, IL 60605 | |
| or | |
| 200 N. Dearborn, Unit 1505 | |
| Chicago, IL 60601 | |

| **Individual Defendants** | **Represented by** |

John Koht
c/o Kohmedia, LLC
520 Rio Vista Rd
Glenview, IL  60025


Brian Lamb
1029 S. Cloverdale Ave
Los Angeles, CA  90019
or
2814 Florentine Ct
Thousand Oaks, CA 91362
or
7316 Woodhome Dr
Dallas, TX 7524

Brian Lamb
c/o Huge Legal Tech Co.
8605 Santa Monica Blvd, #40156
West Hollywood, CA  90069-1094
or,
961 West Laurel Street
San Diego, CA 92101


Michelle Montgomery
6901 S. Oglesby Ave, #3B
Chicago, IL 60649
or
2315 S. Kolin Ave
Chicago, IL 60623

Eric D. Kaplan
Christopher S. Wunder
Kaplan, Papadakis & Gournis, LLP
180 N LaSalle St, Suite 2108
Chicago, IL  60601
(312) 726-0531
ekaplan@kpglaw.com
cwunder@kpglaw.com

**Individual Defendants**                    **Represented by**

William Kelly Shannon
2817 S. Michigan Ave
Chicago, IL  60616


Dorothy Tucker                               Dorothy Tucker
5008 S. Blackstone                           c/o CBS News and Stations
Chicago, IL 60615                            22 West Washington St
                                             Chicago, IL 60602.


Storm Vaske                                  Storm Vaske (work address)
2823 NW 34th Ln                              c/o Grand Prix Printing dba
Ankeny, IA 50023                             The Label Factory
                                             1785 Guthrie Ave
                                             Des Monies, Iowa 50316


Tony Wilkins                                 Tony Wilkins
5008 S. Blackstone Ave                       c/o Standing Oaks Venture Partners
Chicago, IL  60615                           222 Merchandise Mart Plaza, Suite 1212
                                             Chicago, IL  60654

Erika Williams
704 Pier View Way
Oceanside, CA 92054

Patricia Brown Holmes
Lucas Rael
Riley Safer Holmes & Cancila LLP
70 W Madison St, Suite 2900
Chicago, IL 60602
(312) 471-8700
PHolmes@rshc-law.com
LRael@rshc-law.com

| **Corporate Defendants** | **Represented by/Additional Address** |
|---|---|
| CBS News and Stations Division, CBS Entertainment Group, unit of Paramount Global c/o Wendy McMahon, CEO 1515 Broadway, New York, NY 10036 | CBS News and Stations Division, CBS Entertainment Group a unit of Paramount Global c/o Wendy McMahon, CEO 22 West Washington St Chicago, IL 60602. |
| Grand Prix Printing LLC c/o Kent Vaske, Member 4111 NE Bellagio Cir Ankeny, IA  50021 | Grand Prix Printing LLC c/o Kent Vaske, Member 1785 Guthrie Ave Des Monies, Iowa 50316 |
| Huge Legal Technology Company Inc. c/o Cody Barbo, CEO 8605 Santa Monica Blvd, Suite #40156 West Hollywood, CA  90069-1094 | Huge Legal Technology Company c/o Cody Barbo, CEO 961 West Laurel Street San Diego, CA 92101 |
| James D. Montgomery    &  Associates, LTD 33 W. Monroe St, Suite 1375 Chicago, IL  60603 | Eric D. Kaplan Christopher S. Wunder Kaplan, Papadakis & Gournis, LLP 180 N LaSalle St, Suite 2108 Chicago, IL  60601 (312) 726-0501 ekaplan@kpglaw.com cwunder@kpglaw.com |

| **Corporate Defendants** | **Represented by** |
|---|---|
| JP Morgan Chase Co. Inc<br>270 Park Avenue<br>New York, NY  10017-2070 | Patricia Brown Holmes<br>Lucas Rael<br>Riley Safer Holmes & Cancila LLP<br>70 W Madison St, Suite 2900<br>Chicago, IL 60602<br>(312) 471-8700<br>PHolmes@rshc-law.com<br>LRael@rshc-law.com |
| Kohmedia LLC<br>c/o John Koht, Managing Member<br>520 Rio Vista Rd<br>Glenview, IL  60025 | |

| **Corporate Defendants** | **Represented by** |
| --- | --- |

Law Bulletin Media, Inc
Sandy Macfarland, CEO
415 N. State Street
Chicago, IL 60654

Daniel S. Rubin
Howard & Howard
200 S. Michigan Ave, Suite 1100
Chicago, IL 60604
312-456-3448
Drubin@howardandHoward.com


Lila E. Goldston Consulting, LLC
c/o Lila E Goldston, Manager
5201 S. Cornell Ave, Suite 25D
Chicago, IL  60615

Lee Pulliam
Lee Pulliam & Associates
70  E Lake St, Suite 200
Chicago, IL 60602
(312) 759-8800
LPulliamLaw@sbcglobal.net


Omega Psi Phi Fraternity, Inc.
Executive Director, John F. Howard
3951 Snapfinger Pkwy
Decatur, GA  30035

Omega Psi Phi Fraternity, Inc.
Grand Basileus, Ricky L. Lewis
3951 Snapfinger Pkwy
Decatur, GA  30035

**Corporate Defendants**                **Represented by/Additional Address**


Standing Oaks Venture Partners
c/o Tony Wilkins, Managing Partner
222 Merchandise Mart Plaza
Suite 1212
Chicago, IL  60654



TechStars Chicago LLC
c/o  Tricia Martinez
222 Merchandise Mart Plaza
Suite 1212
Chicago, IL  60654